## <u>AFFIDAVIT OF DONALD CRAIG WOOD</u>

STATE OF TEXAS      §
                                  §

COUNTY OF BEXAR     §

BEFORE ME, the undersigned authority, on this day personally appeared DONALD CRAIG WOOD known to me to be the person whose signature appears below, and having been by me duly sworn, the said DONALD CRAIG WOOD stated on oath as follows:

"My name is DONALD CRAIG WOOD. I am over 18 years of age. I have never been convicted of a crime and I am personally competent to make this affidavit. I have personal knowledge of all facts stated in this affidavit, and they are true and correct.

I am an attorney of record for the Northside Independent School District, in the lawsuit styled, *Gerald Carter v. Northside Independent School District*, which is currently pending in the United States District Court for the Western District of Texas, San Antonio Division as Civil Action No. 5:11-cv-492 FB (hereinafter "lawsuit"). I have served in this capacity at all times relevant in this lawsuit. Attached hereto and labeled as Exhibit "A1" are true and correct copies of the deposition excerpts of Gerald Leon Carter, whose deposition was taken on December 19, 2011.

FURTHER AFFIANT SAYETH NOT."

_____
DONALD CRAIG WOOD

SUBSCRIBED AND SWORN TO BEFORE ME by the said DONALD CRAIG WOOD

on this the 24th day of February, 2012, to certify which witness my hand and official

seal.



Notary Public, State of Texas

C. RENEE ROBINSON
Notary Public, State of Texas
My Commission Expires 06-19-2014

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF TEXAS

SAN ANTONIO DIVISION

GERALD CARTER                          )

                                       )

vs.                                    )   CASE NO. 5:11-cv-00492 FB

                                       )

                                       )

NORTHSIDE INDEPENDENT                  )

SCHOOL DISTRICT                        )

ORAL VIDEOTAPED DEPOSITION

GERALD LEON CARTER

December 19, 2011

Telephone
210.698.2727

Eddie Morris - Court Reporters, Inc.
92 Trailcrest San Antonio, Texas 78232

Telecopier
210.698.5556

Gerald Carter Vs.                                                      Gerald Leon Cater
Northside Independent School District                                         12/19/2011

Page 2

```
 1                          APPEARANCES
 2
 3      FOR THE PLAINTIFF:
 4            Mr. Adam Poncio
              PONCIO LAW OFFICES
 5            5410 Fredericksburg Road
              Suite 109
 6            San Antonio, Texas   78229-3550
                 Telephone: 210.212.7979   Fax: 210.212.5880
 7            e-mail: Salaw@msn.com
 8
 9      FOR THE DEFENDANT:
10            Mr. D. Craig Wood
              WALSH, ANDERSON, BROWN, GALLEGOS
11            AND GREEN, P.C.
              100 N.E. Loop 410
12            Suite 900
              San Antonio, Texas   78246-0606
13               Telephone: 210.979.6633   Fax: 210.979.7024
              e-mail: Cwood@sa.wabsa.com
14
15      ALSO PRESENT:
16            Mr. Marcelino Gutierrez, Videographer
17
18
19
20
21
22
23
24
25
```

Page 37

1    Q.    Which vice-principal was that?

2    A.    Evelyn Massiatte.

3    Q.    What was the reason for Ms. Massiatte

4    counseling you in October of 2009?

5    A.    Not turning in my lesson plans.

6    Q.    Is it the case that her counseling with you

7    about not turning in lesson plans led you to the state

8    of mind that you felt like you required partial

9    hospitalization at Laurel Ridge treatment center?

10    A.    Yes.  As I was walking back from that meeting,

11    I teared up and had the familiar depressive feelings

12    and I told myself, "I'm not doing this again.  I'm

13    going to get help."

14    Q.    Had you teared up and had this kind of reaction

15    previously at any of your places of employment?

16    A.    Yes.

17    Q.    I think you mentioned that you had teared up

18    when you were working at Pleasanton.  Is that correct?

19    A.    Yes.

20    Q.    Did you have that experience previously when

21    you were at Cody or at Galm?

22    A.    No.

23    Q.    What did you do when you teared -- well, let me

24    see, first of all, how often would you estimate that

25    occurred while you were employed by Pleasanton, or how

Telephone
210.698.2727

Eddie Morris - Court Reporters, Inc.
92 Trailcrest San Antonio, Texas 78232

Telecopier
210.698.5556

Gerald Carter Vs.                                                  Gerald Leon Cater
Northside Independent School District                              12/19/2011

Page 38

1    many times?

2        A.    I either teared up or had to fight off the

3    symptoms daily.

4        Q.    What would precipitate that?

5        A.    Nothing.

6        Q.    So on a daily basis you were tearing up.

7    And how did you recover from that experience?  I mean,

8    did you leave the classroom?

9        A.    While I was teaching the students, I focused

10   entirely on the students, and as long as I was focused

11   on that, I never teared up in front of the students.

12   If --

13       Q.    What -- go ahead.

14       A.    It would always be after teaching.  I would

15   close the door or visit the restroom and just gather

16   myself.

17       Q.    Did you sometimes go to your principal's office

18   to confer with her when you were --

19       A.    Yes.

20       Q.    And what, if anything, would precipitate you

21   tearing up and having this reaction?

22       A.    A sense of being overwhelmed, not understanding

23   why I had the depression.

24       Q.    When Ms. Massiatte counseled you in October of

25   2009, had you -- prior to that time had you also

Page 40

```
 1    vice-principal to talk about that.
 2        Q.    Who was that?
 3        A.    Her name was Stacy, but I can't remember her
 4    last name.  I don't believe she's still there.
 5        Q.    It's true, isn't it, Mr. Carter, that your job
 6    description for your position at Michael Elementary
 7    indicates that you need to be able to maintain
 8    emotional control under stress?
 9        A.    That's true.
10        Q.    And were you aware of that prior to accepting
11    the position at Michael Elementary?
12        A.    Yes.
13        Q.    Based upon your history beginning in 2005 with
14    Pleasanton Independent School District, did you believe
15    that you were capable of doing that?
16        A.    Yes.
17        Q.    When you were counseled then by
18    Ms. Massiatte in October of 2009, how long was it
19    before you decided to check yourself into partial
20    hospitalization at Laurel Ridge?
21        A.    I don't have the dates in front of me, but I
22    believe it was the following week.  I spent some days
23    -- I took sick leave immediately, and I spent some days
24    with Dr. Moore trying to figure out what to do.  And
25    then I went into the partial.  I believe that was
```

Telephone
210.698.2727

Eddie Morris - Court Reporters, Inc.
92 Trailcrest San Antonio, Texas 78232

Telecopier
210.698.5556

Page 42

1    Q.    Prior to that, in 2008 you had received an

2    evaluation from Ms. Shaw that rated you below

3    expectations in some areas, is that correct, in October

4    of 2008?

5    A.    I would have to see the paperwork.  I -- I

6    could be mistaken, but I don't believe that Ms. Shaw

7    ever did an official appraisal on me from the

8    classroom.

9    Q.    Do you recall whether or not she might have

10   evaluated you and indicated that you had problems with

11   compliance with time lines?

12        MR. PONCIO:   Object, calls for speculation.

13   Q.    (By Mr. Wood) You may answer.

14   A.    The question one more time.

15   Q.    Do you recall whether or not she had rated you

16   below expectations with respect to your compliance with

17   time lines?

18   A.    I don't remember.  I know that was part of the

19   problem at some point, but I don't know specifically

20   that date.

21   Q.    You do recall that you received more than one

22   evaluation that contained items that rated you below

23   expectations?

24   A.    Yes.

25   Q.    In October of 2009, about the time that

Telephone
210.698.2727

Eddie Morris - Court Reporters, Inc.
92 Trailcrest San Antonio, Texas 78232

Telecopier
210.698.5556

Gerald Carter Vs.
Northside Independent School District

Gerald Leon Cater
12/19/2011

Page 43

1    Ms. Massiatte counseled with you about the grade issue,

2    is it fair to say that your fourth grade reading

3    release test results were approximately -- had

4    approximately only a 50 percent passing rate for your

5    class?

6        A.    This is in October of 2000 --

7        Q.    '9.

8        A.    -- '9?

9                Yes, that occurred, but I explained to

10   Ms. Shaw the reason for that.

11       Q.    What was your understanding as to the reason

12   that your passing rate was only 50 percent on the

13   reading test?

14       A.    The other teachers and I previously gave the

15   students multiple attempts at the test, and I told Ms.

16   Shaw I wasn't going to do that anymore.

17       Q.    So you gave your students only one attempt at

18   the test?

19       A.    Yes.  I wanted a more realistic picture so that

20   there would be no surprises when they took the TAKS

21   test.

22       Q.    Besides counseling with you in October of 2009,

23   isn't it true that Ms. Massiatte gave you a memorandum

24   on October 30th that indicated that she was concerned

25   about your turning in lesson plans on time?

Telephone
210.698.2727

Eddie Morris - Court Reporters, Inc.
92 Trailcrest San Antonio, Texas 78232

Telecopier
210.698.5556

Page 44

1    A.   I would have to see the paperwork, but that
2    sounds accurate.
3    Q.   Did she offer you help with respect to any
4    assistance you might need?
5    A.   She said that I could go to Melissa Ramon, my
6    fourth grade team leader, for additional help.
7    Q.   And you said you thought you were at Laurel
8    Ridge in partial hospitalization for about two weeks.
9    You were on leave for approximately four weeks.  Is
10   that correct?
11   A.   I believe so, yes.  I can't -- I believe the
12   issues came in October, and toward the end of October I
13   went into Laurel Ridge for a couple of weeks and then
14   was on medical leave on out.
15   Q.   So following your hospitalization, did you
16   remain at home on medical leave?
17   A.   Yes.
18   Q.   And that would have been for approximately two
19   weeks?
20   A.   No.  I was out longer than that.
21   Q.   Did someone recommend that you remain on
22   medical leave rather than returning to work?
23   A.   The therapist that I had at Laurel Ridge and my
24   psychiatrist, Dr. Salinas, said you would be walking
25   back into a nasty situation that would precipitate or

Telephone
210.698.2727

Eddie Morris - Court Reporters, Inc.
92 Trailcrest San Antonio, Texas 78232

Telecopier
210.698.5556

Gerald Carter Vs.
Northside Independent School District

Gerald Leon Cater
12/19/2011

Page 45

1    cause more problems.

2        Q.    And that was just based upon the fact that Ms.

3    Massiatte had counseled you about the need to turn in

4    your lesson plans on a timely basis?

5        A.    No.  It was based on the attitude of

6    Ms. Shaw and Ms. Massiatte, the trouble I was having

7    handling the job with my symptoms.

8        Q.    Besides this counseling session in which Ms.

9    Massiatte was critical about you turning in lesson

10   plans, what else -- what other issues with

11   Ms. Massiatte or Ms. Shaw were presenting problems for

12   you at that time?

13       A.    I knew I was having trouble keeping up with the

14   workload and knew I could not go to them for emotional

15   support.

16       Q.    When you say you knew you could not go to them

17   for emotional support, what do you base that on?

18       A.    I felt that I was there to do a job and there

19   was -- I felt like I was there to do a job and that was

20   what was expected of me, no exceptions.

21   That was just based on attitude on -- that I perceived

22   from her in conference meetings going over test

23   results.

24       Q.    We talked about your reading test results being

25   only 50 percent.  Did somebody conference with you

Telephone
210.698.2727

Eddie Morris - Court Reporters, Inc.
92 Trailcrest San Antonio, Texas 78232

Telecopier
210.698.5556

Gerald Carter Vs.
Northside Independent School District

Gerald Leon Cater
12/19/2011

Page 46

1    about that and explain to you that that was not a

2    satisfactory passing rate?

3       A.   Yes.

4       Q.   Who counseled with you about that?

5       A.   Lily Shaw counseled with me and each of the

6    teachers about our results.

7       Q.   Was she critical of other teachers' results as

8    well as of your results?

9       A.   I don't know that.  I wasn't in the room with

10   her.

11      Q.   Do you know whether or not there were other

12   teachers who had lower scores with respect to the

13   reading tests than those demonstrated by your class?

14      A.   I don't know if they were higher or lower.

15   I did not know what their results were.

16      Q.   When Ms. Shaw counseled with you about your

17   reading scores, what was your reaction to that?

18      A.   My reaction was that those scores weren't going

19   to cut it and that they needed to be fixed or corrected

20   -- I mean, improved.

21      Q.   Was that your own internal feeling, or was that

22   something that Ms. Shaw indicated to you and you

23   disagreed with?

24      A.   It was my own internal feeling and then she

25   agreed with it.

Telephone
210.698.2727

Eddie Morris - Court Reporters, Inc.
92 Trailcrest San Antonio, Texas 78232

Telecopier
210.698.5556

Gerald Carter Vs.                                                    Gerald Leon Cater
Northside Independent School District                                    12/19/2011

Page 47

1      Q.    Was Ms. Shaw critical or, excuse me, was she

2    harsh to you when she discussed your reading scores

3    with you?

4      A.    Harsh?  No.

5      Q.    Was she unfair to you when she discussed those

6    scores with you?

7      A.    No.

8      Q.    Now, there were also some writing scores that

9    were given approximately at that time.  Do you recall

10   that your class had a 39 percent passing rate on the

11   writing scores?

12     A.    I'd have to see the date of that test, if it

13   was possible that that writing test was given after I

14   was gone.

15     Q.    Do you recall whether or not the writing scores

16   for your class were the lowest of the scores given in

17   the fourth grade?

18     A.    No, I was not aware of that.  And again, I

19   don't know if that test was given while I was actually

20   on campus or not.

21     Q.    Did Ms. Shaw ever counsel with you about your

22   writing scores, to your recollection?

23     A.    Not at all.  We had exemplary writing on the

24   TAKS test in the spring.

25     Q.    So, so far I understand that Ms. Shaw counseled

Gerald Carter Vs.
Northside Independent School District

Gerald Leon Cater
12/19/2011

Page 48

1    with you about your reading scores, but you didn't feel
2    like she was harsh or unfair to you.  And Ms. Massiatte
3    counseled with you about the need to timely turn lesson
4    plans in.  What other experiences were causing you
5    problems or causing you some sort of emotional distress
6    with respect to your employment at Michael in this time
7    period of October and November of 2009?
8        A.   I was unable to keep up with the paperwork.
9    That was me and my standards, I wasn't keeping up with
10   the paperwork.  I was able to have my lessons prepared
11   and be on for the kids.  But the paperwork and test
12   results and meetings and lack of time to work on it, I
13   felt overwhelmed.
14       Q.   And so was the stress that you were suffering
15   from, was that something that was imposed by your own
16   conscience, or was it something that was imposed by
17   something that either Ms. Massiatte or
18   Ms. Shaw did?
19       A.   It was a combination.  I believe it was myself
20   and the standards I had had and feeling like I wasn't
21   keeping up, and then to have that re-affirmed by my
22   supervisors just added to it, added to the stress.
23       Q.   What conferences, other than the one that Ms.
24   Shaw had with you about your reading scores and the one
25   that Ms. Massiatte had with you about turning in lesson

Telephone
210.698.2727

Eddie Morris - Court Reporters, Inc.
92 Trailcrest San Antonio, Texas 78232

Telecopier
210.698.5556

Gerald Carter Vs.
Northside Independent School District

Gerald Leon Cater
12/19/2011

Page 51

```
 1    they feel like they had done as much as needed to be
 2    done in order to discharge you?
 3         A.    I have no way of knowing that.  Insurance only
 4    paid for ten days.
 5         Q.    Is it your understanding that your stay there
 6    was limited just by the amount that the insurance would
 7    pay?
 8         A.    Yes, because I wasn't getting income, so yeah.
 9         Q.    When did you return to work at Michael?
10         A.    In January of 2010.
11         Q.    Did you return immediately at the start of the
12    new semester?
13         A.    Yes.
14         Q.    What was your state of mind like at that point?
15    Did you feel like you had recovered from the episode
16    that led you to refer yourself for partial
17    hospitalization?
18         A.    Yes, I felt like I could start again, new year,
19    and I felt that -- I wanted to believe what one of the
20    therapists had said.  She had told me, "You've just
21    been written up once.  Big deal.  Get back to work when
22    you can and just don't let that one reprimand upset
23    you."  So I went back to work.
24         Q.    Were you aware of other employees who had
25    received a reprimand?
```

Telephone
210.698.2727

Eddie Morris - Court Reporters, Inc.
92 Trailcrest San Antonio, Texas 78232

Telecopier
210.698.5556

Gerald Carter Vs.
Northside Independent School District

Gerald Leon Cater
12/19/2011

Page 52

1      A.    No.   I have no way of knowing that.

2      Q.    Had you ever had discussions with any of your

3   colleagues as to whether or not any of them had ever

4   received reprimands?

5      A.    No.

6      Q.    Did you think that a single reprimand was

7   something that was significant with respect to your

8   future employment with the district?

9      A.    Yes.

10      Q.    Why did you believe that?

11      A.    It had been the first time in my 20 years of

12   teaching that I had ever been reprimand.

13      Q.    Did you feel like the reprimand was warranted

14   based upon the fact that you had not timely submitted

15   lesson plans?

16      A.    That's a decision the supervisor has to make.

17   Previously at my other position, I would have been

18   talked to and there would have been no reprimand.

19      Q.    Well, you talked about your own personal code

20   of the way things ought to be done.  Did you feel like

21   it was acceptable for you not to turn in your lesson

22   plans on a timely manner?

23      A.    No, they needed to be turned in on time.

24      Q.    And if you had had a subordinate who you were

25   supervising, would you have likewise indicated to that

Telephone
210.698.2727

Eddie Morris - Court Reporters, Inc.
92 Trailcrest San Antonio, Texas 78232

Telecopier
210.698.5556

Page 61

1   -- how was it that you -- or by whom did you experience

2   treatment that made you feel like you were not wanted?

3       A.   At the beginning of 2010 and again a year later

4   almost to the day, I had been subject to numerous

5   walk-throughs, weekly meetings, the reprimand, all

6   within the first week or two that I was back.  It's

7   like this guy just came back from Laurel Ridge and

8   let's hammer him.

9       Q.   Was it your understanding that the meetings

10  that they held with you were to hammer you?

11      A.   At first I didn't believe so.

12      Q.   Did they not offer you help during those

13  meetings?

14      A.   I'd like an example of that.

15      Q.   Well, did they?  I mean, you tell me.

16  Based upon your perception when they met with you, did

17  they offer you help with respect to the issues that you

18  were having?

19      A.   In 2010?  Did they offer me help?

20      Q.   First of all, you certainly --

21      A.   It's difficult to classify something as helpful

22  when you're reprimanded.

23      Q.   Are you certain that you were having weekly

24  meetings beginning in January of 2010?

25      A.   No.  I probably had one, maybe two meetings

Telephone
210.698.2727

Eddie Morris - Court Reporters, Inc.
92 Trailcrest San Antonio, Texas 78232

Telecopier
210.698.5556

Gerald Carter Vs.
Northside Independent School District

Gerald Leon Cater
12/19/2011

Page 62

1    within that short time I was there.

2        Q.    With whom did you have those meetings?

3        A.    Massiatte and Shaw.

4        Q.    What do you recall about those meetings?

5        A.    I recall Ms. Shaw taking notes, writing down

6    things that I said, going over --

7        Q.    Do you believe it was one or two meetings in

8    the -- in January of 2010?

9        A.    I believe it was two by the time I left.  I

10   don't know.

11       Q.    Do you believe that both ladies were present

12   during those meetings, or do you believe that those

13   meetings were held separately with those two women?

14       A.    I believe I had a meeting with both of the

15   women, and during those meetings I felt that it was not

16   helpful -- they were not being helpful because they

17   were taking notes like this was some kind of court

18   thing.

19       Q.    What was it about them taking notes that made

20   you feel like it was not helpful?

21       A.    Normal conversation between people wouldn't

22   include taking notes on a yellow pad as you talked, and

23   I didn't find that helpful.

24       Q.    Were one or both of them taking notes during

25   these meetings?

Telephone
210.698.2727

Eddie Morris - Court Reporters, Inc.
92 Trailcrest San Antonio, Texas 78232

Telecopier
210.698.5556

Gerald Carter Vs.                                                Gerald Leon Cater
Northside Independent School District                            12/19/2011

Page 66

1    another year, leaving you with just one year on your
2    contract, was there anything besides those two actions
3    that you felt like was discriminatory in nature when
4    you filed your complaint with -- or your charge of
5    discrimination with the EEOC?
6       A.    I was released and ready to go back to work in
7    January of 2010, and was met with not support but with
8    another reprimand that I felt was unjustified, and then
9    that information was then turned over to central office
10   while I was on medical leave trying to get better from
11   a medical condition that I had.
12      Q.    So specifically we're talking about the January
13   14th memorandum from Ms. Massiatte in which she advised
14   you that the failure to comply with the requirement to
15   post grades in a timely manner would be reflected in a
16   negative manner on your evaluation?
17      A.    That's one of the items, yes.
18      Q.    That's the only reprimand that you received
19   during that time period.  Am I correct?
20      A.    I don't remember if it was just one or if there
21   were two or if there were two meetings.  I can't
22   remember the number of meetings and the reprimands.
23      Q.    So the issuance of that reprimand, another one,
24   if it occurred, Dr. Folks' recommendation and then the
25   attitude of the ladies during those two meetings.  Was

Gerald Carter Vs.
Northside Independent School District

Gerald Leon Cater
12/19/2011

Page 69

```
 1    specific grade level.
 2        Q.    Well, when you met with Mr. Hardison, didn't
 3    suggest to him that you wanted to be re-assigned to a
 4    lower grade level?
 5        A.    I believe it was just I wanted to be
 6    re-assigned to a new school.  A new grade level would
 7    not alleviate the problem of Ms. Shaw and
 8    Ms. Massiatte.
 9        Q.    You were advised, though, that you were not
10    eligible for a transfer, were you not?
11        A.    I was advised that, but they are able to make
12    transfers as needed.
13        Q.    Did you tell Ms. Shaw that you thought the
14    re-assignment to first grade was going to be a good
15    spot for you?
16        A.    At the time that she said it, yes.
17        Q.    So you began in August of 2010 teaching at the
18    first grade level.  Is that correct?
19        A.    I did, after having a meeting going over
20    accommodations the previous summer.
21        Q.    With whom did you meet to discuss the
22    accommodations in the summer of 2010?
23        A.    I was told to attend the meeting by Jim Miller
24    to go over my coming back to school and accommodations.
25        Q.    After Mr. Miller told you to do this, with whom
```

Telephone
210.698.2727

Eddie Morris - Court Reporters, Inc.
92 Trailcrest San Antonio, Texas 78232

Telecopier
210.698.5556

Gerald Carter Vs.
Northside Independent School District

Gerald Leon Cater
12/19/2011

Page 70

```
 1   did you meet?

 2      A.    Ms. Shaw and Mr. Hardison were also there.

 3      Q.    Did that take place at Michael?

 4      A.    No.  It took place at the central office.

 5   I had attempted to delay it because they wanted

 6   accommodations, and I told them I needed to get in

 7   touch with my doctor, but they refused to delay the

 8   conference.

 9      Q.    Did you have absences during the fall of 2010

10   then?

11      A.    I don't remember.  Probably, yes.

12      Q.    You were not on leave for any period after the

13   beginning of the 2010-2011 school year, were you?

14      A.    No, I wasn't.

15      Q.    And by December, someone had made the decision

16   to place you on a Teacher In Need of Assistance, or

17   what we call a TINA plan.  Is that correct?

18      A.    Uh-huh.

19      Q.    What was the purpose or the stated purpose of

20   placing you on a TINA plan in December?

21      A.    The stated purpose of a TINA plan is to help a

22   teacher get back on track and meet the requirements

23   that the supervisors have laid out. That's the stated

24   goal.  I don't believe that was the goal.

25      Q.    Why do you believe it was not the goal?
```

Telephone
210.698.2727

Eddie Morris - Court Reporters, Inc.
92 Trailcrest San Antonio, Texas 78232

Telecopier
210.698.5556

Page 72

1      Q.    What was -- to your recollection, what were you

2    focusing on with respect to the TINA plan?

3      A.    The TINA plan was focusing on classroom

4    management.

5      Q.    When Ms. Shaw gave you the letter of reprimand

6    in January of 2011, did she advise you that the failure

7    to timely submit grades would reflect negatively on

8    your evaluation?

9      A.    Yes.

10      Q.    Now, obviously this had been an issue that you

11    felt like was unfairly directed towards you the

12    previous January.  I take it that it was no surprise at

13    a year later that Ms. Shaw was still persistent about

14    her insistence that grades be entered in a timely

15    manner.  You weren't surprised by that, were you?

16      A.    I was surprised to be met with two or three

17    meetings, a couple of reprimands upon my return in

18    January.

19      Q.    Now, you felt like in January, 2010 it was

20    unfair to expect you to have the grades in by the due

21    date because you had not been on campus.  Was it unfair

22    in January of 2011 to expect you to have your grades in

23    in a timely manner?

24      A.    I would have to see the specific dates that

25    we're discussing.  I don't know what the status of the

Telephone
210.698.2727

Eddie Morris - Court Reporters, Inc.
92 Trailcrest San Antonio, Texas 78232

Telecopier
210.698.5556

Gerald Carter Vs.
Northside Independent School District

Gerald Leon Cater
12/19/2011

Page 73

```
1    grade book was at that time.  But every time I turned
2    in my grades, they were on time, they were complete and
3    Ms. Shaw signed off on them every time I was there.
4        Q.   So is it your belief that in January of 2011
5    when you were reprimanded about failure to timely
6    submit grades, that that was just flat out untrue?
7        A.    Teachers submit grades as they are -- as they
8    come in.  They may not be that day.  They may wait
9    until the weekend.  They -- as my attorney with TSTA
10   stated, there were no -- absolutely no grade
11   requirements for Northside for first grade as far as a
12   number, and we felt that I was being retaliated or
13   discriminated against because they're focusing on such
14   a small matter, when all in the past I have always met
15   the deadlines.
16       Q.   I'm going to read to you from Ms. Shaw's letter
17   to you of January 4th, 2011.
18       A.    Okay.
19       Q.    She says, she begins:  "This memorandum is to
20   communicate the importance of entering student grades
21   in the grade book.  On January 3rd, 2011, I was
22   reviewing your grade book and noticed that there were
23   insufficient grades inputted in math, reading, language
24   arts and science.  By the end of the seventh week, you
25   had the following number of grades inputted per
```

Telephone
210.698.2727

Eddie Morris - Court Reporters, Inc.
92 Trailcrest San Antonio, Texas 78232

Telecopier
210.698.5556

Page 74

1    subject:  Math, 8; reading, 8; language arts, 6; and

2    science, 3.  I referenced the need for you to update

3    your grade book via a meeting on October 20th, 2010,

4    November 10th, 2010 and the walk-through forms dated

5    November 8th, 2010 and December 13th, 2010."

6              That suggests to me that Ms. Shaw had

7    met with you and counseled with you on numerous

8    occasions about the need to timely input your grades.

9    Is that consistent with your recollection of what

10   happened in the fall of 2010?

11     A.   To me, the documentation of those dates back up

12   my claim that I was constantly under a microscope over

13   small matters.  Some of those are within a week of each

14   other.  And again, it goes to the point of not allowing

15   me any accommodation or understanding as far as Mr.

16   Carter has a medical condition and maybe we shouldn't

17   focus so much on these little matters when he's doing a

18   good job with his class.

19     Q.   So your notion is that Ms. Shaw should have

20   just kept her nose out of it and not followed up to

21   make sure as to whether or not you had inputted your

22   grades in a timely manner?

23     A.   I found it curious that she focused on January

24   3rd, the day I came back.

25     Q.   Well, in her letter she also says:  "At the

Telephone
210.698.2727

Eddie Morris - Court Reporters, Inc.
92 Trailcrest San Antonio, Texas 78232

Telecopier
210.698.5556

Page 75

1    beginning the year, all staff were reminded through the

2    Michael staff handbook to keep their grade book updated

3    with consistency amongst the team members."

4                    Was that true?  Was that statement true?

5        A.   Yes.

6        Q.   And she said:  "We visited this subject again

7    at the team leader meeting on November 1, 2010."

8                    Was that true?

9        A.   I wasn't there.

10       Q.   That wasn't true, y'all didn't --

11       A.   I wasn't there.

12       Q.   Oh, you weren't there.

13                    She says:  "Your team leader discussed

14   this with the entire grade level on November 2nd,

15   2010."

16                    Were you present for that?

17       A.   Yes.  I don't recall the number of exact grades

18   that she wanted.

19       Q.   Well, she says you all agreed to take two

20   grades weekly in each subject.  Had you agreed to that?

21       A.   Yes.

22       Q.   And she says it was also discussed to input the

23   grades on a weekly basis.  Do you remember that

24   discussion?

25       A.   Yes.

Telephone
210.698.2727

Eddie Morris - Court Reporters, Inc.
92 Trailcrest San Antonio, Texas 78232

Telecopier
210.698.5556

Page 76

1      Q.    Now, you understood, and she explains in her

2   letter, that the purpose of having the grades inputted

3   on a timely manner -- in a timely manner is so that the

4   parents can view the grades through the Parent

5   Connection.   Is that right?

6      A.    Certainly.

7      Q.    And it's important for them to be able to do so

8   to monitor their child's progress, is it not?

9      A.    Certainly.

10     Q.    And if you have not inputted those grades in a

11  timely manner, those parents are not going to be able

12  to monitor their child's progress?   Is that accurate?

13     A.    Wouldn't be able to monitor it from that the --

14  that's true.

15     Q.    Do you believe it was unfair for Ms. Shaw to

16  give you this letter on January 4th, 2011, indicating

17  that she was going to expect your grades to be input in

18  a timely manner?

19     A.    I believe it was unfair.   It was unfair because

20  she had come back from Christmas break loaded up with

21  ammo with anything she could to make sure that I wasn't

22  renewed that following year.   She had already

23  recommended that I not work there anymore, and in order

24  to justify me not getting my contract renewed, she

25  needed more than what she had.

Telephone
210.698.2727

Eddie Morris - Court Reporters, Inc.
92 Trailcrest San Antonio, Texas 78232

Telecopier
210.698.5556

Gerald Carter Vs.
Northside Independent School District

Gerald Leon Cater
12/19/2011

Page 83

1    that paperwork.

2       Q.    Dr. Folks notified you then that he was going

3    to recommend that your contract not be renewed at the

4    end of the year.   Is that correct?

5       A.    Yes.

6       Q.    And was it your understanding that if you

7    wanted to, you would have been entitled to a hearing

8    before the board of trustees to contest that decision?

9       A.    Yes, I was aware of that.

10      Q.    You understood that if you were non-renewed,

11   that that might have a negative impact on your future

12   employability?

13      A.    I'm certainly aware of that.

14      Q.    Dr. Folks notified you that in lieu of

15   recommending you for non-renewal, that you would have

16   the option to resign?

17      A.    I don't believe he said that in the letter.  I

18   don't recall.

19      Q.    Nonetheless, in April of 2011, you did submit a

20   letter of resignation, did you not?

21      A.    I resigned because I could not work at

22   Northside if they weren't going to give me the

23   accommodations to do my job.   And it seemed of less

24   damage then to be non-renewed.

25      Q.    Let's talk for a moment then about -- well,

Telephone
210.698.2727

Eddie Morris - Court Reporters, Inc.
92 Trailcrest San Antonio, Texas 78232

Telecopier
210.698.5556

Gerald Carter Vs.                                              Gerald Leon Cater
Northside Independent School District                              12/19/2011

Page 95

1    plans are essential to the successful instruction of

2    students.   As has been mentioned to you, the team

3    leader will complete the lesson plans and post them

4    on-line after each week's planning meeting.   You'll

5    need to personalize these plans to reflect any special

6    needs of your students to incorporate your

7    instructional schedule and to add any unique or

8    additional instructional aids or materials.   As you

9    know, these lesson plans are also used by special

10   education teachers and, if needed, substitute

11   teachers."

12              Are those statements true?

13      A.   Yes.

14      Q.   And then he says:   "Because lesson plans are

15   critical to the effective instruction of students, we

16   will continue to require that your lesson plans for

17   Monday be submitted by the Friday before.   However, we

18   are willing to grant you the accommodation that your

19   lesson plans for days Tuesday through Friday will not

20   be due until Monday morning."

21              That was an accommodation that was not

22   afforded to other teachers.   Is that correct?

23      A.   I do not know what they require of other

24   teachers.

25      Q.   He also adds in his letter to you:   "In

Gerald Carter Vs.
Northside Independent School District

Gerald Leon Cater
12/19/2011

Page 96

1    discussions with Ms. Shaw, we anticipate that you may

2    find that delay is not even necessary since the

3    portions of the lesson plans which you will be

4    tailoring will require minimal adjustment from week to

5    week."

6              Did you find that to be the case?

7    A.    Yes, that was the case.   It was minimal

8    adjustments.

9    Q.    And so you didn't have any issue with respect

10   to timely completion of lesson plans after this

11   particular concession was offered by

12   Mr. Hardison, did you?

13   A.    I still found the fact that there wasn't,

14   granted for me to do the lesson plans by Monday in

15   entirety, a small -- it was something that could have

16   been -- easily be granted.   We're talking about minutia

17   here.   And when we mention the lesson plans and

18   personalizing them, that means that when I got in

19   trouble thereafter, I got in trouble for not putting in

20   what class we went to, what time we came back from the

21   library -- minor issues -- again, you can find a

22   mistake with anybody, and I believe they were just

23   looking for it.

24   Q.    One of the other accommodations that you had

25   requested was that the meetings with administration be

Telephone
210.698.2727

Eddie Morris - Court Reporters, Inc.
92 Trailcrest San Antonio, Texas 78232

Telecopier
210.698.5556