**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| **GERALD CARTER** | § | |
| | § | |
| **V.** | § | **CIVIL ACTION NO. 5:11-CV-492 FB** |
| | § | |
| | § | |
| **NORTHSIDE INDEPENDENT** | § | |
| **SCHOOL DISTRICT** | § | |

**PLAINTIFF'S RESPONSE TO DEFENDANT'S**
**MOTION FOR SUMMARY JUDGMENT**

TO THE HONORABLE ARBITRATOR:

Comes Now Plaintiff GERALD CARTER and files this response to the motion for summary judgment filed by the Defendant in this matter requesting that the court deny the motion and in respect thereof would respectfully show:

**I.**

**PARTIES**

1.      Plaintiff is GERALD CARTER (hereinafter "Carter"), a former employee of Defendant who was terminated after complaining of the discriminatory, harassing and retaliatory actions of Defendant.

2.      Defendant NORTHSIDE INDEPENDENT SCHOOL DISTRICT (hereinafter "NISD") was the former employer of Plaintiff herein.

**II.**

**FACTS**

3.      Pending before the Court is a Motion to Remand filed by the Plaintiff (Dkt 18) on or about January 31, 2012.

4.      This is an action under the Texas Labor Code for disability discrimination, harassment,

retaliation and wrongful termination and to correct unlawful employment practices by Defendant NISD.

5.      All conditions precedent to jurisdiction for filing the claim have occurred or been complied with:  a charge of discrimination was filed with the Equal Employment Opportunity Commission and therefore filed with the Texas Workforce Commission within one hundred and eighty days of the acts complained of herein and Plaintiff's Complaint was filed within sixty days of Plaintiff's receipt of the issuance of a right to sue letter.  By filing with the EEOC, Plaintiff's Charge of Discrimination was jointly filed with and investigated by the Texas Workforce Commission, Civil Rights Division, a state agency (TWCCRD), within 180 days of the acts complained of.

6.      Plaintiff GERALD CARTER was formerly an employee of defendant Northside Independent School District.  Plaintiff faithfully worked for the Defendant since October of 2007 as a teacher at Mary Michael Elementary School.

7.      In November 2009, and January 2010, Plaintiff was counseled on performance issues. On or about March 29, 2010, the Superintendent notified Plaintiff in writing that Plaintiff would not be given a new two (2) year contract.  Plaintiff was told that once Plaintiff's then current contract for the 2010 - 2011 school year was completed, Plaintiff would cease to be employed by Defendant Northside.  Plaintiff believed he was being discriminated against in violation of the disability provisions of the Texas Labor Code, which had the same requirements and standards as the Americans with Disabilities Act of 1990, and filed a Charged of Discrimination with the Equal Employment Opportunity Commission on April 26, 2011, under Charge No. 451-2010-00999.  Thus, the claim was dually filed with the Texas Workforce Commission.

8.      After the date of filing his initial Charge of Discrimination, Plaintiff suffered retaliation.

During the week of January 3, 2011, Plaintiff was met with increasing pressure and harassment by Defendant.  This occurred in the form of two (2) official reprimands, three (3) observations by supervisors, and two (2) required meetings with administration, all in the first four (4) days back.  Plaintiff was told in a meeting that as of January 4, 2011, Defendant would not recommend Plaintiff for renewal of his contract based on Plaintiff's performance and reprimands.  The Principal at Mary Michael Elementary made Plaintiff's job increasingly difficult by focusing intently on any infraction that occurred.

9.      Plaintiff had to endure Defendant's supervisors monitoring his classroom and having to attend weekly meetings to discuss Plaintiff's performance, thereby making Plaintiff's job performance difficult under the intensive supervision of Defendant.  Plaintiff was informed by Defendant's attorney of record that the mandatory meeting would cease if Plaintiff dropped his first Charge of Discrimination against Defendant.  Plaintiff did not drop the initial Charge of Discrimination against Defendant and therefore, the mandatory meetings continued.

10.     Plaintiff had been diagnosed by his treating physician with clinical depression and anxiety, and most recently with ADHD.  The Principal and Vice Principal were both aware of Plaintiff's medical conditions and how these conditions were affecting his job performance. Defendant was fully aware that Plaintiff's clinical depression would intensify if there was an increased anxiety and loss of sleep, as Defendant had received letters from Plaintiff's treating physician, as well as personal appeals from Plaintiff.

11.     In June 2010, Plaintiff, with the direction of his treating physician, requested certain accommodation in order to alleviate the stress he was put under by Defendant, and even went to far as to request he be moved to another facility.  Defendant, in turn, denied the accommodations.

12.     Due to the continued stress Plaintiff was being subjected to, on April 22, 2011 Plaintiff has no alternative but to constructively terminate his employment with Defendant.

13.     Plaintiff asserted he was disabled, as defined by the Texas Labor Code, which has adopted the definitions under the Americans with Disabilities Act (ADA).  The Plaintiff's clinical depression and other medical conditions substantially limited some of his life activities. Prior to his constructive termination, and prior to Defendant's harassment and retaliation, Plaintiff was otherwise qualified and able to perform the essential functions of his job as a Teacher.

14.     Plaintiff is/was an employee.

15.     Defendant is/was an employer.

16.     Defendant violated the Labor Code by discriminating against Plaintiff through failure to reasonably accommodate Plaintiff's disability.  Plaintiff could reasonably accommodate the Plaintiff but was unwilling to do so.  Though it was known and obvious to the Defendant that the Plaintiff would require accommodations due to the fact that the Plaintiff continued under the care of a physician for his medical conditions, the Defendant did not make accommodations when the Plaintiff requested them based on his disability and/or based on the perception of his disability.

17.     Additionally, Plaintiff asserted Defendant intentionally discriminated against Plaintiff because of his disability.  Defendant's discriminatory acts include retaliating against and causing the constructive termination of Plaintiff for Defendant's failure to accommodate his disability.

### III.

### THE EVIDENCE

18.     Plaintiff CARTER relies upon and incorporates herein the pleadings on file in the court

(Plaintiff requests that the Court take judicial notice of the Court's file), the Exhibits attached to this response, including the depositions and exhibits attached hereto and documents filed in this cause and any other matter attached to Plaintiff's Response to Defendant's Motion for Summary Judgment and/or unobjected to and uncontroverted in Defendant's Motion.

19.    Plaintiff has established evidence to create a fact question regarding discrimination and retaliation and constructive discharge or wrongful termination as evidenced by the evidence raised in the deposition of GERALD CARTER (Attached Hereto as Exhibit "A"), and any other attachments.  Plaintiff establishes sufficient facts to deny summary judgment as to all or part of Defendant's motion.  The evidence and reasonable facts that can be drawn therefrom demonstrate the following:

20.    A.    <u>Deposition of Plaintiff Gerald Carter (Exhibit "A")</u>

Plaintiff Gerald Carter testified that he took Zoloft, Abilify, Vyvanse and Klonopin.  He testified tat he had been on Zoloft for three years for depression and on antidepressants for longer.  He had been taking Klonopin since 2005 for anxiety.  He had been taking Vyvance since 2009 for his ADHD (depo at p. 9 ll 1-25).

Carter had worked for Northside in late 1999 through 2002 and then resigned to work in Pleasanton (P. 25 l. 13- 26 l. 7). In May 2007, he decided to go back to Northside to get a fresh start because he had suffered depressive episodes in October 2005 .  He suffered depression, anxiety and loss of sleep.  In August or September 2005, he sought treatment from his family physician, who diagnosed him with major depression disorder and anxiety.  He immediately began counseling for the disorders and disabilities and continued through 2009.  He was eventually treated through Alamo Mental Health Group (p. 27 l. 2-30 l. 18).

While at Pleasanton his work became more difficult.  He had to work to focus more and

paperwork became more difficult.  He did not ask Pleasanton for an accommodation but was given one by the Principal .  He was able to perform his work but missed some days (p. 30 l. 25-33 l. 22).

He returned to Northside in October 2007, working for Michael Elementary.  He still suffered from his disabilities, was able to perform the work and was on medication.  In October 2009, he checked himself into Laurel Ridge for treatment after being reprimanded or counseled by vice-principal Massiatte because he had not turned in his lesson plans.  The counseling had led to a depressive attack .  He took leave from school for the treatment  (p. 33 l. 23- 37 l. 16).  He would tear up on a daily basis but would not tear up in front of his students .  He would go to the restroom to gather himself.  He was able, as described in his job description, to maintain emotional control under stress (38 l. 6- 40 l. 16).

His students did not do well on reading tests because he refused to give them multiple attempts at the test.  He did not feel that would be a realistic representation of their abilities .  This was before the TAKS test.  He had been written up for failing to timely turn in his lesson plans.  He had taken four weeks of leave related to his condition.  He was at Laurel Ridge for about two weeks and then was at home and getting treatment for about two weeks.  It had been recommended by his doctors that he remain on leave rather than return to work because of the problems he was having with the attitudes of Massiatte and Principal Shaw (42 l. 25-45 l. 7).

He had been written up for not having grades in December 2009, when he was not on campus because of his treatment.  He had received a writeup in January 2010.  He felt that the substitute during his absence would have taken care of it but he received the writeup for that conduct. (P. 53 l. 20-54 l. 14).

Carter went in for medical treatment again in February 2010.  He was suffering from

severe depression with cognitive disabilities at the time.  He was on leave until the end of the

school year.  In April 2010, he filed a charge of discrimination and retaliation because while he

was on medical leave attempting to get better from his disabilities, he was sent a letter telling

him that his contract would not be renewed for the following school year.  His principal had

recommended that he not be extended even though he intended on going back with some

accommodation for his disabilities.   He was suffering discrimination because of his depression.

He was written up inaccurately and unfairly as he had explained and the school district was

trying to get rid of him .  He thoroughly described the acts of discrimination and retaliation,

including increased and unnecessary walk throughs and reviews after his medical treatment by

Massiatte and Shaw  (54 l. 15- 62 l. 18).  He testified that while he had been written up for not

having turned in all his lesson plans on time, with the exception of the October reprimand, he

had turned them all in on time online (63 ll 4-15).

He was released from medical treatment and returned back to work in January 2010, only

to be met with an unjustified reprimand for grades related to the period of his treatment and

absence.  During his absence, he is told his contract for the following year is not going to be

renewed (65 l 23-68 l. 3). In June 2010, Ms. Shaw informs him that he is going to be reassigned

to the first grade for the following year.  He had asked for an accommodation by transferring

him to another school where he did not have to work with Massiatte and Shaw but was refused.

(68 l. 3-69 l. 12). In August 2010, he began teaching first grade.  In the summer of 2010, he met

with Jim Miller of HR to discuss accommodations related to his disabilities. Ms. Shaw was also

present.  His prior requests for accommodation shad been ignored or watered down and he was

placed on a TINA or Teacher in Need of Assistance Plan.  They made him attend weekly

mandatory meetings which caused additional stress.  In January 2011, Shaw again gave him a

write up regarding grade book entries.  He indicated there were no requirements for gradebook entries of which he was aware but he was being reprimanded, which was discrimination and retaliation  (69 l. 17- 73 l. 15).  A week later, he filed another EEOC charge for discrimination and retaliation because within the first four days after he came back to school, he was given four reprimands  (77 l. 9-l. 23).

He met with Miller at the beginning of the school year to discuss his written request for accommodations related to his disabilities, as documented by his doctor.  Miler was dismissive.  Carter told hm, "Is it your intent not to give me any of those accommodations?"  Miller picked up the paper, dropped it in the file and said "duly noted."  No accommodations were provided.  (78 l. 16-79 l. 23).  Instead, he came back to a microscope of weekly meetings, going over everything he did, was subjected to observations.  He was not provided with the help requested to resolve the issues, just recommendations to be terminated  (80 l. 13-81 l. 16).

Carter had received the letter from the Superintendent of the intent to not renew his contract.  Carter was aware that if there was a non-renewal, it would make it more difficult to find a future job because schools would note the non-renewal.  In April of 2011, he resigned because he was not going to be given the accommodations he requested and he was faced with the damage of non-renewal (83 l. 14-l.23).  He had no choice but to resign.

Carter testified that he was seeking to get his job back and to have the discriminatory reprimands removed.  He testified that he suffered grief and emotional distress related to his treatment and their being dismissive of his illness and his doctors' notes.  He had a period of unemployment and lost wages as a result.  He lost his job and suffered financial losses and emotions and tearfulness as a result.(86 l. 10-93 l. 3).

## IV.

### SUMMARY JUDGMENT STANDARD OF REVIEW

21.     Summary judgment is appropriate when the pleadings, affidavits and other summary

judgment evidence show that no genuine issue of material fact exists and the moving party is

entitled to judgment as a matter of law. Fed. R. Civ. P. 56©; Celotex Corp. v. Catrett, 477 U.S.

317, 322, 106 S.Ct. 2548, 2551, 91 L.Ed.2d 265 (1986). The moving party bears the burden of

identifying those portions of the record it believes demonstrate the absence of a genuine issue of

material fact. Celotex, 477 U.S. at 322-25, 106 S.Ct. at 2551-54. Once a movant makes a

properly supported motion, the burden shifts to the nonmovant to show that summary judgment

should not be granted; the nonmovant may not rest upon allegations in the pleadings, but must

support the response to the motion with summary judgment evidence showing the existence of a

genuine fact issue for trial. *Id.* at 321-25, 106 S.Ct. at 2551-54; Anderson v. Liberty Lobby, Inc.,

477 U.S. 242, 255-57, 106 S.Ct. 2505, 2513-14, 91 L.Ed.2d 202 (1986). All evidence and

reasonable inferences must be viewed in the light most favorable to the nonmovant. United

States v. Diebold, Inc., 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962).

22.     In summary, resolving the Motion hinges on whether Defendant establishes "no genuine

issue as to any material fact." FED. R. CIV. P.56( c).   In Reeves v. Sanderson Plumbing Prods.,

Inc., 530 U.S. 133 (2000), the Supreme Court articulated the following six principles for courts

to follow in making this determination:

> **First,** courts must review the summary judgment record "taken as a whole." Id. at 150
> (quoting Matsushita Elec. Indus. v. Zenith Radio Corp., 475 U.S. 547, 587 (1986)).
> Cherry picking is not permitted.

> **Second**, courts "must draw all reasonable inferences in favor of the nonmoving party."
> Reeves, 530 U.S. at 150 (citing cases); see also Burrell v. Dr. Pepper/Seven Up Bottling
> Group, 482 F.3d 408, 411 (5th Cir. 2007) ("We construe all facts and inferences in the
> light most favorable to the non- moving party").

**Third,** courts "may not make credibility determinations or weigh the evidence." <u>Reeves</u>, 530 U.S. at 150 (quoting <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 255 (1986))("Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge").

**Fourth,** courts must disregard all evidence favorable to the movant that the jury is not required to believe. <u>Reeves</u>, 530 U.S. at 150 (citing 9A C.  Wright & A. Miller, Federal Practice & Procedure § 2529, p. 299 (2nd ed. 1995)).

**Fifth,** courts should give credence to the evidence favoring the nonmovant. <u>Reeves</u>, 530 U.S. at 151.

**Sixth,** courts may give credence to the evidence favorable to the movant only to the extent that it is "uncontradicted and impeached," at least to the extent that it comes from "disinterested witnesses." <u>Id.</u>

23.     The Motion ignores these principles.  Indeed, the Motion amounts to nothing more than a advocate's unsupported trial brief, for it puts emphasis on Defendant's spin on the facts, which is inappropriate in a summary judgment context.  While there is room for advocacy in a motion for summary judgment, such advocacy should not displace the above-referenced principles mandated by the Supreme Court and construing facts in the nonmovant's favor.

**V.**

**METHOD OF PROOF**

24.     "Direct evidence" is rare in employment cases.  As one court put it, "[e]mployers rarely leave concrete evidence of their retaliatory purposes and motives." <u>Nowlin v. Resolution Trust Corp.</u>, 33 F.3d 498, 508 (5th Cir. 1994).  Another court put it this way:

> Unless the employer is a latter-day George Washington, employment discrimination is as difficult to prove as who chopped down the cherry tree.  (Citation omitted).  Employers are rarely so cooperative as to include a notation in the personnel file, 'fired due to age,' or to inform a dismissed employee candidly that he is too old for the job.

<u>Thornbrough v. Columbus & Greenville R.R. Co.</u>, 760 F.2d 633, 640-41 (5th Cir. 1985).  As a result, and to "to ease the evidentiary burden on employment plaintiffs," *Id.,* most employment

cases turn on circumstantial evidence, which "is not only sufficient, but may also be more certain, satisfying and persuasive than direct evidence." <u>Desert Palace v. Costa</u>, 539 U.S. 90, 100 (2003). The present case follows this trend. Defendant's motion should be denied.

**VI.**

**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
AS TO CONSTRUCTIVE DISCHARGE CLAIM-FAILURE TO EXHAUST
ADMINISTRATIVE REMEDIES**

25.     Defendant seeks summary dismissal of Plaintiff's constructive discharge claims, contending that while Plaintiff filed a charge and subsequent retaliation charge, he never filed a charge related to his termination. The termination resulted after he filed his initial charges.

26.     Defendant's arguments are disingenuous in light of the law of which Defendant is well aware. It is undisputed that a trial court is without jurisdiction to consider claims brought under section 21 of the Texas Labor Code (the Texas Commission on Human Rights Act, "TCHRA") unless the aggrieved party has exhausted his administrative remedies by filing a complaint with the Texas Workforce Commission – Civil Rights Division. <u>See</u> <u>Elgahil v. Tarrant County Junior Coll.</u>, 45 S.W.3d 133, 141 (Tex. App. – Fort Worth 2000, pet. denied).

27.     It is well-settled that no separate EEOC charge is legally required to bring a claim for retaliation occurring after the filing of a first EEOC charge. The leading case on this topic is <u>Gupta v. East Texas State University</u>, 654 F.2d 411 (5th Cir. 1981). In *Gupta*, the plaintiff filed two EEOC charges. His employment was terminated, allegedly in retaliation for his filing of those charges. However, he never filed a third EEOC charge alleging retaliatory termination. <u>Gupta</u>, 654 F.2d at 413. Nonetheless, the Fifth Circuit allowed this claim to proceed, holding that "it is unnecessary for a plaintiff to exhaust administrative remedies prior to urging a retaliation claim growing out of an earlier charge . . .." *Id*. at 414. The Fifth Circuit explained that:

> There are strong practical reasons and policy justifications for this conclusion. It is the nature of retaliation claims that they arise after the filing of the EEOC charge. Requiring prior resort to the EEOC would mean that two charges would have to be filed in a retaliation case, a double filing that would serve no purpose except to create additional procedural technicalities when a single filing would comply with the intent of Title VII. We are reluctant to erect a needless procedural barrier to the private claimant under Title VII, especially since the EEOC relies largely upon the private lawsuit to obtain the goals of Title VII. Intertwined with this practical reason for our holding is a strong policy justification. Eliminating this needless procedural barrier will deter employers from attempting to discourage employees from exercising their rights under Title VII.

Gupta, 654 F.2d at 414 (citations omitted).  Thus, the district court had jurisdiction to hear the plaintiff's claim of termination and retaliation even though he did not file a separate EEOC charge complaining of that termination. Id.

Gupta has been followed on this point several times in Texas state courts. See San Antonio Water System v. Odem, 2007 WL 2376147 at *2-*3 (Tex.App.–San Antonio 2007, no pet.) (memo. op.); Elgaghil v. Tarrant County Junior College, 45 S.W.3d 133, 141-42 (Tex.App.–Fort Worth 2000, pet. denied); Thomas v. Clayton Williams Energy, Inc., 2 S.W.3d 734, 738 (Tex.App.–Houston [14th Dist.] 1999, no pet.). In each of these cases, the plaintiffs were permitted to pursue actions for retaliation based on the filing of EEOC charges, without filing additional EEOC charges to complain of that retaliation.  Thus, Defendant's contentions with regard to the termination and retaliation claim should be denied.

28.      With regard to constructive discharge, Carter has met his burden.  He has demonstrated that he suffered retaliation after his treatment and initial EEOC charges.  He has also demonstrated that his requests for accommodations were ignored and that he was left with no alternative but to resign.

## VII.

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
## AS TO DISCRIMINATION AND RETALIATION CLAIMS

29.     Defendant seeks summary dismissal of all of Plaintiff's claims, contending that Plaintiff cannot raise a genuine issue of material fact with regard to any of his claims, and that it is therefore entitled to judgment as a matter of law.

30.     Discrimination And Accommodation Claims

        Plaintiff was an employee who suffered from a disability or was perceived to have suffered from a disability. He requested accommodations but was not provided any.  Moreover, the evidence demonstrates that Plaintiff was discharged or constructively discharged and thus suffered an adverse employment action and suffered discrimination and harassment and was treated differently than others not in the protected group for disability.  There are questions of fact as demonstrated by the facts set out above and Defendant's summary judgment should be denied.

31.     Title I of the Americans with Disabilities Act addresses disability-based discrimination in the employment context, which has been adopted under the Texas Labor Code and is used for guidance.  Title I's main provision prohibits employers from:

> discriminat [ing] against a qualified individual with a
> disability because of the disability of such an individual
> in regard to job application procedures, the hiring,
> advancement, or discharge of employees, employee
> compensation, job training, and other terms and conditions,
> and privileges of employment."

42 U.S.C. §12112(a).  To prove a claim for disability based discrimination, a plaintiff must show that: (1) she is qualified for her position; (2) she has a disability; and (3) she was discriminated against because of her disability.  *Jenkins v. Cleco Power, LLC,* 487 F.3d 309, 315 (5th Cir. 2007); *Picard v. St. Tammany Parish Hospital,* 611 F.Supp. 2d 608 (E.D. La. 2009).

32.     The ADA defines disability as a "physical or mental impairment that substantially limits one or more major life activities." 42 U.S.C. §12102(1)(A).  A physical impairment may include "[a]ny physiological disorder, or condition, cosmetic disfigurement, or anatomical loss . . . " *Picard, supra,* at 613.  Major life activities "are those activities that are of central importance to most people's everyday lives." *Jenkins, supra,* at 315.  Major life activities include "caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." *Mason v. United Air Lines, Inc.,* 274 F.3d 314, 317 (5th Cir. 2001) (quoting 29 C.F.R. §1630.2(I).

33.     A major life activity will be considered "substantially limited" when the individual is unable to perform a major life activity that the average person in the general population can perform; or is significantly restricted as to the condition, manner, or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity. *McInnis v. Alamo Cmty Coll. Dist.,* 207 F.3d 276, 280 (5th Cir. 2000) (quoting 29 C.F.R. §1630.2(j).  In determining whether an impairment is substantially limiting, courts may consider the nature and severity of the impairment, the expected duration of the impairment, and the expected permanent or long term impact resulting from the impairment. *EEOC v. Agro Distribution, LLC,* 555 F.3d 462, 470 (5th Cir. 2009).

34.     The ADA imposes an affirmative duty on covered employers to reasonably accommodate the known physical and mental limitations of their disabled employees.  Failure to make such an accommodation is a prohibited form of discrimination. *Picard, supra,* at 618; *see* 42 U.S.C. §12112(a).  The ADA prohibition against discrimination includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee." 42 U.S.C. §12112(b)(5)(a).  Plaintiff was not provided an accommodation.  Employers are, therefore, under a duty to provide their disabled employees with reasonable accommodations "in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions and privileges of employment." *Picard, supra,* at 619.  Because the failure to reasonably accommodate an employee's disability is, by definition, a failure to provide that employee with an equal employment opportunity, the court in *Picard* found it unnecessary to prove a separate "adverse employment action" element in a

failure to accommodate case. *Picard, supra,* at 620. This finding is in agreement with an unpublished Fifth Circuit decision, as well as with the Fifth Circuit Pattern Jury Instructions. *See Bridges v. Dept. of Social Services,* 254 F.3d 71, 2001 WL 502797 at *1 (5th Cir. 2001) (unpublished); Fifth Circuit Pattern Jury Instructions: Civil §11.7.2 (2006 ed.). Other circuits agree: *Rodal v. Anesthesia Group of Onondoga, P.C.,* 369 F.3d 113, 118 (2d Cir. 2004); *Stevens v. Illinois Dept. of Transp.,* 210 F.3d 732, 736 (7th Cir. 2000).

### VIII.

### DEFENDANT IMPROPERLY RELIES ON INTERESTED WITNESS TESTIMONY FEDERAL COURT APPROACH TO SUMMARY JUDGMENT PRECLUDES SUMMARY JUDGMENT

35.    Defendant in this case primarily relies on the interested testimony or documents of its employees as the grounds and evidence for its summary judgment motion, . In <u>Reeves v. Sanderson Plumbing Products, Inc.,</u> the Supreme Court clarified the approach a court should use when granting a judgment as a matter of law. The court must draw all reasonable inferences in favor of the nonmoving party and not make credibility determinations or weigh the evidence. Credence must be given to the evidence supporting the nonmovant as well as any evidence supporting the moving party that is uncontradicted, unimpeached, and not attributable to interested witnesses. Plaintiff objects to the following declarations of interested witnesses, including the declaration of Lori Shaw, the Principal at the center of the controversy (exhibit B with supporting documentation to summary judgment motion), Declaration of J. Mark Hardison, employee benefits coordinator for Defendant with attachments (Exhibit C), whose statements are self serving and not properly subject to contradiction regarding Plaintiff's claims or intent of Defendant). <u>Reeves v. Sanderson Plumbing Prods., Inc.,</u> 530 U.S. 133, 150-51, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).

36.    Therefore, all evidence of interested witnesses must be disregarded and all of the evidence in the record must be reviewed in favor of Plaintiff, drawing all reasonable inferences

in favor of Plaintiff. <u>Reeves</u>, 530 U.S. at 150, 120 S.Ct. 2097.   Defendant's motion is largely

based on the testimony of interested witnesses, to which Plaintiff objects.

## IX.

## **PRAYER FOR RELIEF**

37.    PREMISES CONSIDERED, Plaintiff prays that the Defendant's motion be denied in

whole or in part. and for such other and further relief to which Plaintiff may be justly entitled.


**Respectfully Submitted,**


By:_____

**ADAM PONCIO**
**State Bar No. 16109800**

**PONCIO LAW OFFICES, P.C.**
**5410 Fredericksburg Road, Suite 109**
**San Antonio, Texas 78229-3550**
**Telephone:    (210) 212-7979**
**Facsimile:     (210) 212-5880**

**ATTORNEYS FOR PLAINTIFF**

## CERTIFICATE OF SERVICE

I hereby certify that on this 28th day of March 2012, I electronically filed the foregoing document with the Clerk of Court using the CMECF system which will send notification of such filing to the following:

D. Craig Wood
Walsh, Anderson, Brown,
Gallegos & Green, P.C.
100 N.E. Loop 410, Suite 900
San Antonio, Texas 78216
(210) 979-6633 Telephone
(210) 979-7024 Facsimile

_____
**ADAM PONCIO**

# EXHIBIT A

1

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

GERALD CARTER          )
                       )
vs.                    )   CASE NO. 5:11-cv-00492 FB
                       )
NORTHSIDE INDEPENDENT  )
SCHOOL DISTRICT        )   ORIGINAL

ORAL VIDEOTAPED DEPOSITION

GERALD LEON CARTER

December 19, 2011

---

2

APPEARANCES

1
2
3   FOR THE PLAINTIFF:
4       Mr. Adam Poncio
5       PONCIO LAW OFFICES
        5410 Fredericksburg Road
        Suite 109
6       San Antonio, Texas  78229-3550
        Telephone: 210.212.7979  Fax: 210.212.6860
7       e-mail: Salaw@msn.com
8
9   FOR THE DEFENDANT:
10      Mr. D. Craig Wood
        WALSH, ANDERSON, BROWN, GALLEGOS
11      AND GREEN, P.C.
        100 N.E. Loop 410
12      Suite 900
        San Antonio, Texas  78246-0806
13      Telephone: 210.979.6633  Fax: 210.979.7024
        e-mail: CWood@sa.wabsa.com
14
15  ALSO PRESENT:
16      Mr. Marcelino Gutierrez, Videographer
17
18
19
20
21
22
23
24
25

---

3

1       ORAL ANSWERS AND DEPOSITIONS of the witness,
2   GERALD LEON CARTER, who resides in San Antonio, Texas,
3   in answer to questions propounded to him in the above
4   styled and numbered cause, taken on behalf of the
5   Defendant, before TERRILYN PAUL CROWLEY, a Certified
6   Shorthand Reporter in and for the State of Texas, on
7   December 19, 2011, in the PONCIO LAW OFFICES, 5410
8   Fredericksburg Road, Suite 109, San Antonio, Texas,
9   between the hours of 9:10 a.m. and 12:04 p.m., of said
10  day, pursuant to notice and the Rules.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

4

INDEX

1
2
3   GERALD LEON CARTER
4   Examination by Mr. Wood ..........................6
5
6   Changes and Signature.........................108
7   Reporter's Certificate........................108
8
9               EXHIBITS
10              (None offered)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

5

```
 1      THE VIDEOGRAPHER:  We're on the record on
 2   December the 19th, 2011 at 9:10 a.m.
 3             GERALD LEON CARTER,
 4   having been first duly sworn, testified as follows:
 5             EXAMINATION
 6      Q.   (By Mr. Wood) Good morning, Mr. Carter.  My
 7   name is Craig Wood, and I am the attorney from
 8   Northside Independent School District in connection
 9   with a lawsuit that you've brought against the
10   district.
11             You and I have met for the first time
12   this morning.  Is that correct?
13      A.   Yes.
14      Q.   I want to reach certain agreements before we
15   begin.  And for purposes of the deposition, it's very
16   important that you listen to my question.  If you don't
17   understand the question, would you ask me to repeat it
18   or restate it?
19      A.   Certainly.
20      Q.   And it's also important so that the court
21   reporter can take down what you are testifying that you
22   answer verbally rather than nodding or shaking your
23   head.  Will you do that?
24      A.   Yes.
25      Q.   And, likewise, if you could avoid saying uh-huh
```

6

```
 1   or huh-uh, it will make it more clear as to what your
 2   responses are.
 3      A.   Yes.
 4      Q.   Have you ever given your deposition before, Mr.
 5   Carter?
 6      A.   No.
 7      Q.   You understand that you're under oath and that
 8   you're sworn to tell the truth just as if you were in
 9   front of the judge and jury today?
10      A.   Yes.
11      Q.   If you need to at any point, please let me know
12   and we can take a break, if you need to take a comfort
13   break or get something to drink or whatever.
14      A.   All right.  Thank you.
15      Q.   I want to make sure that you're comfortable.
16             This is my only chance to hear your side
17   of the story before this matter goes to trial.
18   So it's very important that you be as forthcoming as
19   possible.  There may be times during your testimony
20   during which Mr. Poncio objects.  That's his job to do
21   that.  Nonetheless, after his objection is stated for
22   the record, I'm going to ask that you answer the
23   question, unless he specifically instructs you not to
24   do so and you accept that advice.  Will you do that?
25      A.   I understand.
```

7

```
 1      Q.   Will you state your full name for the record.
 2      A.   Gerald Leon Carter.
 3      Q.   What's your date of birth, Mr. Carter?
 4      A.   ▓▓▓▓▓▓▓▓▓.
 5      Q.   Your Social Security number?
 6      A.   ▓▓▓▓▓▓▓▓▓.
 7      Q.   And do you hold a driver's license?
 8      A.   Yes.
 9      Q.   From the State of Texas?
10      A.   Yes.
11      Q.   Do you know the number to that driver's
12   license?
13      A.   Yes.
14      Q.   What is that?
15      A.   ▓▓▓▓▓▓▓▓▓.
16      Q.   Do you hold a driver's license from any other
17   states?
18      A.   No.
19      Q.   What's your address, Mr. Carter?
20      A.   ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓.
21      Q.   What is your telephone number?
22      A.   ▓▓▓▓▓▓▓▓▓▓.
23      Q.   How long have you lived at Vantage Point?
24      A.   I've lived there since 2000.
25      Q.   Are you married, Mr. Carter?
```

8

```
 1      A.   Yes.
 2      Q.   To whom are you married?
 3      A.   ▓▓▓▓▓▓▓▓▓▓▓▓▓.
 4      Q.   How long have you been married to ▓▓▓▓▓▓▓
 5   ▓▓▓▓▓?
 6      A.   ▓▓ years last week.
 7      Q.   Are you happily married?
 8      A.   Certainly.
 9      Q.   Do you have any children?
10      A.   Yes.
11      Q.   And what are their names and ages?
12      A.   One daughter.  Her name is ▓▓▓▓, and she is
13   ▓▓.
14      Q.   Do you have any other dependents besides your
15   wife and your daughter?
16      A.   No.
17      Q.   Mr. Carter, is there any physical impairment to
18   you understanding and answering my questions today?
19      A.   No.
20      Q.   Are there any mental or emotional impairments
21   that might prevent you from understanding and answering
22   my questions?
23      A.   No.
24      Q.   Are you taking any type of medication?
25      A.   Yes.
```

9

```
 1      Q.    What medications are you taking today?
 2      A.    I'm taking Zoloft, Abilify, Vyvanse and
 3   Klonopin.
 4      Q.    The Zoloft, do you know the dosage on that?
 5      A.    200 milligrams.
 6      Q.    How long have you been taking that?
 7      A.    I believe it's -- I believe it's been three
 8   years, but I've been on anti-depressants for longer.
 9      Q.    As far as the Klonopin, how long have you been
10   taking that?
11      A.    It's been taken since 2005.
12      Q.    Excuse me, let me back up.  What is the Zoloft
13   for?
14      A.    To treat depression.
15      Q.    What about the Klonopin, what is that for?
16      A.    Anxiety.
17      Q.    The Vyvanse, do you know what dosage you take
18   of that?
19      A.    I believe it's 40 milligrams.
20      Q.    And how long have you been taking the Vyvanse?
21      A.    I would have to double check with
22   Dr. Salinas, but I believe she gave it to me in
23   2000 -- October of 2009.
24      Q.    And what is the purpose of the Vyvanse?
25      A.    To treat adult ADHD.
```

10

```
 1      Q.    And what was the fourth medication that you
 2   mentioned?
 3      A.    Abilify.
 4      Q.    And what dosage do you take of the Abilify?
 5      A.    It's 5 milligrams.
 6      Q.    How long have you been taking that medication?
 7      A.    Again, since October, 2009.
 8      Q.    And what is the purpose of the Abilify?
 9      A.    It's a -- I'm not sure how to describe it other
10   than to say it was a anti-depressant supplement booster
11   to try and make the Zoloft work better.
12      Q.    Do you take each of those four medications
13   every day?
14      A.    Yes.
15      Q.    Are there any other medications that are
16   prescribed for you but that you are not taking?
17      A.    I have a Lunesta prescription that I use
18   occasionally for sleep.
19      Q.    How often do you take that?
20      A.    Three or four times a month right now.
21      Q.    As far as you're aware, is there anything about
22   the medications that you're on today that would
23   prohibit you from understanding my questions?
24      A.    No.
25      Q.    What did you do to prepare for today's
```

11

```
 1   deposition?
 2      A.    I reviewed previous e-mails and papers that I
 3   had kept, the same papers that I had forwarded.
 4      Q.    Where did you do that?
 5      A.    At home.
 6      Q.    Did you meet with your attorney in preparation
 7   for your deposition?
 8      A.    No.
 9      Q.    Did you have any conversations with anyone in
10   preparation for your deposition?
11      A.    Other than my wife wishing me good luck, no.
12      Q.    Have you talked about anyone -- excuse me.  Have
13   you talked to anyone at the school district since you
14   resigned from the district?
15      A.    No.
16      Q.    None of the staff at the school or
17   administration?
18      A.    No.
19      Q.    Have you ever been a party to a lawsuit before?
20      A.    No.
21      Q.    Have you ever been arrested?
22      A.    No.
23      Q.    Have you ever been involved in a lawsuit as a
24   witness?
25      A.    No.
```

12

```
 1      Q.    I asked you earlier that -- if you were -- if
 2   you had given deposition testimony.  I take it you've
 3   never given sworn testimony before?
 4      A.    That's correct, I haven't.
 5      Q.    Have you ever had any type of license or
 6   certification that's been suspended or revoked or
 7   canceled?
 8      A.    No.
 9      Q.    What types of organizations do you belong to?
10      Q.    Could you be more specific, what kind of?
11      Q.    Do you belong to any kind of civic or social
12   organizations?
13      A.    I belong to the Texas State Teachers
14   Association, numerous charitable groups I'll send a
15   check to every now and then, but...
16      Q.    Do you belong to a church?
17      A.    Yes.
18      Q.    Which church do you belong to?
19      A.    Shepherd of the Hills Lutheran.
20      Q.    How long have you attended that church?
21      A.    Since -- my daughter started school at that
22   location.
23         THE WITNESS:  I apologize for the ums.
24      A.    2001.
25      Q.    What sorts of things do you do for fun or
```

13

1 recreation?

2    A.    I enjoy reading, following current events,

3 bowling.

4    Q.    Tell me about where you attended high school.

5    A.    I attended high school at Bothell High School

6 for one year, I believe.  That's a suburb of Seattle.

7 Then my father was in the Navy, was transferred to

8 Hawaii, and I finished my high school years at Radford

9 High School.

10    Q.    Where is Radford High School located?

11    A.    It's in Honolulu.

12    Q.    What year did you graduate from high school in

13 Honolulu?

14    A.    1978.

15    Q.    What did you do after you graduated from high

16 school?

17    A.    I stayed there one year working and taking some

18 part-time courses at Leeward Community College.

19    Q.    What sort -- did you have a particular major,

20 or were you just taking some courses at Leeward?

21    A.    Just some general courses.

22    Q.    And what did you do after that year?

23    A.    I applied for and was accepted at Oklahoma

24 Christian College and began attending in 1979.

25    Q.    What were you studying at Oklahoma Christian

14

1 College?

2    A.    That was social work.

3    Q.    Where is Oklahoma Christian College located?

4    A.    Oklahoma City.

5    Q.    Did you receive a degree from Oklahoma

6 Christian College?

7    A.    No.

8    Q.    How long were you there?

9    A.    Two years.

10    Q.    After your two years -- were you working while

11 you were at Oklahoma Christian College?

12    A.    Yes, I was.

13    Q.    What sort of work were you doing?

14    A.    Janitorial dormitory-type cleaning.

15    Q.    After your two years at Oklahoma Christian

16 College, where did you go next?

17    A.    I moved to San Antonio.

18    Q.    What was the reason for your move to

19 San Antonio?

20    A.    That would be -- I was intention -- intending

21 to take just a summer break but ended up working

22 full-time at JC Penney and getting married that year.

23    Q.    Which JC Penney did you work at here in

24 San Antonio?

25    A.    Ingram Park Mall.

15

1    Q.    What was your position there at the

2 JC Penney at Ingram Park Mall?

3    A.    Hardware department, sales.

4    Q.    Did you further your education after you moved

5 here to San Antonio?

6    A.    Yes, I went back to school at UTSA and...

7    Q.    At what point did you do that?

8    A.    I believe it was 1983.  I could be incorrect,

9 but I believe it's 1983.

10    Q.    How long did you work at JC Penney?

11    A.    Approximately one year.

12    Q.    Why did you leave JC Penney?

13    A.    I left JC Penney because they had changed the

14 schedule while I was off duty.  I came in on the wrong

15 day, and then I was let go.

16    Q.    You were terminated from your position?

17    A.    Yes.

18    Q.    While you were working for JC Penney, had you

19 received any sorts of reprimands or write-ups?

20    A.    No.

21    Q.    And they terminated you for this one event?

22    A.    Yes.

23    Q.    Once you were terminated by JC Penney, did you

24 go to work -- did you go to UTSA immediately, or did

25 you find another job?

16

1    A.    I'm having difficulty recalling what exact

2 order.  I worked at Oshman's Sporting Goods there

3 across from North Star while I was at UTSA.  Again,

4 approximately a year, maybe more than that.

5    Q.    Were you terminated at Oshman's?

6    A.    No.  I resigned.

7    Q.    What was the reason for your resignation?

8    A.    I graduated from college and was ready to move

9 on.

10    Q.    What was your degree in from UTSA?

11    A.    Political science.

12    Q.    When did you receive your degree?

13    A.    1985.

14    Q.    What did you do after receiving your degree in

15 political science from UTSA?

16    A.    I was hired by USAA that fall.

17    Q.    And what was your function with them?

18    A.    I was an auto adjuster.

19    Q.    How long did you hold that position?

20    A.    Until May or June of '87.

21    Q.    And why did you leave your position as an auto

22 adjuster for USAA?

23    A.    Our family decided to move to Seattle.

24    Q.    What precipitated the decision to move to

25 Seattle?

17

```
 1        A.   I had been born there, went to junior high
 2   school there and had always liked it.
 3        Q.   Do you have family there?
 4        A.   No.
 5        Q.   And so was your daughter born by this time? I
 6   take it --
 7        A.   No, she was not born until 1994.
 8        Q.   And so it was just you and your wife that moved
 9   to Seattle?
10        A.   Yes.
11        Q.   What did you do once you got to Seattle?
12        A.   I was employed by King County Blue Shield.
13   I think they've changed their name since.
14        Q.   What was your function with them?
15        A.   Subrogation specialist.
16        Q.   How long did you hold that position?
17        A.   Two years.
18        Q.   Why did you leave your position as a
19   subrogation specialist for King County Blue Shield?
20        A.   We decided to move back to Texas.  The teaching
21   position for my wife was temporary.  It
22   was -- she had a full-time contract.  But it's the
23   nature of teaching up there that they have constant
24   reductions in force, and she wasn't guaranteed a
25   position the following year.
```

18

```
 1        Q.   She was teaching there in Seattle?
 2        A.   Yes.
 3        Q.   Public school, private school?
 4        A.   Public school.
 5        Q.   What grade was she teaching?
 6        A.   7th and 8th grade.
 7        Q.   And so what year was it then that you moved
 8   back to Texas?
 9        A.   1989.
10        Q.   And once you returned to Texas, did your wife
11   get another job?
12        A.   Yes.
13        Q.   For whom did she begin working?
14        A.   Northside.
15        Q.   Whereabouts did she teach for Northside?
16        A.   I believe she was at Anson Jones.
17        Q.   Do you remember what grade?
18        A.   Again, I think it's math, 7th and 8th
19   combination.
20        Q.   Did you obtain a position of employment once
21   you returned to Texas?
22        A.   Yes, I did.  Just a moment.  I get confused
23   between our -- we have two moves.  We have one back
24   from Seattle and another later on back from Portland.
25             We came back from Seattle.  She got on
```

19

```
 1   with Northside.  I'm having difficulty remembering
 2   that.  I was not a teacher yet.  I went back to get my
 3   teaching certificate.
 4        Q.   And so where did you do that?
 5        A.   At UTSA.
 6        Q.   And so you re-enrolled in UTSA approximately in
 7   1989?
 8        A.   Uh-huh.
 9        Q.   Did you obtain your teaching certificate during
10   that time period based upon that entry into UTSA?
11        A.   Yes.
12        Q.   When did you receive your teaching certificate?
13        A.   January of 1990.
14        Q.   Were you employed while you were pursuing your
15   teaching certificate, or was your wife the sole
16   breadwinner at that point?
17        A.   She was the sole breadwinner at that time.
18        Q.   And once you received your teaching
19   certificate, did you seek employment?
20        A.   Yes, I was hired by the school district that
21   had given me the student teaching experience, Southwest
22   School District.
23        Q.   Whereabouts did you teach at Southwest?
24        A.   My student teaching was at Southwest
25   Elementary, and my job was at Big Country Elementary.
```

20

```
 1        Q.   What was your position at Big Country?
 2        A.   3rd grade teacher.
 3        Q.   I take it you were on a probationary contract?
 4        A.   Yes, I was, but I had been offered a permanent
 5   contract by the end of that year, as part of a
 6   reference letter that he wrote to me later on.
 7        Q.   Who wrote you the reference letter?
 8        A.   The principal, Clifford Cleborne.
 9        Q.   Do you know whether or not he's still the
10   principal at Big Country?
11        A.   No, he's not.
12        Q.   So how long did you teach then at Big Country?
13        A.   From January, 1990 until May of 1992.
14        Q.   Let me back up for a moment.  Were you
15   terminated from your position at King County Blue
16   Shield?
17        A.   No.  I resigned.
18        Q.   What was the purpose of your resignation?
19        A.   To return to Texas.
20        Q.   Were you ever reprimanded or disciplined while
21   you were there at --
22        A.   No.
23        Q.   Why did you leave Big Country in May of '92?
24        A.   My mother and father had since retired, my dad
25   from the Navy, and had gone to McMinnville, Oregon,
```

21

```
1    just south of Portland.  And I wanted to move closer to
2    them since no one else in the family was nearby.
3    Q.    Do you have brothers and sisters?
4    A.    Yes.
5    Q.    How many brothers?
6    A.    Two brothers.
7    Q.    Older or younger?
8    A.    Older.
9    Q.    And do you have any sisters?
10   A.    Two sisters.
11   Q.    And are they older or younger?
12   A.    Younger.
13   Q.    Once you moved to Portland then, did you seek
14   employment there?
15   A.    Yes, I did.
16   Q.    Did you obtain employment?
17   A.    Only substitute teaching.
18   Q.    And for whom did you substitute teach in
19   Portland?
20   A.    Oregon City School District, North Clackamas
21   School District.  Those were my main -- I believe those
22   were the only two districts that I aided.
23   Q.    When you say you were doing substitute
24   teaching, approximately how often were you called to
25   teach?
```

22

```
1    A.    Three to four days a week.
2    Q.    How long did you continue as a substitute
3    teacher for those school districts?
4    A.    Until 1993, spring of '93.
5    Q.    Why did you decide to do something different in
6    the spring of '93?
7    A.    The education system in Oregon is broken and
8    they had passed a tax limitation and was laying off
9    teachers.
10   Q.    Was your wife working during this time in
11   Oregon?
12   A.    Yes.
13   Q.    And did she have a permanent position?
14   A.    Again, she had a one -- just a one-year
15   contract.
16   Q.    Do you remember for which school district she
17   worked during that year?
18   A.    Oregon City.
19   Q.    Once you decided to leave the Oregon school
20   districts, what did you do next?
21   A.    We returned to Texas.
22   Q.    What year was that?
23   A.    1993, summer.
24   Q.    Was that back to San Antonio?
25   A.    Yes.
```

23

```
1    Q.    Did you seek employment once you returned to
2    Texas then?
3    A.    Yes.
4    Q.    Did you obtain employment?
5    A.    Yes.
6    Q.    Where?
7    A.    Pleasanton School District.
8    Q.    What position did you hold with the Pleasanton
9    School District?
10   A.    That was 3rd grade.
11   Q.    Was that on a probationary contract?
12   A.    Yes.
13   Q.    Does Pleasanton only have one elementary
14   school?
15   A.    No.  They have a unique system.  They have K, 1
16   and 2 at the primary, then they have elementary 3, 4
17   and 5, which is where I was.
18   Q.    Which elementary school was that?
19   A.    I was at Pleasanton Elementary.
20   Q.    Was your wife working once you returned to
21   Texas in '93?
22   A.    Yes, she was hired as well by Pleasanton.
23   Q.    What position did she hold?
24   A.    5th grade contact mastery teacher.
25   Q.    Was that at the same school, Pleasanton
```

24

```
1    Elementary?
2    A.    Yes.
3    Q.    How long were you at Pleasanton Elementary?
4    A.    Until May of 2000.
5    Q.    Why did you leave Pleasanton in May of 2000?
6    A.    Our daughter had been born in '94, and my wife
7    had been able to stay home with her for six years.  It
8    was time to go back to San Antonio just to find a nicer
9    home, be closer to her mother.  Her mother had breast
10   cancer at the time, so she wanted to be closer rather
11   than an hour away.
12   Q.    So from 1993 to 2000 while you were working for
13   Pleasanton, you actually lived in Pleasanton?
14   A.    Yes.
15   Q.    So you moved to San Antonio then in May of
16   2000?
17   A.    Yes.
18   Q.    Did you seek employment here in San Antonio
19   then?
20   A.    Yes.
21   Q.    And when did you obtain employment next?
22   A.    That would be that fall in August with
23   Northside.
24   Q.    Whereabouts?
25   A.    That would be at Cody Elementary.
```

25

```
1    Q.    Were you on a permanent contract in Pleasanton
2  by May of 2000, or term contract?
3    A.    Yes.
4    Q.    And were you let go there?
5    A.    I resigned.
6    Q.    And was that for purposes of returning to San
7  Antonio?
8    A.    Yes.
9    Q.    Were you ever disciplined, reprimanded or
10  receive any type of write-ups while you were at
11  Pleasanton?
12    A.    No.  Only positive.
13    Q.    Once you began working for Cody Elementary,
14  then how long did you work there?
15    A.    I was there one year, and then due to staffing,
16  I was moved over to Galm Elementary the following year.
17  That would be in 199 -- I can't recall.  I'd have to go
18  back and look at what I just said about Cody
19  Elementary, what year that was.
20    Q.    You told me you began work at Cody Elementary
21  in August of 2000.
22    A.    That's right.  Okay.  So 2000, 2001 I was at
23  Cody.  2001, 2002 I was at Galm Elementary.
24    Q.    Was there a reason why you were transferred
25  from Cody to Galm?
```

26

```
1    A.    They had staffing redistricting with students
2  coming in or something like that.  There were a number
3  of us that had to leave or pick our campus.
4    Q.    Were you at Galm more than one year?
5    A.    No.
6    Q.    Why did you leave Galm in 2002?
7    A.    I missed my old employer at Pleasanton.
8    Q.    Did you go back to work for them?
9    A.    Yes.
10    Q.    Was that again at Pleasanton Elementary?
11    A.    It had since changed into Pleasanton
12  Intermediate.
13    Q.    How long were you employed at Pleasanton
14  Intermediate then?
15    A.    Until 2007.  Until May of 2007.
16    Q.    What was it that you preferred about Pleasanton
17  compared to working for Northside?
18    A.    The pace was more relaxed.  The students were
19  more -- how should we say?  There's just a difference
20  between city and country kids.
21    Q.    Were you commuting back and forth between San
22  Antonio and Pleasanton?
23    A.    Yes.  And had a number of friends that worked
24  there, so...
25    Q.    And then why did you decide to leave Pleasanton
```

27

```
1  in May of 2007?
2    A.    May of 2007 I had decided to move to Northside
3  to get a fresh start.
4    Q.    When you say "a fresh start," a fresh start
5  from what?
6    A.    I had suffered depressive -- major depressive
7  episodes.
8    Q.    When did you first experience major depressive
9  episodes?
10    A.    In October of 2005.
11    Q.    What, if anything, served as a triggering event
12  for those major depressive episodes?
13    A.    I can't really pin it on anything in
14  particular.  There was -- I remember reading an
15  editorial about the Iraq war and becoming tearful and
16  my wife saying, "What's the matter," and I just said I
17  was upset about it.  And she said, "You know depression
18  runs in your family.  Your mother has it.  Your brother
19  has it.  Don't you think you should go see a doctor?"
20    Q.    So in May of 2005, you said you began
21  experiencing major depressive episodes.  What did that
22  look like?
23    A.    Lots of -- at home it would be lots of crying,
24  loss of sleep, in addition to lots of anxiety.  Anxiety
25  being not just I'm worried about such and such but just
```

28

```
1  irrational anxiety.  Just being uncomfortable anywhere
2  and not being able to calm myself down.
3    Q.    You indicated that family members had a similar
4  type of experience.  Were they -- I take it they were
5  diagnosed before you were?
6    A.    Yes.
7    Q.    And do you have family members who are treated
8  for major depressive episodes?
9    A.    Yes.
10    Q.    When did you first seek some sort of
11  intervention either from psychologists or psychiatrists
12  with respect to these major depressive episodes?
13    A.    I believe it was August or September of 2005.
14    Q.    And to whom did you go to seek some sort of
15  intervention?
16    A.    Our family doctor, Sybil Morgan.
17    Q.    What did Dr. Morgan do for you?
18    A.    She said, "You have major depressive disorder
19  and anxiety," and she put me on -- it's starts with an
20  L.  I'm trying to recall the anti-depressant.  It's
21  starts with an L, but I'm coming up short.
22    Q.    Lexapro?
23    A.    Yes, that's it.
24    Q.    And was it effective in alleviating the
25  symptoms?
```

29

```
 1      A.   No.
 2      Q.   Did you seek any type of counseling in
 3  connection with the depressive episodes?
 4      A.   Yes, I immediately began counseling with Javier
 5  Villanueva.  He's a psych...
 6      Q.   How often did you see Javier Villanueva for
 7  counseling?
 8      A.   Once a week.
 9      Q.   Is Mr. Villanueva here in San Antonio?
10      A.   Yes.
11      Q.   How long did you continue that counseling
12  therapy?
13      A.   That continued into 2000 -- I want to say 2009.
14  2009.  It wasn't weekly at that point.
15      Q.   How often was it -- how long was -- how often
16  -- excuse me.  For how long were you seeing him on a
17  weekly basis beginning in 2005 and ending approximately
18  when?
19      A.   The summer of 2006.
20      Q.   For what reason did you cease seeing
21  Mr. Villanueva on a weekly basis?
22      A.   It was upon his recommendation that I only
23  needed to come once a month.
24      Q.   And you indicated that the Lexapro intervention
25  was not successful.  Did you consult either with Dr.
```

30

```
 1  Horgan or with someone else to seek any sort of
 2  alternative?
 3      A.   Yes.
 4      Q.   With whom did you consult with?
 5      A.   I can't remember the name of the doctor, but it
 6  was at Alamo Mental Health Clinic.  There were two or
 7  three doctors there that whoever was open they saw you.
 8      Q.   Was that a recommendation made by
 9  Dr. Horgan, or did you just seek some independent
10  advice with respect to the issue?
11      A.   It was by her recommendation.
12      Q.   Did the folks at Alamo Mental Health put you on
13  a different regimen of medication?
14      A.   Yes.
15      Q.   What did they recommend?
16      A.   I went to Cymbalta.  And I had been on
17  Klonopin.  I failed to mention that earlier.  I
18  continued on Klonopin.  But I was then on Cymbalta.
19      Q.   Was the Klonopin recommended by Dr. Horgan?
20      A.   I don't remember.  I believe so, but I don't
21  remember.
22      Q.   How did the Cymbalta work?  Was it effective?
23      A.   It was a support mechanism.
24      Q.   During this time you indicate that you're
25  having major depressive episodes beginning in 2005.  Did
```

31

```
 1  that present any type of obstacle for your work at
 2  Pleasanton Intermediate School?
 3      A.   Yes.
 4      Q.   What sorts of obstacles did it present?
 5      A.   I had to focus more on teaching the students
 6  than I had previously.  Paperwork became more
 7  difficult.  I remember having just one light on in the
 8  classroom just to try and keep things relaxed. I was
 9  able to continue teaching the students with an aide and
10  assistance of my principal.
11      Q.   Who was your principal?
12      A.   Sandy Coward.
13      Q.   Did you have to ask the folks at Pleasanton
14  Independent School District for any sort of
15  accommodation with respect to your issues of major
16  depressive disorder?
17      A.   I did not ask specifically for them, but I was
18  given the ability to go into the principal's office and
19  talk with her at will.  It was a very understanding
20  situation, and they let me do my job.
21      Q.   Was the ability to go in and visit with your
22  principal at will effective in helping you manage the
23  stress that you were experiencing?
24      A.   Yes.
25      Q.   And then you left Pleasanton in --
```

32

```
 1      Q.   Did you see anyone after Alamo Mental
 2  Health before you came back to Northside?
 3      A.   Yes, but I cannot remember her name.  I went --
 4  I went to another psychiatrist, and she gave me
 5  Effexor.  I only went to her one time because the
 6  Effexor created high blood pressure and increased my
 7  anxiety.
 8      Q.   And you don't remember her name?
 9      A.   No.  She was off of Vance Jackson, I believe.
10      Q.   How long were you on the Effexor?
11      A.   Probably three months.
12      Q.   Was that substituted for the Cymbalta?
13      A.   Yes.
14      Q.   And when you realized that it was increasing
15  your blood pressure and your anxiety, what did you do
16  next?
17      A.   I'm having trouble recalling, but I believe I
18  went back to Alamo Mental Health Clinic.
19      Q.   What did they prescribe for you when you
20  returned?
21      A.   I was on Cymbalta again.
22      Q.   During this time period from the time that the
23  major depressive episodes began in 2005 -- let me back
24  up.  Before 2005 had you ever experienced anything like
25  this?
```

33

1    A.    No.

2    Q.    To the best of your recollection, this

3  basically started when you read -- or you first noticed

4  it when you read an article about the Iraq war?

5    A.    Yes, that was the first noticeable time.

6    Q.    How often were you having some sort of what you

7  would describe as a depressive episode beginning in

8  2005?

9    A.    It was -- when I say "episode," I'm referring

10  to a time frame longer than just a short period.  So I

11  would say it lasted to 2006 to 2000 -- I don't

12  remember.  But it was a serious black hole of

13  depression.

14    Q.    Were you still able to attend your job

15  regularly at Pleasanton Intermediate?

16    A.    Yes.  However, there were times that I went

17  into work late or I used my sick leave as much as

18  possible.

19    Q.    How often do you estimate that you missed work

20  beginning in 2005 while you were employed by Pleasanton

21  for that next two-year period?

22    A.    Possibly 10 to 15 days.

23    Q.    When you returned to San Antonio in 2007, did

24  you go back to work for Northside?

25    A.    Yes.

34

1    Q.    Where were you hired to work for Northside in

2  -- was it August of 2007?

3    A.    I was hired in October.

4    Q.    In October.

5    A.    For Michael Elementary.

6    Q.    How was your state of mind at the time that you

7  returned to Northside in October, 2007?  Were you still

8  experiencing the depressive episodes, or was your

9  treatment effective in reducing the effects of that?

10    A.    The treatment was effective in reducing the

11  effects enough so that I felt like I could go back to

12  work and try and get a fresh start without any worries

13  about people seeing me upset and -- as they had in

14  Pleasanton.

15    Q.    Were you back on Cymbalta at the time that you

16  returned to Northside?

17    A.    I'm pretty sure it was Cymbalta and the

18  Klonopin.

19    Q.    At what point was the Cymbalta eliminated?

20    A.    That would be in October of 2009.

21    Q.    So from October, 2007 to October -- when you

22  went to work for Michael Elementary, to October of

23  2009, you were on Cymbalta?

24    A.    Yes.

25    Q.    What was substituted in October of 2009?

35

1    A.    I self-checked myself into partial

2  hospitalization at Laurel Ridge and was given Zoloft

3  and Abilify.

4    Q.    Were you still seeing the folks over at Alamo

5  Mental Health on any kind of regular basis or at all

6  during the period from October, 2007 to October of

7  2009?

8    A.    Some -- I cannot remember when I first began

9  seeing Dr. Jolene Moore, psychiatrist.  I

10  was -- had gotten fed up with Alamo Mental Health.

11    Q.    When you say you had gotten fed up with them,

12  why was that?

13    A.    They would see you for five minutes and refill

14  your prescription.  They were not interested in talking

15  with you.

16    Q.    Who recommended Dr. Jolene Moore to you?

17    A.    Javier Villanueva.

18    Q.    When did you cease counseling therapy with Mr.

19  Villanueva in 2009?

20    A.    I believe I saw him until January, 2010.

21  I'm not sure.

22    Q.    Why did you cease counseling therapy with him

23  at that point then?

24    A.    I had learned of a Crossroads Christian

25  Counseling and wanted a different perspective on

36

1  therapy.

2    Q.    At the time you checked yourself into partial

3  hospitalization at Laurel Ridge, were you still seeing

4  Mr. Villanueva for therapy?

5    A.    Yes.

6    Q.    Did you talk to him about your intent to do

7  that, to check yourself into partial hospitalization

8  before you did so?

9    A.    Yes.

10    Q.    And what was his recommendation?

11    A.    He suggested that that would be a good idea,

12  that I need to attack it in another form, you know,

13  have someone else take a look at my problem.

14  He recommended either Methodist or Laurel Ridge.

15    Q.    Was he the one that suggested that you check

16  into a partial hospitalization, or are you the one that

17  came up with that idea?

18    A.    He had listed it as one of the options, and we

19  had worked through therapy.  We had worked through

20  medication.  And when an event occurred at school, I

21  thought that those other options had been exhausted and

22  I needed to try something different.

23    Q.    What was the event that occurred at school?

24    A.    I was -- I believe I was counseled and possibly

25  reprimanded in October, 2009 by the vice-principal.

37

```
 1      Q.   Which vice-principal was that?
 2      A.   Evelyn Massiatte.
 3      Q.   What was the reason for Ms. Massiatte
 4  counseling you in October of 2009?
 5      A.   Not turning in my lesson plans.
 6      Q.   Is it the case that her counseling with you
 7  about not turning in lesson plans led you to the state
 8  of mind that you felt like you required partial
 9  hospitalization at Laurel Ridge treatment center?
10      A.   Yes.  As I was walking back from that meeting,
11  I teared up and had the familiar depressive feelings
12  and I told myself, "I'm not doing this again.  I'm
13  going to get help."
14      Q.   Had you teared up and had this kind of reaction
15  previously at any of your places of employment?
16      A.   Yes.
17      Q.   I think you mentioned that you had teared up
18  when you were working at Pleasanton.  Is that correct?
19      A.   Yes.
20      Q.   Did you have that experience previously when
21  you were at Cody or at Galm?
22      A.   No.
23      Q.   What did you do when you teared -- well, let me
24  see, first of all, how often would you estimate that
25  occurred while you were employed by Pleasanton, or how
```

38

```
 1  many times?
 2      A.   I either teared up or had to fight off the
 3  symptoms daily.
 4      Q.   What would precipitate that?
 5      A.   Nothing.
 6      Q.   So on a daily basis you were tearing up.
 7  And how did you recover from that experience?  I mean,
 8  did you leave the classroom?
 9      A.   While I was teaching the students, I focused
10  entirely on the students, and as long as I was focused
11  on that, I never teared up in front of the students.
12  If --
13      Q.   What -- go ahead.
14      A.   It would always be after teaching.  I would
15  close the door or visit the restroom and just gather
16  myself.
17      Q.   Did you sometimes go to your principal's office
18  to confer with her when you were --
19      A.   Yes.
20      Q.   And what, if anything, would precipitate you
21  tearing up and having this reaction?
22      A.   A sense of being overwhelmed, not understanding
23  why I had the depression.
24      Q.   When Ms. Massiatte counseled you in October of
25  2009, had you -- prior to that time had you also
```

39

```
 1  continued to have that same issue that you would tear
 2  up on a daily basis at Michael Elementary?
 3      A.   No, it wasn't a daily basis.  It was -- I would
 4  frequently go to the restroom just to gather myself.
 5  It was not as severe as it was in Pleasanton.
 6      Q.   In Pleasanton, did they ever counsel with you
 7  or criticize you for anything -- issues relating to
 8  your job performance?
 9      A.   No.  I had high recommendations.
10      Q.   So prior to Ms. Massiatte counseling you about
11  grades in -- or lesson -- was it grades or lesson
12  plans, do you recall, in October, 2009?
13      A.   I do not recall.  It was either grades or
14  lesson plans.
15      Q.   Prior to her counseling with you in October of
16  2009, had anyone ever criticized your performance with
17  respect to employment issues?
18      A.   I had talked with my team members about the
19  lesson plans because they -- I had turned them in late.
20  And I had talked to them, but there was no official
21  reprimand until October with Ms. Massiatte. There was
22  no reprimands in Pleasanton whatsoever.
23      Q.   Were your teammates critical of the fact that
24  you hadn't timely submitted your lesson plans?
25      A.   I only know that one of them had gone to the
```

40

```
 1  vice-principal to talk about that.
 2      Q.   Who was that?
 3      A.   Her name was Stacy, but I can't remember her
 4  last name.  I don't believe she's still there.
 5      Q.   It's true, isn't it, Mr. Carter, that your job
 6  description for your position at Michael Elementary
 7  indicates that you need to be able to maintain
 8  emotional control under stress?
 9      A.   That's true.
10      Q.   And were you aware of that prior to accepting
11  the position at Michael Elementary?
12      A.   Yes.
13      Q.   Based upon your history beginning in 2005 with
14  Pleasanton Independent School District, did you believe
15  that you were capable of doing that?
16      A.   Yes.
17      Q.   When you were counseled then by
18  Ms. Massiatte in October of 2009, how long was it
19  before you decided to check yourself into partial
20  hospitalization at Laurel Ridge?
21      A.   I don't have the dates in front of me, but I
22  believe it was the following week.  I spent some days
23  -- I took sick leave immediately, and I spent some days
24  with Dr. Moore trying to figure out what to do.  And
25  then I went into the partial.  I believe that was
```

41

```
 1   within a week.
 2        Q.   And what did the partial hospitalization look
 3   like?  Were you actually a resident there, or did you
 4   spend -- did you spend the entire day there, or how did
 5   that work?
 6        A.   I would go in at 8 a.m., maybe 9.  I can't
 7   remember.  And I would stay until 3, and then I'd go
 8   home.
 9        Q.   What happened during that time period?
10   What did you do?
11        A.   Nurses would talk with me and make me feel
12   comfortable there.  The psychiatrist, Dr. Salinas,
13   changed my prescriptions.  I was in group therapy,
14   music therapy.  I watched videos about depression,
15   which I already know about.  I can't think of anything
16   else.
17        Q.   What did you do when you left each day?
18        A.   I would just go home.
19        Q.   How long did that partial hospitalization at
20   Laurel Ridge last?
21        A.   It was ten days.  Or two weeks.  I can't
22   remember if it was ten days or two weeks.
23        Q.   And during that period of time, you were on
24   leave from the school district?
25        A.   Yes.
```

EDDIE HORRIS - COURT REPORTERS, INC.
92 Trailcrest, San Antonio, Texas 78232
Telephone (210) 698-2727  Telecopier (210) 698-5556

42

```
 1        Q.   Prior to that, in 2008 you had received an
 2   evaluation from Ms. Shaw that rated you below
 3   expectations in some areas, is that correct, in October
 4   of 2008?
 5        A.   I would have to see the paperwork.  I -- I
 6   could be mistaken, but I don't believe that Ms. Shaw
 7   ever did an official appraisal on me from the
 8   classroom.
 9        Q.   Do you recall whether or not she might have
10   evaluated you and indicated that you had problems with
11   compliance with time lines?
12             MR. PONCIO:  Object, calls for speculation.
13        Q.   (By Mr. Wood) You may answer.
14        A.   The question one more time.
15        Q.   Do you recall whether or not she had rated you
16   below expectations with respect to your compliance with
17   time lines?
18        A.   I don't remember.  I know that was part of the
19   problem at some point, but I don't know specifically
20   that date.
21        Q.   You do recall that you received more than one
22   evaluation that contained items that rated you below
23   expectations?
24        A.   Yes.
25        Q.   In October of 2009, about the time that
```

EDDIE HORRIS - COURT REPORTERS, INC.
92 Trailcrest, San Antonio, Texas 78232
Telephone (210) 698-2727  Telecopier (210) 698-5556

43

```
 1   Ms. Hassiatte counseled with you about the grade issue,
 2   is it fair to say that your fourth grade reading
 3   release test results were approximately -- had
 4   approximately only a 50 percent passing rate for your
 5   class?
 6        A.   This is in October of 2000 --
 7        Q.   '9.
 8        A.   -- '9?
 9             Yes, that occurred, but I explained to
10   Ms. Shaw the reason for that.
11        Q.   What was your understanding as to the reason
12   that your passing rate was only 50 percent on the
13   reading test?
14        A.   The other teachers and I previously gave the
15   students multiple attempts at the test, and I told Ms.
16   Shaw I wasn't going to do that anymore.
17        Q.   So you gave your students only one attempt at
18   the test?
19        A.   Yes.  I wanted a more realistic picture so that
20   there would be no surprises when they took the TAKS
21   test.
22        Q.   Besides counseling with you in October of 2009,
23   isn't it true that Ms. Hassiatte gave you a memorandum
24   on October 30th that indicated that she was concerned
25   about your turning in lesson plans on time?
```

EDDIE HORRIS - COURT REPORTERS, INC.
92 Trailcrest, San Antonio, Texas 78232
Telephone (210) 698-2727  Telecopier (210) 698-5556

44

```
 1        A.   I would have to see the paperwork, but that
 2   sounds accurate.
 3        Q.   Did she offer you help with respect to any
 4   assistance you might need?
 5        A.   She said that I could go to Melissa Ramon, my
 6   fourth grade team leader, for additional help.
 7        Q.   And you said you thought you were at Laurel
 8   Ridge in partial hospitalization for about two weeks.
 9   You were on leave for approximately four weeks.  Is
10   that correct?
11        A.   I believe so, yes.  I can't -- I believe the
12   issues came in October, and toward the end of October I
13   went into Laurel Ridge for a couple of weeks and then
14   was on medical leave on out.
15        Q.   So following your hospitalization, did you
16   remain at home on medical leave?
17        A.   Yes.
18        Q.   And that would have been for approximately two
19   weeks?
20        A.   No.  I was out longer than that.
21        Q.   Did someone recommend that you remain on
22   medical leave rather than returning to work?
23        A.   The therapist that I had at Laurel Ridge and my
24   psychiatrist, Dr. Salinas, said you would be walking
25   back into a nasty situation that would precipitate or
```

EDDIE HORRIS - COURT REPORTERS, INC.
92 Trailcrest, San Antonio, Texas 78232
Telephone (210) 698-2727  Telecopier (210) 698-5556

45

1  cause more problems.
2  Q.   And that was just based upon the fact that Ms.
3  Hassiatte had counseled you about the need to turn in
4  your lesson plans on a timely basis?
5  A.   No.  It was based on the attitude of
6  Ms. Shaw and Ms. Hassiatte, the trouble I was having
7  handling the job with my symptoms.
8  Q.   Besides this counseling session in which Ms.
9  Hassiatte was critical about you turning in lesson
10 plans, what else -- what other issues with
11 Ms. Hassiatte or Ms. Shaw were presenting problems for
12 you at that time?
13 A.   I know I was having trouble keeping up with the
14 workload and knew I could not go to them for emotional
15 support.
16 Q.   When you say you knew you could not go to them
17 for emotional support, what do you base that on?
18 A.   I felt that I was there to do a job and there
19 was -- I felt like I was there to do a job and that was
20 what was expected of me, no exceptions.
21 That was just based on attitude on -- that I perceived
22 from her in conference meetings going over test
23 results.
24 Q.   We talked about your reading test results being
25 only 50 percent.  Did somebody conference with you

46

1  about that and explain to you that that was not a
2  satisfactory passing rate?
3  A.   Yes.
4  Q.   Who counseled with you about that?
5  A.   Lily Shaw counseled with me and each of the
6  teachers about our results.
7  Q.   Was she critical of other teachers' results as
8  well as of your results?
9  A.   I don't know that.  I wasn't in the room with
10 her.
11 Q.   Do you know whether or not there were other
12 teachers who had lower scores with respect to the
13 reading tests than those demonstrated by your class?
14 A.   I don't know if they were higher or lower.
15 I did not know what their results were.
16 Q.   When Ms. Shaw counseled with you about your
17 reading scores, what was your reaction to that?
18 A.   My reaction was that those scores weren't going
19 to cut it and that they needed to be fixed or corrected
20 -- I mean, improved.
21 Q.   Was that your own internal feeling, or was that
22 something that Ms. Shaw indicated to you and you
23 disagreed with?
24 A.   It was my own internal feeling and then she
25 agreed with it.

47

1  Q.   Was Ms. Shaw critical or, excuse me, was she
2  harsh to you when she discussed your reading scores
3  with you?
4  A.   Harsh?  No.
5  Q.   Was she unfair to you when she discussed those
6  scores with you?
7  A.   No.
8  Q.   Now, there were also some writing scores that
9  were given approximately at that time.  Do you recall
10 that your class had a 39 percent passing rate on the
11 writing scores?
12 A.   I'd have to see the date of that test, if it
13 was possible that that writing test was given after I
14 was gone.
15 Q.   Do you recall whether or not the writing scores
16 for your class were the lowest of the scores given in
17 the fourth grade?
18 A.   No, I was not aware of that.  And again, I
19 don't know if that test was given while I was actually
20 on campus or not.
21 Q.   Did Ms. Shaw ever counsel with you about your
22 writing scores, to your recollection?
23 A.   Not at all.  We had exemplary writing on the
24 TAKS test in the spring.
25 Q.   So, so far I understand that Ms. Shaw counseled

48

1  with you about your reading scores, but you didn't feel
2  like she was harsh or unfair to you.  And Ms. Hassiatte
3  counseled with you about the need to timely turn lesson
4  plans in.  What other experiences were causing you
5  problems or causing you some sort of emotional distress
6  with respect to your employment at Michael in this time
7  period of October and November of 2009?
8  A.   I was unable to keep up with the paperwork.
9  That was me and my standards, I wasn't keeping up with
10 the paperwork.  I was able to have my lessons prepared
11 and be on for the kids.  But the paperwork and test
12 results and meetings and lack of time to work on it, I
13 felt overwhelmed.
14 Q.   And so was the stress that you were suffering
15 from, was that something that was imposed by your own
16 conscience, or was it something that was imposed by
17 something that either Ms. Hassiatte or
18 Ms. Shaw did?
19 A.   It was a combination.  I believe it was myself
20 and the standards I had had and feeling like I wasn't
21 keeping up, and then to have that re-affirmed by my
22 supervisors just added to it, added to the stress.
23 Q.   What conferences, other than the one that Ms.
24 Shaw had with you about your reading scores and the one
25 that Ms. Hassiatte had with you about turning in lesson

49

```
1   plans, what other conferences did you have with those
2   two that might have imposed any additional stress?
3       A.   What time frame are you asking about?
4       Q.   October and November of 2009.
5       A.   They pulled me in for a meeting.  I can't
6   recall the reason.  But I left in tears.  I can't
7   recall the meeting.
8       Q.   Was that prior to your hospitalization at
9   Laurel Ridge?
10      A.   I believe so.
11      Q.   Did you believe, based upon what was going on
12  at that time, that you were maintaining emotional
13  control under stress?
14      A.   In front of the students I was.
15      Q.   Were you breaking down into tears during the
16  school day?
17      A.   Yes.
18      Q.   And was that for the entire school day, or were
19  there times that you broke down during the day?
20      A.   Just temporary moments I allowed myself to go
21  to the restroom and gather my thoughts and emotions and
22  get back to work.
23      Q.   So during the time period after you left Laurel
24  Ridge treatment center and before you returned to work
25  at Michael Elementary, I take it you were staying at
```

50

```
1   home during the day?
2       A.   I was staying at home and continuing to see Dr.
3   Villanueva and Dr. Moore.
4       Q.   How often were you seeing Dr. Villanueva during
5   that time period?
6       A.   I don't remember.  I'd have to look at the
7   printout of how much I saw him then.  And I -- and I
8   don't remember how often.  It was at least once a
9   month.
10      Q.   And what about Dr. Moore, how often were you
11  seeing her?
12      A.   That was a transition time between
13  Dr. Salinas and Dr. Moore.  I saw both of them, I
14  believe -- I believe Dr. Salinas was weekly.  I can't
15  remember.
16      Q.   What did you do when you would see
17  Dr. Salinas when you weren't receiving counseling from
18  her.
19      A.   I received -- she checked on my medications to
20  see if they were helping.  She checked on weight and
21  blood pressure.  We talked about work, talked about the
22  treatment at Laurel Ridge, how I was feeling.  It was
23  not just a five-minute meeting as previous
24  psychiatrists.
25      Q.   When you were discharged from Laurel Ridge, did
```

51

```
1   they feel like they had done as much as needed to be
2   done in order to discharge you?
3       A.   I have no way of knowing that.  Insurance only
4   paid for ten days.
5       Q.   Is it your understanding that your stay there
6   was limited just by the amount that the insurance would
7   pay?
8       A.   Yes, because I wasn't getting income, so yeah.
9       Q.   When did you return to work at Michael?
10      A.   In January of 2010.
11      Q.   Did you return immediately at the start of the
12  new semester?
13      A.   Yes.
14      Q.   What was your state of mind like at that point?
15  Did you feel like you had recovered from the episode
16  that led you to refer yourself for partial
17  hospitalization?
18      A.   Yes, I felt like I could start again, new year,
19  and I felt that -- I wanted to believe what one of the
20  therapists had said.  She had told me, "You've just
21  been written up once.  Big deal.  Get back to work when
22  you can and just don't let that one reprimand upset
23  you."  So I went back to work.
24      Q.   Were you aware of other employees who had
25  received a reprimand?
```

52

```
1       A.   No.  I have no way of knowing that.
2       Q.   Had you ever had discussions with any of your
3   colleagues as to whether or not any of them had ever
4   received reprimands?
5       A.   No.
6       Q.   Did you think that a single reprimand was
7   something that was significant with respect to your
8   future employment with the district?
9       A.   Yes.
10      Q.   Why did you believe that?
11      A.   It had been the first time in my 20 years of
12  teaching that I had ever been reprimand.
13      Q.   Did you feel like the reprimand was warranted
14  based upon the fact that you had not timely submitted
15  lesson plans?
16      A.   That's a decision the supervisor has to make.
17  Previously at my other position, I would have been
18  talked to and there would have been no reprimand.
19      Q.   Well, you talked about your own personal code
20  of the way things ought to be done.  Did you feel like
21  it was acceptable for you not to turn in your lesson
22  plans on a timely manner?
23      A.   No, they needed to be turned in on time.
24      Q.   And if you had had a subordinate who you were
25  supervising, would you have likewise indicated to that
```

53

```
1    employee if they needed to turn in their lesson plans
2    on a timely basis?
3        A.   Yes.
4        Q.   When you returned in January of 2010, I know
5    there was an additional issue about your final grades
6    not being submitted timely.  Do you recall that?
7        A.   Certainly.
8        Q.   And you met, again, with Ms. Hassiatte about
9    that?
10       A.   Yes, I did.
11       Q.   Did she tell you that she did not see any
12   grades that had been posted since December for your
13   class?
14       A.   Yes, she did.
15       Q.   Are you aware that there were other employees
16   with whom Ms. Hassiatte also met with respect to the
17   issue of late grades or grades not submitted in a time
18   --
19       A.   I have no way of knowing that.
20       Q.   Did she give you a reprimand in January that
21   indicated to you that your failure to comply with the
22   requirement to post grades in a timely manner would be
23   reflected in a negative manner on your evaluation?
24       A.   Yes, she did.
25       Q.   Did you believe that was warranted?
```

54

```
1        A.   No.
2        Q.   Why not?
3        A.   I was written up for not having grades in
4    December, and I wasn't even on campus.
5        Q.   Once you returned, though, with grades being
6    due on January 15th, was it your understanding that you
7    were responsible for that, whether you had been on
8    campus in December or not?
9        A.   That was not my understanding.  It was my
10   understanding that they would take care of the grades,
11   or the substitute would, while I was gone.
12       Q.   So you felt like this was something that was
13   not your responsibility?
14       A.   That's correct.
15       Q.   Now, during -- in February you went in for
16   medical treatment again.  Is that correct?
17       A.   This is 2010?
18       Q.   Yes.  With Ms. Salinas or Dr. Salinas.
19       A.   Yes, I did.
20       Q.   And she filled out a Medical Certification of
21   Health Care Providor.  Is that correct?
22       A.   Yes.
23       Q.   And she indicated in that form that she felt
24   like you were incapacitated.  Is that accurate?
25       A.   That's accurate.
```

55

```
1        Q.   And she said that your mood was severely
2    depressed with significant cognitive effects including
3    affecting memory and concentration?
4        A.   Yes.
5        Q.   And she also indicated that you may be unable
6    -- that you will be unable to perform some of the
7    essential functions of the job.  Is that correct?
8        A.   Yes.
9        Q.   In fact, she recommended that you not return to
10   teaching, did she not?
11       A.   She recommended that I not return that year.
12       Q.   And based upon that recommendation, did you go
13   -- again go on leave, or did you --
14       A.   I was on leave until the end of the school
15   year, yes.
16       Q.   You met with Mark Hardison in March of 2010,
17   did you not?
18       A.   In March?  Yes.
19       Q.   Did you tell Mr. Hardison that when you
20   returned to work that you would like to be placed in a
21   lower grade level because of the stress?
22       A.   I know I had asked for a different school for a
23   fresh start.  I can't recall the lower grade level
24   request.
25       Q.   And then in April you filed a charge of
```

56

```
1    discrimination with the EEOC, did you not?
2        A.   Yes.
3        Q.   Why did you do that?
4        A.   While I was on medical leave attempting to get
5    better from my medical condition, Dr. Folks sent me a
6    letter saying that my contract would not be renewed,
7    and I felt that was discriminatory.
8        Q.   In fact, what Dr. Folks informed you was that
9    he was not going to recommend an extension.
10   Isn't that accurate?
11       A.   It's accurate, but it's a verbal jujitsu about,
12   you know, basically you're done here.
13       Q.   Well, in fact, after Dr. Folks' recommended
14   action, you still had one year remaining on your
15   contract, did you not?
16       A.   I did.  But it would be terminated at that end.
17       Q.   And how do you know that it would be terminated
18   at the end of that second year?  That's a presumption
19   --
20       A.   Because my principal recommended that I not be
21   renewed, and I was going to go back to that same
22   principal, without any accommodations.
23       Q.   She recommended that you not be extended at
24   that time.  Isn't that accurate?
25       A.   Extended is accurate.  But again, it's once
```

57

1 that's on your record as a teacher, it is a black mark,
2 because another school district will ask, "Have you
3 ever had your certificate" -- not certificate, "but
4 your contract non-renewed or," and there's another
5 sentence. I can't remember it. Southwest uses it to
6 block out candidates such as myself.
7     Q.   I realize this is somewhat of a technical and
8 legal area, but it is important that we get your
9 understanding. Isn't it your understanding that after
10 Dr. Folks communicated with you in 2010, that you would
11 still have a contract of employment for the 2010-2011
12 school year?
13    A.   Yes, I know that.
14    Q.   And so you filed your charge of discrimination
15 with the EEOC in April of 2010. What was your
16 complaint?
17    A.   I felt I had been discriminated against because
18 my contract was not being redone based on my depressive
19 symptoms. The depressive symptoms caused problems for
20 me in the classroom in keeping up, and I was under
21 constant pressure. I was written up twice inaccurately
22 and unfairly in those -- in January.
23 And I felt that the school district was trying to get
24 rid of me.
25    Q.   Let me take those a piece at a time. As far as

58

1 acts of discrimination, you said you were under
2 pressure in the classroom.
3    A.   Uh-huh.
4    Q.   Did you believe that to be
5 discriminatory -- that some discriminatory motive led
6 to you being put under pressure in the classroom, or
7 was that just a function of the fact that you had
8 stress associated with your job?
9    A.   I had stress going with my job, but based on
10 the reprimands, I felt like I was under a microscope
11 rather than being supported and accommodated.
12    Q.   So specifically with respect to discriminatory
13 type of treatment, you felt like the issuance of these
14 two reprimands was -- were the acts that were
15 discriminatory in nature?
16    A.   Yes. And I wrote as such in my reply.
17    Q.   And so when you are talking about the two
18 reprimands -- I want to make sure that I understand.
19 The reprimand that you were given -- or the memorandum
20 that you were given in October by
21 Ms. Hassiatto, did you believe that one to be
22 discriminatory?
23    A.   No.
24    Q.   So that was a reasonable criticism of the fact
25 that you hadn't turned in lesson plans on time?

59

1    A.   Yes.
2    Q.   So the reprimand then that you received in
3 January -- on January 14th from Ms. Hassiatto about
4 your failure to post grades, did you feel like that was
5 discriminatory?
6    A.   Yes. They were penalizing me for something
7 that I wasn't there to do.
8    Q.   So you believe that it was unfair because of
9 the fact that you had not been there and you shouldn't
10 be responsible?
11    A.   I agree with that.
12    Q.   And there wasn't anything that -- about the
13 reprimand from Ms. Hassiatto that was based upon --
14 that you believe was based upon your disability. Is
15 that fair?
16    A.   No. I believe I was -- I would have to see the
17 paperwork in front of me. But I believe I was given
18 two reprimands, both of them were inaccurate, and I --
19 and as noted in my reply, inaccurate and unfair.
20 Again, they penalized me for something that I wasn't
21 there to do. And then I was criticized or reprimanded
22 for my grades. And my grades have always been done on
23 time and approved by Ms. Shaw. It was just a
24 reprimand, and there was no talking at all.
25 It was just, "We're going to have a meeting,

60

1 Mr. Carter, and, oh, by the way, here's a reprimand."
2    Q.   So besides the issuance of a memorandum
3 relating to grades, which you felt like was unfair
4 because you had been out, do you believe that there was a
5 second reprimand issued over approximately that time?
6    A.   I believe so, unless I'm getting it confused
7 with the beginning of 2011.
8    Q.   I think that might be the case.
9    A.   Oh, okay.
10    Q.   So it's fair to say that in essence what
11 precipitated your filing a complaint of discrimination
12 in April of 2010 was the fact that
13 Ms. Hassiatto had given you a reprimand for not having
14 your grades recorded in a timely manner. Is that fair?
15    A.   No. I wrote the discrimination -- I submitted
16 the EEOC complaint because of John Folks' letter and
17 because of the inaccurate reprimand, and I felt that I
18 had come back from Laurel Ridge, and the feeling
19 that the -- they did not want me around, because I had
20 received no positive help or talks. It had all been,
21 "Do your job."
22    Q.   So let me just clarify. So Ms. Hassiatto's
23 reprimand for not entering grades, Dr. Folks'
24 recommendation that your contract not be extended and
25 you said you felt like you weren't wanted, what was it

61

```
1   -- how was it that you -- or by whom did you experience
2   treatment that made you feel like you were not wanted?
3       A.   At the beginning of 2010 and again a year later
4   almost to the day, I had been subject to numerous
5   walk-throughs, weekly meetings, the reprimand, all
6   within the first week or two that I was back.  It's
7   like this guy just came back from Laurel Ridge and
8   let's hammer him.
9       Q.   Was it your understanding that the meetings
10  that they held with you were to hammer you?
11      A.   At first I didn't believe so.
12      Q.   Did they not offer you help during those
13  meetings?
14      A.   I'd like an example of that.
15      Q.   Well, did they?  I mean, you tell me.
16  Based upon your perception when they met with you, did
17  they offer you help with respect to the issues that you
18  were having?
19      A.   In 2010?  Did they offer me help?
20      Q.   First of all, you certainly --
21      A.   It's difficult to classify something as helpful
22  when you're reprimanded.
23      Q.   Are you certain that you were having weekly
24  meetings beginning in January of 2010?
25      A.   No.  I probably had one, maybe two meetings
```

EDDIE MORRIS - COURT REPORTERS, INC.
92 Trailcrest, San Antonio, Texas 78232
Telephone (210) 698-2727 Telecopier (210) 698-5556

62

```
1   within that short time I was there.
2       Q.   With whom did you have those meetings?
3       A.   Massiatte and Shaw.
4       Q.   What do you recall about those meetings?
5       A.   I recall Ms. Shaw taking notes, writing down
6   things that I said, going over --
7       Q.   Do you believe it was one or two meetings in
8   the -- in January of 2010?
9       A.   I believe it was two by the time I left.  I
10  don't know.
11      Q.   Do you believe that both ladies were present
12  during those meetings, or do you believe that those
13  meetings were held separately with those two women?
14      A.   I believe I had a meeting with both of the
15  women, and during those meetings I felt that it was not
16  helpful -- they were not being helpful because they
17  were taking notes like this was some kind of court
18  thing.
19      Q.   What was it about them taking notes that made
20  you feel like it was not helpful?
21      A.   Normal conversation between people wouldn't
22  include taking notes on a yellow pad as you talked, and
23  I didn't find that helpful.
24      Q.   Were one or both of them taking notes during
25  these meetings?
```

EDDIE MORRIS - COURT REPORTERS, INC.
92 Trailcrest, San Antonio, Texas 78232
Telephone (210) 698-2727 Telecopier (210) 698-5556

63

```
1       A.   I don't remember.
2       Q.   What do you recall about the conversation at
3   those two meetings?
4       A.   They went over the -- I believe they went over
5   the lesson plans and the grades, stressing how
6   important it was that those were done on time.
7       Q.   Were you aware of that before you had the
8   meeting with them, that it was important to have your
9   lesson plans and grades submitted in a timely manner?
10      A.   Yes.  With the exception of the October
11  reprimand, I believe all my lesson plans had been
12  turned in on-line and on time.
13      Q.   Did you point that out to them in that
14  conversation?
15      A.   Yes.
16      Q.   And did they accept that?
17      A.   No.  It needed to be in print in her mailbox.
18      Q.   Were you aware of that requirement before your
19  meeting with Ms. Shaw and Ms. Massiatte?
20      A.   Yes.
21      Q.   So that wasn't a surprise to you?
22      A.   It was a surprise that they would bring up such
23  a small matter and turn it into something that I would
24  lose my job on later.
25      Q.   Did they tell you that you were going to lose
```

EDDIE MORRIS - COURT REPORTERS, INC.
92 Trailcrest, San Antonio, Texas 78232
Telephone (210) 698-2727 Telecopier (210) 698-5556

64

```
1   your job?
2       A.   They said it would reflect negatively on my
3   next appraisal.
4       Q.   And that's true, if you don't timely submit
5   your lesson plans or your grades, it does reflect
6   negatively on your appraisal, does it not?
7       A.   At the principal's choice, yes.
8       Q.   Do you know whether or not there were other
9   persons -- other teachers who did not timely submit
10  lesson plans or grades who received the same sort of
11  treatment from Ms. Shaw or Ms. Massiatte?
12      A.   I was unaware of that and was not told that was
13  happening.
14      Q.   Did it surprise you that they advised you that
15  you were going -- that that would reflect negatively on
16  your appraisal since you knew it was a requirement?
17      A.   Yes, it surprised me because that's not what
18  teaching is about.  I thought that they were looking
19  for any small matter that they could use against me to
20  not renew my contract.
21      Q.   Had you ever failed to turn in lesson plans or
22  grades in a timely manner prior to this experience at
23  Michael?
24      A.   No, I don't believe so.
25      MR. PONCIO:  Tell me when you're at a breaking
```

EDDIE MORRIS - COURT REPORTERS, INC.
92 Trailcrest, San Antonio, Texas 78232
Telephone (210) 698-2727 Telecopier (210) 698-5556

65

```
 1   point, please.
 2          MR. WOOD:  Now is a good time.
 3          THE VIDEOGRAPHER:  We're off the record at
 4   10:41 a.m.
 5          (Recess taken)
 6          THE VIDEOGRAPHER:  We're back on the record at
 7   10:50 a.m.
 8      Q.   (By Mr. Wood)  Mr. Carter, we were talking about
 9   the early part of 2010 from January up until you filed
10   a charge of discrimination in April.  And I want to
11   make sure that I understand what precipitated you
12   filing a charge of discrimination.  You indicated that
13   you received at least one reprimand from
14   Ms. Massiatte.  Is that correct?
15      A.   I believe so.
16      Q.   That you believe was unjust, relating to
17   grades?
18      A.   Yes.
19      Q.   The prior memorandum she had given you in
20   October 30th -- on October 30th you felt like was
21   justified more?
22      A.   Yes.
23      Q.   So when Ms. Massiatte reprimanded you for not
24   having your grades entered and when Dr. Folks
25   recommended that your contract not be extended for
```

66

```
 1   another year, leaving you with just one year on your
 2   contract, was there anything besides those two actions
 3   that you felt like was discriminatory in nature when
 4   you filed your complaint with -- or your charge of
 5   discrimination with the EEOC?
 6      A.   I was released and ready to go back to work in
 7   January of 2010, and was met with not support but with
 8   another reprimand that I felt was unjustified, and then
 9   that information was then turned over to central office
10   while I was on medical leave trying to get better from
11   a medical condition that I had.
12      Q.   So specifically we're talking about the January
13   14th memorandum from Ms. Massiatte in which she advised
14   you that the failure to comply with the requirement to
15   post grades in a timely manner would be reflected in a
16   negative manner on your evaluation?
17      A.   That's one of the items, yes.
18      Q.   That's the only reprimand that you received
19   during that time period.  Am I correct?
20      A.   I don't remember if it was just one or if there
21   were two or if there were two meetings.  I can't
22   remember the number of meetings and the reprimands.
23      Q.   So the issuance of that reprimand, another one,
24   if it occurred, Dr. Folks' recommendation and then the
25   attitude of the ladies during those two meetings.  Was
```

67

```
 1   it the attitude of both ladies, or just one of them?
 2   What do you recall -- what did you perceive to be
 3   discriminatory during those meetings?
 4      A.   I was ready to go back to work, and instead of
 5   receiving any support in the way of, "Welcome back, Mr.
 6   Carter, let's go over a couple of things, how you
 7   doing," it was, "We have a meeting scheduled and you
 8   need to be there and we're going to nail you on grades
 9   or lesson plans."  They had no complaint about my
10   classroom at all.  They had no complaint about my
11   teaching.  They were picking at small matters that
12   almost any teacher would tell you those lesson plans,
13   if there's a fine detail that's left out, it's not
14   important.
15          The day flows along, and you have to
16   make adjustments.  I was being criticized for not
17   having the time that the kids came back from the
18   library later on.  It just -- I was being told that I
19   need to submit grades while I'm out on medical leave,
20   which I had not been notified of.
21      Q.   But to be fair, you don't know whether or not
22   other teachers were reprimanded or counseled about
23   their failure to timely turn in grades or lesson plans,
24   do you?
25      A.   No.  I'm not interested in how other teachers
```

68

```
 1   were treated.  I was not made aware of that.  I was not
 2   made aware that I was not going to be non-renewed
 3   either.
 4      Q.   In June, Ms. Shaw advised you that she was
 5   going to re-assign you to the first grade.  Is that
 6   correct?  June of 2010.
 7      A.   Yes.
 8      Q.   And you thought that that was going to be a
 9   good spot for you, did you not?
10      A.   I came back to work willing to do whatever it
11   took to make people happy to keep my job.  And if they
12   were going to put me in first grade or fifth grade, I
13   was going to take it.
14      Q.   Was it your understanding that the requirement
15   to submit written materials relating to academics was
16   less for a first grade teacher than it was for a fourth
17   grade teacher?
18      A.   Yes, I agree that there are -- there's less
19   testing of first graders and less requirements as far
20   as posting grades, but I was still being assigned to a
21   grade level that was brand-new to me with its own
22   stressors.
23      Q.   You had actually asked for that, though, had
24   you not?
25      A.   Had I asked for -- I don't recall asking for a
```

69

```
1  specific grade level.
2      Q.   Well, when you met with Mr. Hardison, didn't
3  suggest to him that you wanted to be re-assigned to a
4  lower grade level?
5      A.   I believe it was just I wanted to be
6  re-assigned to a new school.  A new grade level would
7  not alleviate the problem of Ms. Shaw and
8  Ms. Massiatto.
9      Q.   You were advised, though, that you were not
10 eligible for a transfer, were you not?
11     A.   I was advised that, but they are able to make
12 transfers as needed.
13     Q.   Did you tell Ms. Shaw that you thought the
14 re-assignment to first grade was going to be a good
15 spot for you?
16     A.   At the time that she told it, yes.
17     Q.   So you began in August of 2010 teaching at the
18 first grade level.  Is that correct?
19     A.   I did, after having a meeting going over
20 accommodations the previous summer.
21     Q.   With whom did you meet to discuss the
22 accommodations in the summer of 2010?
23     A.   I was told to attend the meeting by Jim Miller
24 to go over my coming back to school and accommodations.
25     Q.   After Mr. Miller told you to do this, with whom
```

EDDIE MORRIS - COURT REPORTERS, INC.
92 Trailcrest, San Antonio, Texas 78232
Telephone (210) 698-2727  Telecopier (210) 698-5556

70

```
1  did you meet?
2      A.   Ms. Shaw and Mr. Hardison were also there.
3      Q.   Did that take place at Michael?
4      A.   No.  It took place at the central office.
5  I had attempted to delay it because they wanted
6  accommodations, and I told them I needed to get in
7  touch with my doctor, but they refused to delay the
8  conference.
9      Q.   Did you have absences during the fall of 2010
10 then?
11     A.   I don't remember.  Probably, yes.
12     Q.   You were not on leave for any period after the
13 beginning of the 2010-2011 school year, were you?
14     A.   No, I wasn't.
15     Q.   And by December, someone had made the decision
16 to place you on a Teacher In Need of Assistance, or
17 what we call a TINA plan.  Is that correct?
18     A.   Uh-huh.
19     Q.   What was the purpose or the stated purpose of
20 placing you on a TINA plan in December?
21     A.   The stated purpose of a TINA plan is to help a
22 teacher get back on track and meet the requirements
23 that the supervisors have laid out.  That's the stated
24 goal.  I don't believe that was the goal.
25     Q.   Why do you believe it was not the goal?
```

EDDIE MORRIS - COURT REPORTERS, INC.
92 Trailcrest, San Antonio, Texas 78232
Telephone (210) 698-2727  Telecopier (210) 698-5556

71

```
1      A.   Because prior to that, my accommodations that I
2  had requested had been ignored or watered down, and the
3  meetings continued, despite my asking that the weekly
4  mandatory meetings stop because they were causing me
5  stress.  And I felt that they were just adding more --
6  adding more stress to me rather than helping.  If they
7  wanted to help, they would have gone with the
8  accommodations.
9      Q.   Did you explain to you that the purpose of the
10 weekly meetings was to help you?
11     A.   Oh, that's what they said.
12     Q.   In January, then, Ms. Shaw gave you a letter
13 again about grade book entries, did she not?
14     A.   This is January, 2011?
15     Q.   Yes.
16     A.   Yes, I believe so.
17     Q.   And she pointed out that on several occasions
18 she had directed you regarding that particular issue?
19     A.   Yes.
20     Q.   And that issue of timely submitting grade book
21 entries was something that was part of your TINA, was
22 it not?
23     A.   I don't recall the two being linked.  As far as
24 I know, I was going according to the TINA plan and that
25 there hadn't been a problem.
```

EDDIE MORRIS - COURT REPORTERS, INC.
92 Trailcrest, San Antonio, Texas 78232
Telephone (210) 698-2727  Telecopier (210) 698-5556

72

```
1      Q.   What was -- to your recollection, what were you
2  focusing on with respect to the TINA plan?
3      A.   The TINA plan was focusing on classroom
4  management.
5      Q.   When Ms. Shaw gave you the letter of reprimand
6  in January of 2011, did she advise you that the failure
7  to timely submit grades would reflect negatively on
8  your evaluation?
9      A.   Yes.
10     Q.   Now, obviously this had been an issue that you
11 felt like was unfairly directed towards you the
12 previous January.  I take it that it was no surprise at
13 a year later that Ms. Shaw was still persistent about
14 her insistence that grades be entered in a timely
15 manner.  You weren't surprised by that, were you?
16     A.   I was surprised to be met with two or three
17 meetings, a couple of reprimands upon my return in
18 January.
19     Q.   Now, you felt like in January, 2010 it was
20 unfair to expect you to have the grades in by the due
21 date because you had not been on campus.  Was it unfair
22 in January of 2011 to expect you to have your grades in
23 in a timely manner?
24     A.   I would have to see the specific dates that
25 we're discussing.  I don't know what the status of the
```

EDDIE MORRIS - COURT REPORTERS, INC.
92 Trailcrest, San Antonio, Texas 78232
Telephone (210) 698-2727  Telecopier (210) 698-5556

73

1   grade book was at that time.  But every time I turned
2   in my grades, they were on time, they were complete and
3   Ms. Shaw signed off on them every time I was there.
4       Q.   So is it your belief that in January of 2011
5   when you were reprimanded about failure to timely
6   submit grades, that that was just flat out untrue?
7       A.   Teachers submit grades as they are -- as they
8   come in.  They may not be that day.  They may wait
9   until the weekend.  They -- as my attorney with TSTA
10  stated, there were no -- absolutely no grade
11  requirements for Northside for first grade as far as a
12  number, and we felt that I was being retaliated or
13  discriminated against because they're focusing on such
14  a small matter, when all in the past I have always met
15  the deadlines.
16      Q.   I'm going to read to you from Ms. Shaw's letter
17  to you of January 4th, 2011.
18      A.   Okay.
19      Q.   She says, she begins: "This memorandum is to
20  communicate the importance of entering student grades
21  in the grade book.  On January 3rd, 2011, I was
22  reviewing your grade book and noticed that there were
23  insufficient grades inputted in math, reading, language
24  arts and science.  By the end of the seventh week, you
25  had the following number of grades inputted per

74

1   subject:  Math, 8; reading, 8; language arts, 6; and
2   science, 3.  I referenced the need for you to update
3   your grade book via a meeting on October 20th, 2010,
4   November 10th, 2010 and the walk-through forms dated
5   November 8th, 2010 and December 13th, 2010."
6            That suggests to me that Ms. Shaw had
7   met with you and counseled with you on numerous
8   occasions about the need to timely input your grades.
9   Is that consistent with your recollection of what
10  happened in the fall of 2010?
11      A.   To me, the accumulation of those dates back up
12  my claim that I was constantly under a microscope over
13  small matters.  Some of those are within a week of each
14  other.  And again, it goes to the point of not allowing
15  me any accommodation or understanding as far as Mr.
16  Carter has a medical condition and maybe we shouldn't
17  focus so much on these little matters when he's doing a
18  good job with his class.
19      Q.   So your notion is that Ms. Shaw should have
20  just kept her nose out of it and not followed up to
21  make sure as to whether or not you had inputted your
22  grades in a timely manner?
23      A.   I found it curious that she focused on January
24  3rd, the day I came back.
25      Q.   Well, in her letter she also says:  "At the

75

1   beginning the year, all staff were reminded through the
2   Michael staff handbook to keep their grade book updated
3   with consistency amongst the team members."
4            Was that true?  Was that statement true?
5       A.   Yes.
6       Q.   And she said:  "We visited this subject again
7   at the team leader meeting on November 1, 2010."
8            Was that true?
9       A.   I wasn't there.
10      Q.   That wasn't true, y'all didn't --
11      A.   I wasn't there.
12      Q.   Oh, you weren't there.
13           She says:  "Your team leader discussed
14  this with the entire grade level on November 2nd,
15  2010."
16           Were you present for that?
17      A.   Yes.  I don't recall the number of exact grades
18  that she wanted.
19      Q.   Well, she says you all agreed to take two
20  grades weekly in each subject.  Had you agreed to that?
21      A.   Yes.
22      Q.   And she says it was also discussed to input the
23  grades on a weekly basis.  Do you remember that
24  discussion?
25      A.   Yes.

76

1       Q.   Now, you understood, and she explains in her
2   letter, that the purpose of having the grades inputted
3   on a timely manner -- in a timely manner is so that the
4   parents can view the grades through the Parent
5   Connection.  Is that right?
6       A.   Certainly.
7       Q.   And it's important for them to be able to do so
8   to monitor their child's progress, is it not?
9       A.   Certainly.
10      Q.   And if you have not inputted those grades in a
11  timely manner, those parents are not going to be able
12  to monitor their child's progress?  Is that accurate?
13      A.   Wouldn't be able to monitor it from that the --
14  that's true.
15      Q.   Do you believe it was unfair for Ms. Shaw to
16  give you this letter on January 4th, 2011, indicating
17  that she was going to expect your grades to be input in
18  a timely manner?
19      A.   I believe it was unfair.  It was unfair because
20  she had come back from Christmas break loaded up with
21  ammo with anything she could to make sure that I wasn't
22  renewed that following year.  She had already
23  recommended that I not work there anymore, and in order
24  to justify me not getting my contract renewed, she
25  needed more than what she had.

77

```
 1      Q.   You say it was unfair because she came back
 2  from Christmas break loaded up for bear, but,
 3  in fact, she had not met with you about that same issue in
 4  October and November and December, had she not?
 5      A.   Yes, because we had mandatory weekly meetings,
 6  and we went over everything with a fine-tooth comb,
 7  after I had requested that those meetings not occur.
 8  And my TSTA attorney had also requested that.
 9      Q.   You -- then about a week later after she gave
10  you that letter, you again submitted a discrimination
11  and retaliation claim, did you not?
12      A.   Yes, but it wasn't specifically just for that
13  letter.
14      Q.   What else besides that letter was there that
15  led you to submit a discrimination and retaliation
16  claim?
17      A.   The reasons are listed on the EEOC form, but I
18  believe it would say that I came back with a couple of
19  reprimands, three observations -- I'm not sure --
20  possibly four, all within the first four days back at
21  work.
22      Q.   After the Christmas break is up?
23      A.   Uh-huh.
24      Q.   Once you filed that claim of discrimination and
25  retaliation, EEOC asked to you submit information to
```

78

```
 1  support those claims, did they not?
 2      A.   I don't remember getting that.
 3      Q.   Do you remember -- were you copied with a
 4  letter that the EEOC sent to your attorney,
 5  Mr. Poncio, requesting that you submit information and
 6  evidence in support of your claims?
 7      A.   I would imagine that would have happened, but
 8  I'm not aware of it.
 9      Q.   Isn't it true that you did not submit any type
10  of information or evidence in support of those claims
11  to EEOC?
12      A.   I don't recall submitting any answers to EEOC.
13  I wasn't aware that they were pursuing it.  In the past
14  they just took the complaints and didn't do anything
15  with it.
16      Q.   Tell me every act of what you perceive to be
17  discrimination or retaliation that took place during
18  the 2010-2011 school year that you were subjected to.
19      A.   In my meeting before the school year started, I
20  had requested, at Mr. Hiller's request, some
21  accommodations.  When told of the accommodations, he
22  was dismissive.  And I said, "Is it your intent not to
23  give me any of those accommodations?"
24           And he picked up the paper of my
25  accommodations and just dropped it in the file and
```

79

```
 1  said, "Duly noted."
 2           Mr. Hardison quickly backtracked, said,
 3  "Well, we need to look at it all.  We'll see."
 4           I had five accommodations listed on that
 5  that would have helped me in the coming school year, as
 6  documented by my doctor, not just me.  I asked that I
 7  be re-assigned to another campus to get a fresh start.
 8  I asked that the lesson plans be due on Monday instead
 9  of Friday, a practice that could have easily have been
10  done and is done at other campuses.  I asked that I be
11  put in a grade level that I'm familiar with.  Instead I
12  was put into first grade, which is an entirely
13  different ballgame than fourth grade.
14           And there were five accommodations.  I
15  don't have my paper in front of me.  But I asked that
16  the -- I have a weekly meeting with my team to go over
17  lesson plans and such, and that was quickly done away
18  with within the first month.  She said we are each
19  responsible for our own lesson plans and we weren't
20  going to have team meetings for that purpose.
21      Q.   Were any of these accommodations that you
22  requested during the summer of 2010 extended to you?
23      A.   I can't think of one.
24      Q.   I guess I'm confused because in June of 2010 is
25  when Ms. Shaw advised you that you would be assigned to
```

80

```
 1  the first grade, and my understanding was that you told
 2  her that you thought that was a good spot for you.
 3      A.   I told her as an employee, just accepting
 4  whatever she told me.
 5      Q.   You sent Ms. Carter an e-mail on June 15th,
 6  2010, and you said in it, "I told you" -- "I told him,"
 7  you're talking about your meeting with
 8  Mr. Hardison, "you had already assigned the first grade
 9  job and that it sounded like a good spot for me."  Is
10  that correct?  Is that what you told
11  Ms. Shaw?
12      A.   I believe I told Ms. Shaw that, yes.
13      Q.   You were describing for me the actions that you
14  believe to be discriminatory in 2010-2011.  Anything
15  else?
16      A.   I came back to work under a microscope of
17  weekly meetings, going over everything that I did in
18  the classroom or didn't do.  I was told that I could
19  ask Ms. Ardyce Welch for help in June or July.  At the
20  time I declined.  However, she came in January and
21  said, "We're going to observe your classroom."
22           "Fine, I'll go along with that."
23           "And at the end we'll give you some
24  recommendations as far as how we can make your
25  classroom management better."
```

81

```
 1              "That's fair."
 2         So sho did.
 3    Q.    Did you perceive that you were having problems
 4  with classroom management?
 5    A.    I myself didn't think so.  I had not been
 6  written up for classroom management.  There was an
 7  appraisal where they marked me down for classroom
 8  management.  But Ms. Welch's letter was not helpful.
 9  She just turned over the information to my principal,
10  saying how deficient my classroom management was and
11  that she would not recommend -- I can't remember the
12  wording -- wouldn't recommend me to continue or
13  something like that.  And then I responded with a
14  letter saying it's not what I expected, and I never
15  heard from her again.  So she wasn't there to help. She
16  never responded.
17    Q.    Did you believe that Ms. Welch discriminated
18  against you?
19    A.    I think it was an unfair characterization of my
20  class, and then I believe it was used by -- I would
21  like to know who assigned her to visit my classroom.
22    Q.    You indicated in your correspondence to
23  Ms. Welch that you thought that she had been cordial
24  and helpful while she was actually in the room with
25  you, did you not?
```

82

```
 1    A.    While she was there, yes.
 2    Q.    And then when she was critical of your
 3  classroom management, did you believe that to be
 4  discriminatory?
 5    A.    Taking that information and going to the
 6  principal with it, to me it sounded like that I was
 7  just being set up.  This was more same saying Carter's
 8  not cutting it, we have to get more documentation, and
 9  -- because she wasn't helpful.
10  She didn't write me back.  We didn't have a meeting
11  afterwards.  It was just used by Ms. Shaw later that
12  day to say that I wasn't fit for the job.
13    Q.    Besides Ms. Welch and Ms. Shaw,
14  Ms. Hassiatte and Dr. Folks, is there anyone else that
15  you believe perpetrated any type of discrimination or
16  retaliation towards you?
17    A.    Geri Garza or Garcia, I don't remember her
18  name.  She was the vice-principal at the time.  She was
19  in on all meetings and was aware of what was happening.
20  I believe she was the one that wrote up the appraisals
21  on me.  Again, I don't recall Ms. Shaw ever doing a
22  formal observation on me.  I find it remarkable that
23  someone who would recommend that I be fired never do a
24  formal observation on me.
25              I could be wrong, but I haven't found
```

83

```
 1  that paperwork.
 2    Q.    Dr. Folks notified you then that he was going
 3  to recommend that your contract not be renewed at the
 4  end of the year.  Is that correct?
 5    A.    Yes.
 6    Q.    And was it your understanding that if you
 7  wanted to, you would have been entitled to a hearing
 8  before the board of trustees to contest that decision?
 9    A.    Yes, I was aware of that.
10    Q.    You understood that if you were non-renewed,
11  that that might have a negative impact on your future
12  employability?
13    A.    I'm certainly aware of that.
14    Q.    Dr. Folks notified you that in lieu of
15  recommending you for non-renewal, that you would have
16  the option to resign?
17    A.    I don't believe he said that in the letter. I
18  don't recall.
19    Q.    Nonetheless, in April of 2011, you did submit a
20  letter of resignation, did you not?
21    A.    I resigned because I could not work at
22  Northside if they weren't going to give me the
23  accommodations to do my job.  And it seemed of less
24  damage than to be non-renewed.
25    Q.    Let's talk for a moment then about -- well,
```

84

```
 1  first of all, let me ask you:  Have you told me about
 2  every instance of what you considered to be either
 3  discriminatory or retaliatory conduct towards you that
 4  you can recall?
 5    A.    The lack of accommodations, the intense
 6  scrutiny I was put under, the lack of support.  And if
 7  they really wanted to help, I think they would have
 8  been helpful rather than just shuffle papers my way
 9  saying you've screwed up.  And the fact that they
10  ignored my doctor's request.  There may be more, but
11  those are the ones that stand out.
12    Q.    Let me talk to you about the shuffling papers
13  to say you screwed up.  It's fair to say that in
14  January -- that on January 15th of 2010 when the grades
15  were supposed to be inputted into the computer, it's
16  fair to say that they were not in the computer, isn't
17  it?  Regardless of who's responsible, it's fair to say
18  that the grades were not in there?
19    A.    That's fair to say.
20    Q.    And right or wrong, they were critical of you
21  for not having those grades in there in January of
22  2010?
23    A.    Yes.
24    Q.    By the time you get to October then, October,
25  November, December and then January of 2011, they're
```

85

```
 1   still meeting with you, sending you written
 2   correspondence saying it's a problem that your grades
 3   are not input on a timely basis.  You acknowledge that?
 4       A.   I acknowledge that.  But, again, the grades
 5   were always done on time and signed off by Ms. Shaw
 6   when they were due.  When it came time to the six weeks
 7   progress reports, when it came time to the report
 8   cards, everything was there.  I don't recall any
 9   complaints from parents regarding the matter.  I was
10   not made aware of any complaints by any parents.
11       Q.   Well, if the grades were always there on time
12   when they were supposed to be -- I take it when you say
13   that, you're meaning by the end of the semester?
14       A.   By the end of the six weeks progress reports
15   and then again on the report card time, yes.
16       Q.   And Ms. Shaw suggests that as a team you-all
17   had agreed that they would be done on a more frequent
18   basis, that they would be input on a weekly basis?
19       A.   Yes, but my team was not doing the grade book;
20   I was.  And I was attempting to deal with depression
21   and anxiety symptoms where I had to prioritize what
22   needs to be done in the classroom.
23       Q.   So when the team agreed to this, I guess your
24   testimony is that you had not agreed to that?
25       A.   I agreed to that.  I mean, I heard it,
```

86

```
 1   understood it.
 2       Q.   So is it fair to say that you agreed to it?
 3       A.   Yes.  But again, it was a matter of priorities
 4   when I was juggling with a medical condition and lack
 5   of accommodations.
 6       Q.   You have asked the court to award you damages
 7   with respect to your claim -- your claims of
 8   discrimination and retaliation.  Is that correct?
 9       A.   Yes.
10       Q.   What sorts of damages do you believe that you
11   are entitled to?
12       A.   I'm entitled to have my job back.  Or at least
13   a clean record so I can go somewhere else.
14       Q.   When you say, "a clean record," what exactly
15   does that look like to you?
16       A.   The discriminatory reprimands are removed and
17   any references to those are taken out.
18            There may be additional ones, but I --
19       Q.   And when we're talking about the discriminatory
20   reprimands, I take it that that would be the reprimand
21   in 2010 about not timely inputting grades and then the
22   second reprimand in January of 2011 also relating to
23   grades.  Is that correct?
24       A.   I think so.  And there's probably one on lesson
25   plans.  And --
```

87

```
 1       Q.   I think you said you had one in October --
 2   October 30th of 2009 relating to lesson plans, but you
 3   felt like that one was justified?
 4       A.   I felt that was justified.  That was just
 5   before I went in the partial hospitalization.
 6       Q.   So the removal of those two reprimands, the
 7   January, 2010 and January, 2011, would give you a clean
 8   record.  Anything else that you would need in order to
 9   have a clean record?
10       A.   I would have to see my file to know what's in
11   there.  I don't remember what's in there.
12       Q.   Other than those two items, the possibility of
13   having your job back or having your file cleaned up in
14   the manner you just described, anything else that you
15   would ask the court to award?
16       A.   I'd ask them to consider the grief or stress
17   that this has caused over the last year or two, and --
18   I felt like I could do my job if I had the support from
19   central office and from Ms. Shaw beginning back in June
20   or July, whenever we met.  But it was clear from then
21   on that I was not going to receive support, that they
22   were dismissive of my illness, dismissive of my
23   doctors' notes.  So I would like to be compensated for
24   the mental anguish that that has caused me and my
25   family.
```

88

```
 1            I remain unemployed.  I'm not employable
 2   as a teacher with this on my record.  I --
 3       Q.   What makes you believe that you're not
 4   employable as a teacher?  Because my understanding is
 5   that you resigned from your position.  What makes you
 6   believe that that would render you unemployable?
 7       A.   One of the first questions, I believe it's at
 8   the Southwest School District, is:  Have you ever been
 9   notified that your contract will not be renewed or
10   extended?  And immediately that would toss me out of
11   the personnel file.
12       Q.   Let me get to that in a moment.
13            You were talking about an award for
14   mental anguish.  And I guess it's going to be hard for
15   -- it would be hard for me to tease out how to measure
16   that.  Beginning in 2005 you began suffering from
17   severe depression episodes.  How has that situation
18   changed due to any actions from anyone within
19   Northside?
20       A.   During my time at my worst in Pleasanton, I
21   received nothing but positive commendations and letters
22   and support.  My deciding to leave was entirely my
23   choice based on I'm tired of everyone seeing me being
24   upset here.
25            And I understand it's difficult to come
```

89

```
 1    up with any kind of figure for mental anguish.
 2    I don't know what that would be. But I've lost a
 3    couple of years -- I mean, when I was at my worst in
 4    Pleasanton, I was still doing my job. I never filed a
 5    lawsuit against them. I never even asked for
 6    accommodations. And I was in far worse shape.
 7    Instead of giving me and offering support, they cranked
 8    up the heat, looked for the things that I was doing
 9    wrong.
10              So I can't -- it's my understanding that
11    I can't get a teaching job at this point. So my next
12    ten years of teaching are gone. I mean, I had a
13    20-year career in teaching until this occurred. Part
14    of it is depression. Most of it is not being allowed
15    to work with it.
16         Q.   You mentioned that you were in far worse shape
17    when you were employed with Pleasanton. At that time
18    you were, I think you described, crying on a daily
19    basis at school.
20         A.   Uh-huh.
21         Q.   That did not occur at any point while you were
22    employed by Northside, did it?
23         A.   On a daily basis, no.
24         Q.   At the time that you were employed by
25    Pleasanton and you were suffering from these kinds of
```

90

```
 1    severe fits of depression, you indicated that you were
 2    going in to see Dr. Villanueva on a weekly basis. Is
 3    that correct?
 4         A.   Uh-huh.
 5         Q.   Have you since your -- you began having the
 6    difficulties with Northside, how often have you sought
 7    some sort of psychological counseling?
 8         A.   It was a couple of times a month. I can't
 9    remember. But it was a couple of times a month during
10    when things were stressful, and then it went to
11    monthly. That was with Crossroads Christian
12    Counseling.
13         Q.   When did you begin attending counseling at
14    Crossroads?
15         A.   That was 2010. I might have seen
16    Dr. Villanueva once.
17         Q.   Approximately when in 2010 did you begin seeing
18    Crossroads?
19         A.   I'm pretty sure I saw her a couple times in
20    January. It might have even been before 2010. I don't
21    recall when I started up with her.
22         Q.   Was it before your partial hospitalization at
23    Laurel Ridge?
24         A.   No, I didn't -- I would have seen
25    Dr. Villanueva then.
```

91

```
 1         Q.   So maybe the tail end of 2009 or the first part
 2    of 2010?
 3         A.   Right.
 4         Q.   And how often did you attend counseling then
 5    with Crossroads beginning at that time period?
 6         A.   I would still say a couple times a month.
 7    Probably out until -- I would have to check the
 8    records. Maybe April things slowed down.
 9         Q.   April of 2010?
10         A.   I'm getting my years mixed up now.
11         Q.   In June you were notified that you would be
12    teaching the first grade. So by that point you had
13    slowed down in seeing Crossroads?
14         A.   Yes.
15         Q.   And how frequently were you going to Crossroads
16    for counseling beginning in April of 2010?
17         A.   At least monthly, possibly biweakly. I don't
18    remember. Sorry.
19         Q.   When was the last time you went in for any kind
20    of counseling?
21         A.   Counseling was in probably October. I don't
22    believe I saw her in November. We couldn't afford the
23    copayments anymore.
24         Q.   After April of 2010 and up until October, did
25    your frequency of going to Crossroads for counseling
```

92

```
 1    increase or decrease or stay about the same?
 2         A.   Stayed about the same, I believe, at once a
 3    month.
 4         Q.   About once a month. And were you seeing any
 5    other treatment provider besides Crossroads during that
 6    time period of April of 2010 to October of this year?
 7         A.   Dr. Salinas would see me.
 8         Q.   How frequently?
 9         A.   At least month -- well, at the beginning it
10    was, like in January of 2011 -- what are we talking
11    about, what years?
12         Q.   April of 2010 to October of 2009 (sic).
13         A.   I would stick with my monthly estimate that I
14    saw her monthly. There were times when I saw her a
15    couple times a month.
16         Q.   What about when -- back when you were having
17    more severe issues in your time at Pleasanton, how
18    often did you see Dr. Salinas at that point?
19         A.   I was -- wasn't with her yet. I was at the
20    Alamo Mental Health Clinic, and I'd go once a month, I
21    believe; and I saw Dr. Villanueva every week.
22         Q.   With respect to your claims of mental anguish
23    then, are you indicating that you have had any kind of
24    marital difficulties because of this?
25         A.   It's been very hard on my wife to see no lose
```

93

```
1    my job and to deal with that financially and my
2    emotions as far as the tearfulness and just crashing at
3    home and being useless, but...
4        Q.   Have y'all found it necessary to seek any kind
5    of counseling with respect to that issue?
6        A.   Dr. Salinas suggested it, but my wife's not
7    really interested in doing that.
8        Q.   Are you making any claim for loss of
9    consortium?
10       A.   I need to talk to my attorney.  I don't know.
11           MR. PONCIO:  We haven't made that claim.
12           MR. WOOD:  Okay.
13           MR. PONCIO:  Can we take a break?
14           MR. WOOD:  Absolutely, that's fine.
15           THE VIDEOGRAPHER:  We're off the record at
16   11:38 a.m.
17
18           (Recess taken)
19           THE VIDEOGRAPHER:  We're back on the record at
19   11:45 a.m.
20       Q.   (By Mr. Wood) Mr. Carter, I'm going to back up
21   for a second before we continue talking about damages.
22   You indicated in June you submitted a request for
23   accommodation or accommodations to the school district.
24   Mr. Hardison wrote you a letter, do you recall, in July
25   of 2010 when he addressed those?
```

94

```
1        A.   Yes.
2        Q.   And, in fact, he granted several -- or the
3    school district granted several of those requested
4    accommodations, did they not?
5        A.   On paper they said they did, but that's not
6    what happened in practice.
7        Q.   Well, let me ask you about this.  You had
8    requested team planning with your grade level to
9    discuss student progress and plan for the coming week.
10   They granted that one.  Is that correct?
11       A.   On paper they did, but within a month that was
12   changed.  We just had team meetings as necessary, and
13   it wasn't to go over team planning because team
14   planning was done away with.
15       Q.   You had also asked that your lesson plans be --
16   that you be allowed to turn your lesson plans in later
17   in your request for accommodations, and they told you
18   that the lesson plans for Monday needed to be in by
19   Friday but the remainder of them did not have to be in
20   until the next week.  Is that correct?
21       A.   Yes.  But I had asked that all the lesson plans
22   be due on Monday.  That was a small request.  Could have
23   been granted easily.
24       Q.   I think Mr. Hardison stresses to you in his
25   letter, and his particular response says:  "Lesson
```

95

```
1    plans are essential to the successful instruction of
2    students.  As has been mentioned to you, the team
3    leader will complete the lesson plans and post them
4    on-line after each week's planning meeting.  You'll
5    need to personalize those plans to reflect any special
6    needs of your students to incorporate your
7    instructional schedule and to add any unique or
8    additional instructional aids or materials.  As you
9    know, these lesson plans are also used by special
10   education teachers and, if needed, substitute
11   teachers."
12           Are those statements true?
13       A.   Yes.
14       Q.   And then he says:  "Because lesson plans are
15   critical to the effective instruction of students, we
16   will continue to require that your lesson plans for
17   Monday be submitted by the Friday before.  However, we
18   are willing to grant you the accommodation that your
19   lesson plans for days Tuesday through Friday will not
20   be due until Monday morning."
21           That was an accommodation that was not
22   afforded to other teachers.  Is that correct?
23       A.   I do not know what they require of other
24   teachers.
25       Q.   He also adds in his letter to you:  "In
```

96

```
1    discussions with Ms. Shaw, we anticipate that you may
2    find that delay is not even necessary since the
3    portions of the lesson plans which you will be
4    tailoring will require minimal adjustment from week to
5    week."
6            Did you find that to be the case?
7        A.   Yes, that was the case.  It was minimal
8    adjustments.
9        Q.   And so you didn't have any issue with respect
10   to timely completion of lesson plans after this
11   particular concession was offered by
12   Mr. Hardison, did you?
13       A.   I still found the fact that there wasn't,
14   granted for me to do the lesson plans by Monday in
15   entirety, a small -- it was something that could have
16   been -- easily be granted.  We're talking about minutia
17   here.  And when we mention the lesson plans and
18   personalizing them, that means that when I got in
19   trouble thereafter, I got in trouble for not putting in
20   what class we went to, what time we came back from the
21   library -- minor issues -- again, you can find a
22   mistake with anybody, and I believe they were just
23   looking for it.
24       Q.   One of the other accommodations that you had
25   requested was that the meetings with administration be
```

97

```
1   lessened.  And Mr. Hardison says in his letter to you:
2   "The meetings with administrators are designed to
3   assist you with issues which have previously been
4   identified in performance evaluations, and they were in
5   part in response to your suggestion to Ms. Shaw that
6   you needed assistance with prioritizing.  At your
7   request, we are going to suspend those weekly meetings
8   at this time."
9            Was it your understanding that they
10  would agree to do that?
11       A.  That was my understanding, but that's -- again,
12  in practice that's not what happened.  I was required
13  to go to meetings shortly after school started.
14       Q.  Were they weekly?
15       A.  At one point they became weekly.  I don't
16  remember the date.  And again, I -- at my request, I
17  asked that they not have the weekly meetings because
18  they were stressful and caused me to get upset and
19  sometimes leave work.  So their accommodation for that
20  was, well, we'll just have then later in the day.  That
21  was hardly an accommodation.
22       Q.  Well, in fact, Mr. Hardison specifically says:
23  "If requested, so as not to affect your daily teaching
24  performance, the meetings will be scheduled for periods
25  after the end of the instructional day."
```

98

```
1        A.  The same stressful meetings would be required
2   of me.
3        Q.  Did you make the request that those meetings be
4   held later in the day rather than earlier in the day?
5        A.  Yes.
6        Q.  And did they grant that request?
7        A.  Yes.
8        Q.  We were talking then about your request for
9   damages, and I believe that you indicated that you're
10  not seeking loss of consortium.  My understanding is
11  that you're seeking an amount for lost wages, past and
12  future.  Have you sought employment at any other
13  potential employers since the time that you resigned
14  your position with Northside?
15       A.  Yes.
16       Q.  Where have you sought other employment,
17  alternative employment?
18       A.  JC Penney, Petco, Hobby Lobby, USAA, Department
19  of Health and Human Services, a couple of other retail
20  places.  And a Federal worker administering tests for
21  the Army.
22       Q.  Have you applied with any school districts?
23       A.  No.
24       Q.  No?
25       A.  No.  I got to the Southwest School District,
```

99

```
1   and that question just kicked me out.  So it's like...
2        Q.  Have you ever filed any other lawsuits,
3   grievances, administrative actions other than the two
4   complaints with EEOC and the instant lawsuit?
5        A.  And which one?
6        Q.  The instant lawsuit.
7        THE WITNESS:  What's that?
8        MR. PONCIO:  Any others besides this one.
9        A.  Yes.
10       Q.  (By Mr. Wood) In what instance?
11       A.  Northside's provider of disability insurance
12  denied me disability insurance, then Northside's
13  provider of workman's comp denied me workman's comp.
14  So I fought both of them.
15       Q.  Did you file a lawsuit in those instances?
16       A.  I retained counsel for the workman's comp one,
17  and the disability one they did file a lawsuit.
18       Q.  Who represented you in the disability lawsuit?
19       A.  Greg Reed.
20       Q.  What was the final resolution of that?
21       A.  It was an out-of-court settlement.
22       Q.  What was the amount of that out-of-court
23  settlement?
24       MR. PONCIO:  You can't disclose that.  It's
25  confidential.
```

100

```
1        Q.  (By Mr. Wood) When was that matter resolved?
2        A.  November of 2010.
3        Q.  Was that filed in the Bexar County District
4   Courts?
5        A.  Yes.
6        Q.  You said the resolution of the other one -- I'm
7   sorry, I was unclear.  You did not file a lawsuit in
8   the other matter?
9        A.  No.  The attorney dropped it.
10       Q.  There was no settlement there?
11       A.  No settlement.
12       Q.  Any other grievances that you filed?
13       A.  No.  "Any other grievances," I'm not sure what
14  you mean by that.
15       Q.  Well, I just wondered if you've ever filed a
16  grievance with a school district.
17       A.  No.
18       Q.  Just looking through some documents here.
19            Carol Walters.  Is she the therapist
20  that you see through Crossroads Christian Counseling?
21       A.  Yes.
22       MR. WOOD:  Can we take about five minutes, Mr.
23  Poncio?  I just want to make sure that I've covered
24  everything in my notes.
25       MR. PONCIO:  Sure.
```

101

```
 1        THE VIDEOGRAPHER:  We're off the record at
 2   11:55 a.m.
 3              (Recess taken)
 4        THE VIDEOGRAPHER:  We're back on the record at
 5   12:02 p.m.
 6        Q.   (By Mr. Wood) Mr. Carter, have you understood
 7   the questions that I've asked you today?
 8        A.   Yes.
 9        Q.   Is there anything that you felt like you did
10   not understand?
11        A.   No, I understood everything.
12        Q.   Is there anything, after you reflect back, that
13   you believe you need to change with respect to answers
14   you've provided earlier?
15        A.   I may have the dates -- the 2010, 2011 thing
16   mixed up.  And also as far as when I was working --
17   when I was good to go at work.  I don't remember when I
18   said.  I don't know if it was before Laurel Ridge.  You
19   asked me that question whether you were ready to go
20   back to work or if it was after.
21        Q.   Anything else you feel like you need to add at
22   this point?
23        A.   No.
24        MR. WOOD:  I appreciate your time and patience,
25   and thank you very much.
```

EDDIE MORRIS - COURT REPORTERS, INC.
92 Trailcrest, San Antonio, Texas  78232
Telephone (210) 698-2727  Telecopier (210) 698-5556

102

```
 1        THE WITNESS:  Sure.
 2        MR. PONCIO:  We'll reserve our questions.
 3        THE VIDEOGRAPHER:  We're off the record on
 4   December 19th, 2011, at 12:04 p.m.
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

EDDIE MORRIS - COURT REPORTERS, INC.
92 Trailcrest, San Antonio, Texas  78232
Telephone (210) 698-2727  Telecopier (210) 698-5556

103

```
 1              CHANGES AND SIGNATURE
 2              GERALD LEON CARTER
 3               December 19, 2011
 4   PAGE LINE  CHANGE              REASON
 5   _____
 6   _____
 7   _____
 8   _____
 9   _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19   _____
20   _____
21   _____
22   _____
23   _____
24   _____
25   _____
```

EDDIE MORRIS - COURT REPORTERS, INC.
92 Trailcrest, San Antonio, Texas  78232
Telephone (210) 698-2727  Telecopier (210) 698-5556

104

```
 1        I, GERALD LEON CARTER, hereby certify that I
 2   have read the foregoing deposition; and that this
 3   deposition, together with any corrections noted on the
 4   errata sheet, is a true record of my testimony given at
 5   this deposition and all answers are within my personal
 6   knowledge and are true and correct.
 7
 8        _____
 9             GERALD LEON CARTER
10
11        Before me the undersigned authority, personally
12   appeared GERALD LEON CARTER who, upon her oath, states
13   that all answers given by her in the foregoing
14   deposition are within her personal knowledge and are
15   true and correct.
16
17        SUBSCRIBED AND SWORN TO BEFORE ME, this
18   _____ day of _____, A.D. 20___.
19
20
21
22             NOTARY PUBLIC IN AND FOR
23             THE STATE OF _____
24
25   My Commission Expires: _____
```

EDDIE MORRIS - COURT REPORTERS, INC.
92 Trailcrest, San Antonio, Texas  78232
Telephone (210) 698-2727  Telecopier (210) 698-5556

105

```
 1        IN THE UNITED STATES DISTRICT COURT
           FOR THE WESTERN DISTRICT OF TEXAS
 2                  SAN ANTONIO DIVISION

 3   GERALD CARTER

 4   vs.                      CASE NO. 5:11-cv-00492 FB

 5
     NORTHSIDE INDEPENDENT
 6   SCHOOL DISTRICT

 7   -------------------------------------------

 8

 9   STATE OF TEXAS

10   COUNTY OF BEXAR

11

12        I, Terrilyn Paul, Certified Shorthand Reporter in

13   and for the State of Texas, do hereby certify that the

14   facts stated and set forth on the caption hereto are

15   true; that after the witness, GERALD LEON CARTER, had

16   been by me first duly cautioned and sworn to tell the

17   truth, the whole truth and nothing but the truth, the

18   foregoing questions were propounded to him by the

19   attorneys named in the caption hereto, and that the

20   foregoing answers were made by said witness at said

21   time in response to said questions so propounded to the

22   said witness and the said answers in response thereto

23   were by me, at said time and place, taken down in

24   shorthand on December 19, 2011, and that the foregoing

25   is a true record of the testimony given by the witness.
```

EDDIE MORRIS - COURT REPORTERS, INC.
92 Trailcrest, San Antonio, Texas 78232
Telephone (210) 698-2727 Telecopier (210) 698-5556

106

```
 1        Pursuant to information given at the time said

 2   testimony was taken, the following includes all parties

 3   of record and the amount of time used by each party at

 4   the deposition:

 5

 6   Mr. Adam Poncio        0 hours 0 minutes

 7   Mr. D. Craig Wood      2 hours 32 minutes

 8

 9        Request having been made prior to the completion

10   of the deposition for the deponent to review said

11   testimony, the transcript was delivered to MR. ADAM

12   PONCIO for review and signature by the deponent, with

13   instructions that the deposition be returned to me

14   within 30 days of receipt thereof, along with a

15   completed errata sheet if necessary.

16

17

18        I further certify that I am neither attorney or

19   counsel for, nor related to or employed by any of the

20   parties to the action in which this deposition is

21   taken, and further that I am not a relative or employee

22   of any attorney or counsel employed by the parties

23   thereto or financially interested in the action.

24

25
```

EDDIE MORRIS - COURT REPORTERS, INC.
92 Trailcrest, San Antonio, Texas 78232
Telephone (210) 698-2727 Telecopier (210) 698-5556

107

```
 1        WITNESS MY HAND AND SEAL OF OFFICE this

 2   the  4th  day of  January , 2012.

 3

 4

 5            Terrilyn Paul Crowley
 6            Terrilyn Paul Crowley, CSR
 7            Certified Shorthand Reporter
              In and for the State of Texas
 8            Certificate No. 5113
              Expiration Date:  12/31/12
 9            EDDIE MORRIS COURT REPORTERS
              Firm Registration No. 74
10            Expiration Date:  12/31/12

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

EDDIE MORRIS - COURT REPORTERS, INC.
92 Trailcrest, San Antonio, Texas 78232
Telephone (210) 698-2727 Telecopier (210) 698-5556

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

GERALD CARTER                            §
                                         §
V.                                       §          CIVIL ACTION NO. 5:11-CV-492 FB
                                         §
                                         §
NORTHSIDE INDEPENDENT                    §
SCHOOL DISTRICT                          §

## ORDER REGARDING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

On this the ___ day of _____, 2012, came on to be considered  the Defendant's

Motion For Summary Judgment and Motion for Partial Dismissal (Dkt 20).  The Court finds that

the Motion should be DENIED.

SIGNED THIS THE _____ DAY OF _____, 2012

_____
HONORABLE FRED BIERY
DISTRICT JUDGE