UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| GERALD CARTER | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | CIV. NO. SA-11-CA-0492-FB |
| | * | |
| NORTHSIDE INDEPENDENT SCHOOL | * | |
| DISTRICT, | * | |
| | * | |
| Defendant. | * | |

## MEMORANDUM AND RECOMMENDATION

Gerald Carter, a teacher formerly employed by the Northside Independent School District ("NISD"), filed suit in state court on May 23, 2011, alleging that he was discriminated against in violation of the Americans with Disabilities Act of 1990 ("ADA"). He alleges that the NISD failed to accommodate his disability of depression and anxiety, retaliated against him, and constructively discharged him.  The NISD has filed a motion for summary judgment (docket nos. 20, 26), to which motion Carter has responded (docket no. 24).  Having considered the briefs, the summary judgment evidence, and applicable law, the Court is of the opinion the motion should be granted.

## Summary Judgment

Summary judgment shall be rendered if the movant shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  **Rule 56(a), Fed.R.Civ.P.**  The plain language of this rule mandates the entry of

summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In such a situation, there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. *Id.* at 322-23. The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

A summary judgment movant or opponent must cite to materials in the record or show that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact. **Rule 56(c)(1), Fed.R.Civ.P.** An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify to the matters stated. **Rule 56(c)(4), Fed.R.Civ.P.** If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact, as required by Rule 56(c), the Court may (1)

2

give an opportunity to properly support or address the fact, (2) consider the fact to be undisputed for purposes of the motion, or (3) grant summary judgment if the motion and supporting materials show that the movant is entitled to it. **Rule 56(e), Fed.R.Civ.P.**

<u>**BACKGROUND**</u>

According to the affidavit of Lori Shaw, the campus principal at Mary Burns Michael Elementary School in the NISD, and the exhibits attached thereto[1], Carter was employed as a fourth grade teacher at Michael Elementary School in the fall of 2007.  He entered into a two-year employment contract with NISD on April 27, 2009 for the 2009-10 and 2010-11 school years.  In the 2008-09 school year, Carter routinely failed to timely submit completed lesson plans, did not timely complete attendance records for his class, missed several deadlines, admitted to Principal Shaw that he did not know which students in his class were failing, and admitted that he was not sure which of his students might need more academic assistance.  In his October 2008 evaluation, Principal Shaw rated Carter "Below Expectations" in several areas, including classroom management, compliance with District policies and directives, and monitoring student attendance and intervention needs.

Vice-Principal Evelyn Massiatte evaluated Carter in April 2009. She observed that Carter was "Below Expectations" in several

---

[1]Carter's objection to the affidavits of Principal Shaw and Mark Hardison, the NISD Employee Benefits Coordinator, simply because they are "interested witnesses" is overruled.

areas, including following NISD policies and directives, as well as monitoring student attendance and student intervention needs. In Carter's Summative Appraisal for the 2008-09 school year, he received "Below Expectations" in Domain VII: Compliance with Policies. Principal Shaw met with Carter on April 15, 2009 to go over the details of his 2008-09 evaluations and summative appraisal, including the areas in which he received "Below Expectations" ratings. She discussed with him the importance of meeting deadlines and turning in lesson plans, and specifically asked what she could do to help him improve and meet his deadlines. Carter told her that her reminders were sufficient.

On or about September 24, 2009, Vice-Principal Massiatte advised Carter that his students' progress reports were overdue and that he needed to turn them in to her. Vice-Principal Massiatte had verbally reminded Carter several times to turn in his lesson plans and grades on time. On September 25, 2009, Principal Shaw, along with Vice-Principal Massiatte, met with Carter and reminded him that it is part of his job as a teacher to timely submit student grades and progress reports.

On October 20, 2009, the fourth grade teachers gave a benchmark test on Reading to their students to assess the students' preparedness to take the state-wide assessment test known as TAKS. On November 10, 2009, the fourth grade teachers gave a benchmark test on Writing to their students. Carter's fourth grade class had

a 50% passage rate on the Reading benchmark test and a 39% passage rate on the Writing benchmark test.  He was the only fourth grade teacher to have a failing passing rate on the Writing benchmark test, and he had the second lowest Reading passing rate.

Principal Shaw requires all teachers on her campus to turn in their lesson plans for the following week, in writing, by the end of the day on Friday.  Teachers are informed of the lesson plan deadlines at the beginning of the school year.  Additionally, before school begins and throughout the school year, Principal Shaw informs all of her teachers that student grades are required to be inputted on the computer weekly so that parents are able to keep track of their child's grades online.  She also reminds teachers that they should have approximately two to three grades per subject per week for all students.

In October 2009, Carter again failed to turn in completed lesson plans.  Vice-Principal Massiatte reminded him of the lesson plan deadlines and asked him to submit his completed plans.  He still failed to turn in completed lesson plans after the reminder. When he did turn in his lesson plans, not only were they late but they were also incomplete.  Because he failed to turn in timely, completed lesson plans, on October 30, 2009, Vice-Principal Massiatte issued a written reprimand to Carter.  She then assigned fourth grade team leader, Melissa Ramon, to help remind Carter of upcoming lesson plan deadlines to assist him in meeting the

deadlines.  On November 4, 2009, Carter applied for a medical leave of absence, which the District approved from November 9, 2009 through January 4, 2010.

In November 2009, while Carter was on leave, which was approximately half-way into the nine week grading period, Principal Shaw discovered that there were very few grades inputted for Carter's students in Math, Reading, and Language Arts, which were not enough grades to prepare the progress reports that were due to be sent out to parents.  He had not entered any grades for Science and Social Studies.  Additionally, they discovered a lot of student work left in a tray in his room, which was not graded; so, they graded the work themselves and inputted the grades into the system.  However, there was no student work completed for Science and Social Studies.  As a result, they had to give new assignments to Carter's students so that they would have grades for assessment and reporting purposes.

Principal Shaw, along with Vice-Principal Massiatte, also had to clean Carter's classroom because it was in substantial disorder.  Of particular concern were several stacks of curriculum work that were found and had apparently never been given to his students in Science and Social Studies.  As a result, other campus Science and Math teachers were asked to assist Carter's students and give lessons and assignments to Carter's students.  The substitute teacher in Carter's class during this time also gave assignments,

graded them, and entered them into the system.

Carter returned to work on or about January 5, 2010.  Final grades for the nine week grading period were due on January 15, 2010.  Vice-Principal Massiatte reminded Carter to input his grades before January 15, 2010.  Shortly before the deadline, Principal Shaw reviewed Carter's gradebook and again discovered that he had not entered any grades during the period in which he had returned.  He did not post any grades for the first 1.5 weeks of school in January 2010.  Principal Shaw and Vice-Principal Massiatte again had to complete his grading and input grades so that report cards could be printed for his students.  Because he failed to input student grades timely, on January 14, 2010, Vice-Principal Massiatte again issued a written reprimand to Carter.  When they met with Carter to discuss the reprimand, he began crying and stated that he was "not able to get the job done."  He also said that "you don't deserve this."  They assigned fourth grade team leader, Melissa Ramon, to help Carter with inputting grades in an effort to help him meet deadlines.

On January 15, 2010, at the end of the school day, Carter again applied for a medical leave of absence, which was approved.  Carter was on medical leave of absence from January 13, 2010 through June 7, 2010.  On April 26, 2010, he filed a complaint of disability discrimination under the ADA with the Equal Employment Opportunity Commission ("EEOC").  He alleged that, in November

2009, and January 2010, he was counseled on performance issues. Carter further stated that, on or about March 29, 2010, the Superintendent notified him in writing that he would not be given a new two-year contract.

On or about June 18, 2010, Principal Shaw, along with the NISD Employee Benefits Coordinator Mark Hardison and Assistant Superintendent Jim Miller, met with Carter to discuss his request for workplace accommodations. At that meeting, Carter presented a list of written requests for accommodations. Carter requested (1) a team plan with his grade level to discuss student progress and plan for the coming week, (2) to be assigned to a grade level that he is experienced in, such as 3rd, 4th, or 5th grade, (3) to allow his lesson plans to be turned in, or posted online, by Monday morning, (4) elimination of weekly meetings with his supervisors, and (5) reassignment to a different campus.

At the June 18th meeting, they discussed reassigning Carter to teach first grade, believing it would be less stressful for him since it was not a TAKS testing grade level. Carter expressed an interest in a non-TAKS position. Regarding team meetings, they agreed that team meetings, which already occurred at Principal Shaw's campus, would continue. They also agreed to have Carter's grade team leader assist him in completion of his lesson plans, with Carter's responsibility being to personalize the lesson plans to reflect any special needs of his students and incorporate his

8

instructional schedule into the plans.  Additionally, they agreed to allow him to extend the time to turn in his lesson plans for Tuesday through Friday on the following Monday, but Monday's lesson plans had to be turned in on Friday.  Additionally, they suspended his weekly meetings with Principal Shaw unless they decided he needed additional assistance again.  Carter's request to transfer to another campus was denied.

On June 21, 2010, Carter amended his EEOC complaint to allege retaliation.  He stated that, on June 18th, he requested and denied the following reasonable accommodations:

1. Be assigned to a grade level that he is experienced in such as 3rd, 4th or 5th grade;

2. Allow lesson plans to be turned in, or posted online, by Monday mornings; and

3. Eliminate required weekly performance meetings with administration and be reassigned to a different campus.

For the 2010-11 school year, Principal Shaw assigned Carter to teach first grade.  In his new assignment, Carter would no longer be required to prepare any written academic portion of the lesson plans for his classroom.  Rather the first grade teachers met together to plan their lessons, and then the team leader prepared the academic portion of the lesson plans for all first grade teachers.  Carter was only required to tailor the lesson plans for information that applied to his particular classroom, i.e. what

time his students go to lunch, physical education, music, etc.  On
or about October 19, 2010, Principal Shaw checked the first grade
teachers' grade books.  She noticed that Carter had again failed to
enter sufficient grades for his students.  As of October 19, 2010,
Carter had significantly less grades than the other first grade
teachers.  After over six weeks of school, Carter only had four
Language Arts grades, eight Math grades, two Reading grades, two
Science grades, and three Social Studies grades inputted.  At that
point in the grading period, Carter should have had at about twelve
grades for the core subjects of Language Arts, Reading, and Math.

In September 2010, Carter failed to turn in his lesson plans
for at least three weeks.  When he did turn in plans, they were
only partially completed.  On October 20, 2010, Principal Shaw met
with Carter, along with Vice-Principal Geri Garza to discuss that
he again was failing to timely complete his lesson plans.
Principal Shaw discussed with him the importance of turning in
completed plans, and pointed out to him that his team was
completing the core components of the plans for him, that he had
very few things he needed to complete on them.  Because he was
struggling meeting these requirements, Principal Shaw asked him to
meet with her weekly so they could help him meet those deadlines.

On November 1 and 2, 2010, Principal Shaw met with the first
grade team and reminded them to enter grades weekly and to have at
least two grades per subject per week for each student.  She also

reminded them about deadlines for turning in lesson plans.  Carter was present for this meeting.  On November 4, 2010, Vice-Principal Garza conducted a performance appraisal of Carter.   In his appraisal, he received "Below Expectations" ratings in several areas, including student progress, student assessment, and management of student discipline and instructional strategies. Additionally, Carter accidently left a student in the restroom when he walked his class to another room.

On November 8, 2010, Principal Shaw found that Carter again had not completed a sufficient number of grades in his gradebook and had not submitted completed lesson plans.  She again reminded him to do so.   On November 10, 2010, two students left his classroom without permission, unnoticed by Carter.  Vice-Principal Garza and Principal Shaw spoke with Carter about the importance of monitoring his students and keeping track of them at all times. Carter's first grade students showed significant lack of progress in their reading levels.  Because of this, Principal Shaw asked the campus reading specialist to assist him in teaching reading. Carter routinely failed to identify students in his classroom who needed additional instruction or specialized instruction in reading.

Due to Carter's continued problems in classroom management, on or about December 1, 2010, Principal Shaw placed him on a Teacher In Need of Assistance ("TINA") Plan to assist him in correcting his

deficiencies.   In his TINA plan, he was directed to post lesson plans timely and input at least two grades per subject per week. Carter was also directed to work on classroom management of student behavior.  The TINA provided him with assistance in lesson planning from his first grade team and feedback from a District specialist in classroom management.

On January 4, 2011, District specialist Ardyce Welch observed Carter's classroom and provided Principal Shaw with a memorandum of her observations.  Specialist Welch noted that in December, Carter struggled with classroom behavior management skills and getting the class to pay attention to the lesson.  She observed that he still struggled with classroom management and expressed concern about the lack of academic progress of his students.  She indicated her concern that his students would not be prepared for second grade the following year if he did not immediately improve his instructional methods.

Even after repeated directives to timely input grades, as of January 3, 2011, which was approximately the seventh week of the nine week grading period, Carter had only input eight grades in Math, six in Language Arts, eight in Reading, and three in Science. On January 4, 2011, Principal Shaw issued a written reprimand to Carter for his repeated failure to input grades.  Also on January 4, 2011, she issued a reprimand to Carter for his failure to timely complete his lesson plans.  Several weeks of lesson plans from

November and December were incomplete, where Carter wholly failed to include reading instruction plans and times that were specific for his classroom, such as library and lab times.

On January 10, 2011, Carter filed another EEOC charge of discrimination. He alleged that he suffered further retaliation during the week of January 3, 2011 when he received two official reprimands, three observations by supervisors, and two required meetings with administration. Also, Carter asserted that he was told they would not recommend him for renewal of his contract based upon his performance and these reprimands.

Carter took another leave of absence on or about January 13, 2011 and did not return to work. A physician's note of February 2, 2011 states that he suffers from a major depressive disorder and anxiety. He was then experiencing recurrent episodes exacerbated by stressors of work. The physician indicated that Carter's leave would be indefinite.

Due to Carter's persistent performance deficiencies and failure to follow directives, Principal Shaw recommended to Superintendent John Folks that he recommend to the Board of Trustees to propose Carter's contract for nonrenewal. On or about April 5, 2011, Superintendent John Folks recommended that the District's Board of Trustees propose Carter's employment contract for nonrenewal. On or about April 8, 2011, the District sent a letter to Carter notifying him of his right to a hearing before the

Board of Trustees to consider the proposed nonrenewal.  On or about April 21, 2011, Carter submitted his written resignation, which was accepted in writing by Superintendent Folks.

**Analysis**

**1. Constructive Discharge Claim**

In his complaint, Carter alleges that he had no "alternative but to constructively terminate his employment with Defendant." The NISD contends that the Court lacks jurisdiction over this constructive discharge claim because it was never raised before the EEOC.  Carter responds, citing ***Gupta v. East Texas State University***, 654 F.2d 411 (5th Cir. 1981), that it was unnecessary for him to file a separate charge of discrimination.  While acknowledging that the filing of an administrative complaint is a jurisdictional prerequisite to bringing suit, the Court of Appeals in ***Gupta*** held that it was unnecessary for a plaintiff to exhaust administrative remedies prior to urging a retaliatory discharge claim growing out of an earlier EEOC charge.  ***Id.*** at 413-14.

The NISD contends that ***Gupta*** is no longer good law in light of ***National R.R. Passenger Corp. v. Morgan***, 536 U.S. 101 (2002).  In ***Morgan***, the Supreme Court held that a Title VII plaintiff has the obligation to file an administrative claim as to each discrete discriminatory or retaliatory act.  536 U.S. at 110-14.  However, our Court of Appeals continues to recognize, after ***Morgan***, that "a plaintiff must exhaust his administrative remedies prior to filing

14

a retaliation claim, unless the 'retaliation claim ... arise[s] after the filing of the EEOC charge.'" *Williams v. AT & T Inc.*, 356 Fed.Appx. 761, 766 (5th Cir. 2009), *quoting*, *Gupta*, 654 F.2d at 414.   Thus, the Court concludes that Carter has satisfied the exhaustion requirement as to his constructive discharge claim. *See Lewis-Sterling v. Christus Homecare*, 2009 WL 3247238, at *6 n.79 (S.D.Tex. 2009)(*Gupta* still applies after *Morgan*); *Griggs v. University Health System*, 2007 WL 708608, at *2-3 (W.D.Tex. 2007)(same). *But see Simmons-Myers v. Caesars Entertainment Corp.*, 2012 WL 2885366, at *4-6 (N.D.Miss. 2012)(*Gupta* no longer applies in light of *Morgan*).

## 2. Disability and Accommodation Discrimination

When, as here, Carter must rely upon indirect evidence of discrimination, the Court will apply the *McDonnell Douglas* burden-shifting scheme for discriminatory treatment cases. *Raytheon Co. v. Hernandez*, 540 U.S. 44 (2003)(applying *McDonnell Douglas* in an ADA case); *E.E.O.C. v. Chevron Phillips Chemical Co., LP*, 570 F.3d 606, 615 (5th Cir. 2009). Carter must first establish a *prima facie* case of discrimination, whereupon the burden shifts to the NISD to articulate a legitimate, nondiscriminatory reason for its employment action; if the NISD meets this burden, the presumption of intentional discrimination disappears, but Carter can still prove disparate treatment by offering evidence

15

demonstrating that the NISD's explanation is pretextual. ***McDonnell Douglas Corp. v. Green***, 411 U.S. 792, 802-04 (1973).

Although the NISD has addressed Carter's claim of disability discrimination, Carter also argues in his complaint that he was denied reasonable accommodations. This constitutes a separate cause of action. To make out a *prima facie* case of disability discrimination, Carter must show that he: (1) suffers from a disability; (2) was qualified for the job; (3) was subject to an adverse employment action; and (4) was replaced by a non-disabled person or was treated less favorably than non-disabled employees. ***Amsel v. Texas Water Development Bd.***, 464 Fed.Appx. 395, 399 (5th Cir. 2012). An individual is qualified under the ADA if, with or without reasonable accommodation, the person can perform the essential functions of the position. **42 U.S.C. § 12111(8);** ***Rodriguez v. ConAgra Grocery Prods. Co.***, 436 F.3d 468, 477 n. 32 (5th Cir. 2006). To establish a *prima facie* case of discrimination based on failure to accommodate a disability, Carter must show: (1) the NISD is covered by the statute; (2) he is an individual with a disability; (3) he can perform the essential functions of the job with or without reasonable accommodation; and (4) the NISD had notice of the disability and failed to provide accommodation. ***Mzyk v. North East Indep. Sch. Dist.***, 397 Fed.Appx. 13, 15 (5th Cir. 2010); ***Chapa v. Floresville Independent School Dist.***, 2012 WL 3062781, at *10 (W.D.Tex. 2012).

The NISD does not dispute that it is an employer covered by the statute or that Carter suffers from a disability. Under either cause of action, Carter must show he is able to perform the essential functions of the position. As the NISD notes, an essential element of any job is the ability to appear for work. ***Rogers v. International Marine Terminals, Inc.***, 87 F.3d 755, 759 (5th Cir. 1996). According to the affidavit of Mark Hardison, the NISD Employee Benefits Coordinator, of the 187 contracted work days for teachers in each of the 2009-10 and 2010-11 school years, Carter was on leave for approximately 130 work days due to personal illness in the 2009-10 school year and approximately 98 work days due to personal illness in the 2010-11 school year. **Motion for Summary Judgment**, exh. C. Thus, he was absent from work over 60% of the time. Additionally, the last Fitness-for-Duty Certificate received from Carter's doctor in February 2011 indicated that his date to return to work was "indefinite." Indefinite leave is not a reasonable accommodation. **Amsel**, 464 Fed.Appx. at 400.

An essential element of any job is also "an ability ... to complete tasks within a reasonable period of time." ***Bazile v. AT&T-Bell Laboratories, Inc.***, 142 F.3d 1279, 1998 WL 224540, at *2 (5th Cir. 1998), *quoting*, **Rogers**, 87 F.3d at 759. Aside from excessive absences, Carter was unable to perform other essential functions of his job when he was present. It is undisputed that he was required to prepare lesson plans and input student grades as

17

directed.  In the 2008-09 school year, Carter routinely failed to timely submit completed lesson plans, did not timely complete attendance records for his class, and missed several deadlines.  In the 2009-10, Carter's lesson plans and grades were overdue, although he had been reminded several times to complete and submit them on time.  When the lesson plans were turned in, they were often incomplete.  Principal Shaw and others repeatedly discussed with Carter his deficiencies and the importance of meeting deadlines.  He was provided assistance with these functions which did not alleviate the situation.  In his deposition, Carter admitted that he turned in lessons plan late, had trouble keeping up with the workload, was unable to keep up with the paperwork, test results and the meetings.  **Response**, exh. A, pp. 39, 45, 48, 58-59, 84-86.  Carter's fourth grade students did very poorly on the benchmark tests on Reading and Writing given in October and November 2009.

Carter's inability to perform the essential functions of his job led to his first written reprimand in on October 30, 2009, and his first request for medical leave.  Carter returned to work on or about January 5, 2010 and failed to post any grades for the first 1.5 weeks of school in January 2010.  Another written reprimand was issued, and Carter left on medical leave for the remainder of the school year.

Despite being moved to the less stressful environment of

teaching first grade for the school year of 2010-11, Carter continued to fail to turn in his lesson plans or submitted them incomplete.  He also had significantly less grades than the other first grade teachers.  Efforts to correct these deficiencies continued to prove fruitless.  In November 2010, Vice-Principal Garza conducted appraised Carter with "Below Expectations" ratings in several areas, including student progress, student assessment, and management of student discipline and instructional strategies. Carter's first grade students showed significant lack of progress in their reading levels.

On January 4, 2011, a District specialist observed that Carter struggled with classroom behavior management skills and getting the class to pay attention to the lesson.  She expressed concern that his students would not be academically prepared for second grade if he did not immediately improve his instructional methods.  Carter's failure to input grades and to timely complete lesson plans led to two more written reprimands on January 4, 2011.  He took another leave of absence on or about January 13, 2011 and did not return to work.

In his deposition, Carter takes issue with some of the NISD assertions but fails to create a genuine issue of material fact regarding his ability to perform the essential functions of his job.  He chose to attribute the problems at work to the attitudes of Principal Shaw and Vice-Principal Massiatte.  **Response**, exh. A.,

p. 45.  Yet, he acknowledged he was having trouble handling his job due to his symptoms.  **Id.**  Carter agreed that the October 2009 reprimand given to him on October 30, 2009 by Vice-Principal Massiatte for failing to turn in timely, completed lesson plans was justified.  **Id.**, pp. 58-59.  He felt that the January 2010 reprimand for failing to input grades was unwarranted, because he was not at school in December 2009.  **Id.**, pp. 53-54, 59.  However, Principal Shaw testified Carter was reprimanded for not posting any grades for the first 1.5 weeks of school in January 2010 and failing to input student grades timely on January 14, 2010.  **Motion for Summary Judgment**, exh. B, p. 5.

In apparent contradiction to Principal Shaw, Carter testified that his "grades have always been done on time."  **Response**, exh. A., pp. 59, 73, 85.  During his deposition, Carter was questioned about Principal Shaw's reprimand of January 4, 2011 in which she detailed how Carter had failed to input sufficient grades in Math, Reading, Language Arts and Science.  **Motion for Summary Judgment**, exh. B19; **Response**, exh. A, pp. 73-74.  Carter did not respond that he had, in fact, input sufficient grades, but that he was constantly "under a microscope over small matters" and was not being allowed any accommodation or understanding as far as his medical condition.  **Response**, exh. A, p. 74.  Carter testified that he had agreed to input two grades weekly in each subject so parents can view the grades through the Parent Connection.  **Id.**, pp. 75-76.

He later stated that his grades were always in by the end of the six weeks progress reports and he received no complaints from parents. **Id.**, p. 85. Clearly, this is what Carter considers timely. He testified that, although it was required that he submit grades more frequently and he had agreed to input grades more frequently, he had to "deal with depression and anxiety symptoms where I had to prioritize what needs to be done in the classroom." **Id.**, pp. 84-85.

Also contrary to Principal Shaw's testimony, Carter stated that, with the exception of the October 2009 reprimand, he believed all lesson plans had been turned in online and on time. **Response**, exh. A, p. 63. This is clearly contradicted by extensive and specific testimony from Principal Shaw and the attached exhibits. In September 2010, Carter failed to turn in his lesson plans for at least three weeks. **Motion for Summary Judgment**, exh. B, p. 7. When he did turn in plans, they were only partially completed. **Id.** Exhibit B14 is the lesson plan that Carter turned in for the week of September 20, 2010. On November 8, 2010, Principal Shaw again found that Carter had not submitted completed lesson plans. **Id.**, p. 8. Carter's January 4, 2011 reprimand for failure to timely submit completed lesson plans details various errors in Carter's lesson plans for weeks in November and December 2010, as well as the week of January 3-7, 2011. **Id.**, exh. B20.

When opposing parties tell two different stories, one of which

21

is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment. *Scott v. Harris*, 550 U.S. 372, 380 (2007). Carter's generalized assertions that he timely input grades and lesson plans are blatantly contradicted by the record, including Carter's own testimony. In addition to Principal Shaw's testimony, and the attachments thereto, Carter stated "I knew I was having trouble keeping up with the workload ..." **Response**, exh. A, p. 45. "I was unable to keep up with the paperwork... I was able to have my lessons prepared and be on for the kids. But the paperwork and test results and meetings and lack of time to work on it, I felt overwhelmed." **Id.**, p. 48. In January 2010, Carter admitted to Principal Shaw and Vice-Principal massiatte that he was "not able to get the job done." **Motion for Summary Judgment**, exh. B, p. 5.

The Court finds no genuine issue of material fact regarding Carter's ability to perform the essential functions of his job. It was required that he submit timely and complete lesson plans and input grades as directed by Principal Shaw. He repeatedly failed to do so. Even with assistance and the easier burden of first grade, Carter continuously was unable to perform these functions despite numerous discussions with his supervisors and opportunities to comply. When his failures resulted in written reprimands, he responded by seeking medical leave. As a consequence, Carter

missed an extensive amount of work–over 60%.  His inability to appear for work and inability to complete tasks as directed establish that Carter could not perform the essential functions of his job.  He was not qualified to be a teacher at Michael Elementary School.  Therefore, he has failed to prove a *prima facie* case of disability discrimination.

In addition to proving that he was able to perform the essential functions of his job, Carter, to establish a *prima facie* cause of action of failure to accommodate a disability, must show that the NISD failed to provide accommodation.  ***Mzyk***, 397 Fed.Appx. at 15.  The June 18, 2010 meeting was held to address Carter's five requests.  He asked: (1) for a team plan with his grade level to discuss student progress and plan for the coming week, (2) to be assigned to a grade level that he is experienced in, such as 3rd, 4th, or 5th grade, (3) to allow his lesson plans to be turned in, or posted online, by Monday morning, (4) to eliminate weekly meetings with his supervisors, and (5) for reassignment to a different campus *with an administrator who would be understanding of my condition*.  **Motion for Summary Judgment**, exh. B11 (emphasis added).  The letter of Mark Hardison to Carter, dated July 15, 2010, reflected the results of that meeting.  **Id.**, exh. C6.  The letter states that (1) team planning is a practice currently in place at Michael Elementary School, (2) in accord with his wishes, Carter

would be assigned to a lower grade level for the next school year[2], (3) while Carter's lesson plans for Monday must be submitted by the Friday before, he can submit lesson plans for the days Tuesday through Friday on Monday morning, and (4) weekly meetings would not be held unless necessary.  The only request that was outright denied was Carter's desire to be transferred to another school.

When a qualified individual with a disability requests a reasonable accommodation, the employer and employee should engage in flexible, interactive discussions to determine the appropriate accommodation.  ***E.E.O.C. v. Agro Distrib.***, 555 F.3d 462, 471 (5th Cir. 2009).  Carter and the NISD did so in this case.  The June 18th meeting resulted in the granting of most of Carter's requests.  Only his desired accommodation for a transfer to another school, where he would not be supervised by Principal Shaw, was denied.

"The ADA provides a right to reasonable accommodation, not to the employee's preferred accommodation."  ***Griffin v. United Parcel Service, Inc.***, 661 F.3d 216, 224 (5th Cir. 2011), *quoting*, ***Agro Distrib.***, 555 F.3d at 471.  While "reasonable accommodation" may include reassignment to a vacant position, 42 U.S.C. § 12111(9), as evidenced by Carter's transfer to a first grade teaching position, "reasonable accommodation" under the ADA does not include

---

[2]First Grade required less paperwork and no standardized testing.  Also, the grade level team wrote the first grade's lesson plans for all core subjects, leaving Carter with the limited responsibility of personalizing the plans for his particular classroom.

reassignment to a different supervisor. *Ghoston v. Nissan North America, Inc.*, 2008 WL 879737, at *7 (S.D.Miss. 2008). *See Weiler v. Household Finance Corp.*, 101 F.3d 519, 526 (7th Cir. 1996)(a transfer away from particular supervisors or co-workers is not required as a "reasonable accommodation" under the ADA). The Court concludes that Carter has failed to create a genuine issue of fact regarding his allegation that the NISD failed to accommodate his disability. For this reason, as well as the fact that Carter was unable to perform the essential functions of the position, he has failed to present a *prima facie* case that the NISD failed to accommodate his disability.

Assuming Carter could establish a *prima facie* case under either theory of discrimination, the burden then shifts to the NISD to articulate some legitimate, nondiscriminatory reason for its actions. *McDonnell Douglas*, 411 U.S. at 802. It has done so for all of the reasons discussed above. Carter repeatedly failed to perform the essential functions of his job, despite being given the assistance of NISD personnel. His response to reprimands for those failures was extended medical leave which further precluded him from performing the essential functions of his work. No genuine issue of fact exists regarding the existence of disability or accommodation discrimination.

**3. Retaliation Discrimination**

Carter also claims that the District retaliated against him.

25

To make a *prima facie* case of retaliation under the ADA, he must demonstrate that: (1) he engaged in protected activity, (2) an adverse employment action occurred, and (3) a causal link exists between the protected activity and the adverse employment action. **Roberts v. Unitrin Specialty Lines Ins. Co.**, 405 Fed.Appx. 874, 881 (5th Cir. 2010). Undoubtedly, Carter engaged in protected activity when he filed his EEOC complaint of disability discrimination on April 26, 2010. On June 21, 2010, Carter amended his EEOC complaint to allege retaliation in the denial of reasonable accommodations. On January 10, 2011, Carter filed another EEOC charge of discrimination, alleging further retaliation when he received two official reprimands, three observations by supervisors, and two required meetings with administration. Also, Carter asserts that he was told they would not recommend him for renewal of his contract based upon his performance and these reprimands.

To establish the second prong of his *prima facie* retaliation case, Carter must establish that the reprimands, observations, and meetings were an "adverse employment action." With respect to a claim of retaliation, he must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination. **Burlington N. & Santa Fe Ry. Co. v. White**, 548 U.S. 53, 68 (2006). Carter has made

no attempt to do so.  Because the challenged action must be
"materially adverse," even after *Burlington Northern*, allegations
of unpleasant work meetings, verbal reprimands, and unfair
treatment do not constitute actionable adverse employment actions
for a retaliation claim.  *King v. Louisiana*, 294 Fed.Appx. 77, 85
(5th Cir. 2008); *Chapa*, 2012 WL 3062781, at *14, n.6.  Because the
reprimands, observations, and meetings would not dissuade a
reasonable worker from making or supporting a charge of
discrimination, they do not constitute an adverse employment action
as required to establish a *prima facie* case of retaliation.

Carter has also failed to show a causal connection between the
protected activity and the alleged adverse employment action.  As
the NISD observes, the reprimands, observations and meetings that
Carter endured after he filed his initial April 2010 EEOC
complaint, were prompted by the same types of infractions and
failures for which he received reprimands and poor evaluations
before he filed an EEOC claim.  *See Silverman v. Board of Educ. of
Chicago*, 637 F.3d 729, 743-44 (7th Cir. 2011)(finding no
retaliation when employee's negative evaluations were consistent
both before and after complaint of discrimination filed); *Collier
v. Charlottesville School Bd.*, 218 Fed.Appx. 244, 245 (4th Cir.
2007).  As for Carter's claim of constructive discharge, Principal
Shaw recommended non-renewal of his contract based upon Carter's
numerous deficiencies, described above, which deficiencies began

before he ever filed a charge of discrimination.  Thus, Carter has failed to establish a *prima facie* case of retaliation discrimination.  Additionally, assuming *arguendo* that he has, the NISD, for the reasons stated above, has articulated legitimate, nondiscriminatory reasons for the actions it took.

## 4. Constructive Discharge

The only arguable adverse employment action suffered by Carter was his alleged "constructive discharge."  To succeed on a constructive discharge claim, Carter is required to show working conditions so intolerable that a reasonable person in his position would have felt compelled to resign.  ***Nassar v. University of Texas Southwestern Medical Center***, 674 F.3d 448, 453 (5th Cir. 2012). Constructive discharge claims are essentially hostile work environment claims but more extreme.  ***Id.***  He must prove the existence of an aggravating factor, such as (1) demotion; (2) reduction in salary; (3) reduction in job responsibility; (4) reassignment to menial or degrading work; (5) reassignment to work under a younger supervisor; (6) badgering harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (7) offers of early retirement or continued employment on terms less favorable than the employee's former status.  ***Id.***

Nothing in the summary judgment evidence, including Carter's deposition, indicates that Carter was subjected to extreme or

intolerable working conditions.  None of the aggravating factors cited above existed.  The NISD set a hearing regarding the recommendation that Carter's contract not be renewed for the next school year.  Carter voluntarily chose to waive that hearing and resign his position as a teacher at Michael Elementary School.  He testified that he decided to resign because he could not get the accommodations he requested and because it was less damaging than being "non-renewed."  **Response**, exh. A, p. 83.  As discussed above, the only accommodation Carter did not receive was his request for a transfer.  Working conditions were not so intolerable that a reasonable person in his position would have felt compelled to resign.  No evidence exists that Carter was constructively discharged.

### <u>Recommendation</u>

It is, therefore, the recommendation of the Magistrate Judge that the motion of the NISD for summary judgment be **GRANTED**.

### Instructions for Service and<br><u>Notice of Right to Object</u>

The District Clerk shall serve a copy of this Memorandum and Recommendation on all parties either electronically or by mailing a copy by certified mail, return receipt requested.  Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b)(2), Fed.R.Civ.P., any party who desires to object to this Memorandum and Recommendation must serve and file specific written objections within 14 days after being

served with a copy. **Such party shall file the objections with the District Clerk and serve the objections on all other parties and the Magistrate Judge.**  A party's failure to file written objections to the findings, conclusions, and recommendations contained in this report within 14 days after being served with a copy shall bar that party from *de novo* review by the District Judge of those findings, conclusions, and recommendations and, except on grounds of plain error, from appellate review of factual findings and legal conclusions to which the party did not object, which were accepted and adopted by the District Court.  *Thomas v. Arn*, 474 U.S. 140, 150 (1985); *Douglass v. United Services Automobile Association*, 79 F.3d 1415, 1428-29 (5th Cir. 1996).

   **SIGNED** August 10, 2012.

_____
JOHN W. PRIMOMO
UNITED STATES MAGISTRATE JUDGE